## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; and PLANNED PARENTHOOD ASSOCIATION OF UTAH, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES; and CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> Defendants. | Case No. 1:25-cv-11913 |

## COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs Planned Parenthood Federation of America, Inc., on behalf of itself and all 47 of its members, as well as two of those members, Planned Parenthood League of Massachusetts and Planned Parenthood Association of Utah, allege in support of their Complaint for Declaratory and Injunctive Relief as follows:

## NATURE OF THE ACTION

1.      This is a challenge to Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 (the "Defund Provision"),[1] to vindicate rights secured by the Constitution's Bill of Attainder Clause and by the First and Fifth Amendments to the United States Constitution.

2.      The clear purpose of the Defund Provision is to categorically prohibit health centers associated with Planned Parenthood from receiving Medicaid reimbursements.  The prohibition specifically targets Planned Parenthood Federation of America ("PPFA") and its member health care providers (collectively, the "Members" and each individually, a "Member") in order to punish them for lawful activity, namely advocating for and providing legal abortion access wholly outside the Medicaid program and without using any federal funds.

3.      Anti-abortion politicians have targeted PPFA and its Members (collectively, "Planned Parenthood") for decades, and the history and context of the Defund Provision underscores that the purpose of this law is to punish Planned Parenthood by blocking its Members from providing and being reimbursed for care through the Medicaid program.  The Defund Provision targets Planned Parenthood Member providers by expressly limiting its application to abortion providers that are non-profits that primarily provide family planning services, and

---

[1]      *Available at* https://www.congress.gov/bill/119th-congress/house-bill/1/text.

COMPLAINT

received more than $800,000 in Medicaid reimbursements in fiscal year 2023—a set made up almost entirely of Planned Parenthood Members.  And if there were any doubt, President Trump, Speaker Johnson, and their allies have been promising to "defund Planned Parenthood" for years now.  That is what the Defund Provision does.

4.    If allowed to take effect and prevent Planned Parenthood Members from providing care to the almost 80 million Americans who rely on Medicaid for their essential health care needs, the Defund Provision will have devastating consequences nationwide.

5.    With a history going back over 100 years, PPFA and its 47 independent Members play an essential role in the delivery of health care to millions of people in the United States. Planned Parenthood envisions a world of equity: where sexual and reproductive rights are basic human rights, where access to health care does not depend on who you are, where you live, or your ability to pay, and where every person has the opportunity to choose their own path to a healthy and meaningful life.  All Planned Parenthood organizations are driven by this mission to ensure access to sexual and reproductive health care and rights, including abortion care.

6.    As detailed below, Planned Parenthood Members are at the forefront of providing high-quality reproductive health care to individuals and communities facing serious barriers to obtaining such care—especially individuals with low incomes, individuals in rural and other medically underserved areas, and individuals of color.  Planned Parenthood Members operate nearly 600 health centers across the Nation and serve over 2,000,000 patients each year, providing vital health care services such as contraception, cancer screenings, testing and treatment for sexually transmitted infections ("STIs"), gender-affirming hormone therapy, and abortion services.

7.      Planned Parenthood Members have been a critical part of the Medicaid program for decades, providing preventive and life-saving health care to eligible low-income patients across the nation.  More than 1,000,000 patients each year receive health care services at Planned Parenthood Member health centers through Medicaid.  Consistent with their mission-driven commitment to provide high-quality sexual and reproductive health care to all people, regardless of their ability to pay, no Planned Parenthood Member limits the number of Medicaid patients it will treat.[2]  At a time when low reimbursement rates lead many health care providers to either effectively limit the number of Medicaid patients they serve or not participate in Medicaid at all, in many communities, a Planned Parenthood Member health center is the only place where individuals can receive sexual and reproductive health care services through the Medicaid program.  For this reason, losing the ability to choose a Planned Parenthood Member health center as their Medicaid provider will be devastating for Medicaid patients across the country.

8.      If the Defund Provision is not enjoined, the consequences will be catastrophic for Planned Parenthood Members, each of which is a non-profit health care provider with a mission of ensuring that every person has access to sexual and reproductive health care and education, and as a result will harm health care access among non-Medicaid patients too.  More than 50% of Planned Parenthood Member patients rely on Medicaid to access essential health services.  In federal fiscal year 2023, more than one-third of Members' total aggregate revenue was from Medicaid reimbursement for health care services the Members provided.  Because of the great unmet need for high-quality Medicaid providers of sexual and reproductive health care, some of

---

[2]      Planned Parenthood Members participate in Medicaid programs in every state where they are able, a total of forty-six of forty-seven Members across forty-three states.

those Members received the vast majority (over three quarters) of their health services revenue from Medicaid reimbursements that year. Stripping away this patient volume and reimbursements for care provided will result in the elimination of services, laying off staff, and health center closures. The public health consequences for Medicaid patients and non-Medicaid patients alike will be dire and compounding.

9.     The Defund Provision emphatically does *not* address federal funding for abortion. For more than four decades, federal law has prohibited health care providers from using federal funds for abortions (subject to extremely narrow exceptions) and that has been true for the entirety of Planned Parenthood Members' participation in Medicaid. Thus, this statute must be doing something more—and it is. The Defund Provision is a naked attempt to leverage the government's spending power to attack and penalize Planned Parenthood and impermissibly single it out for unfavorable treatment. It does so not only because of Planned Parenthood Members' long history of providing legal abortions to patients across the country, but also because of Planned Parenthood's unique role in advocating for policies to protect and expand access to sexual and reproductive health care, including abortion.

10.     There is no legitimate justification for the statute; rather, the true design of the Defund Provision is simply to express disapproval of, attack, and punish Planned Parenthood, which plays a particularly prominent role in the public debate over abortion and (if Planned Parenthood's Members are treated collectively) is the only nationwide abortion provider. Supporters of the Defund Provision, including President Trump and members of Congress, have made this point unmistakably clear.

11.    For these reasons, the Defund Provision's exclusion of Planned Parenthood Members from a program designed to provide high-quality medical care to the Nation's neediest patients—care that Planned Parenthood Members have delivered for decades—is unconstitutional as to all Planned Parenthood Members as a Bill of Attainder and it also violates Plaintiffs' Equal Protection and First Amendment rights.

12.    In the alternative, if the Defund Provision is allowed to remain in effect as to any Planned Parenthood Member, it should be held not to apply to those Members who do not independently meet each of the required statutory triggers for defunding.  It is clear that Congress intended to punish Planned Parenthood Members for their unique role in providing abortions and to defund *all* entities associated with Planned Parenthood for their participation in a visible and unique membership association with a shared mission of abortion advocacy.  However, the enacted language is actually more narrow, likely because Congress misunderstood Planned Parenthood's structure.  By its terms, the Defund Provision applies only to entities that meet the statutory requirements for being a "prohibited entity" and entities that have a relationship of ownership or control with those "prohibited entit[ies]."  No such relationship exists between PPFA and any of its Members.  Indeed, if not construed this way, the Defund Provision is an unconstitutional attack on the associational rights of those Planned Parenthood Members who do not independently meet the trigger, by forbidding them from being reimbursed for Medicaid care based solely on their association with other Planned Parenthood Members providers despite a lack of any relationship of ownership or control.  At best, the Defund Provision is unconstitutionally vague as applied to those Members on this point, and they will have no choice but to stop seeking Medicaid

reimbursement absent direction from the Court, lest they otherwise face the untenable risk of arbitrary enforcement.

13.     If not enjoined, the Defund Provision will devastate Planned Parenthood Members, their patients, and the broader public health of the Nation.  If allowed to take effect and construed to apply to all Members, the Defund Provision will jeopardize care for the more than 1,000,000 patients per year who receive care from Planned Parenthood Members through the Medicaid program—with many of those patients losing access to health care altogether.  Many Planned Parenthood Members will be required to lay off staff and curtail services, with serious adverse consequences for the many patients served at those centers even if they do not use Medicaid to access services.  Worse still, Members may be forced to shutter a substantial number of their health centers nationwide, many of which are in rural or underserved areas without alternative providers. And even where alternative providers are theoretically available, those providers, who are already stretched to capacity, often do not offer the same comprehensive sexual and reproductive health service options, have long wait times for patients, and cannot accommodate the huge influx of patients who would need to find a new provider of care.

14.     The adverse public health consequences of the Defund Provision will be grave.  The elimination or reduction in access to sexual and reproductive health care across the Nation is likely to lead to increased rates of undiagnosed and untreated STIs and cancer, as well as increased rates of unplanned pregnancies and abortions.  Moreover, individuals with low incomes, who live in medically underserved or rural areas, and who are Black, Latinx, or members of other communities of color will disproportionately feel those consequences.

COMPLAINT

15.     Thus, to remedy the multiple violations of their constitutional rights and to prevent irreparable harm to themselves and to the millions of individuals whose health care would be jeopardized, Plaintiffs seek declaratory and injunctive relief to prevent the Defund Provision from remaining in effect.  In the alternative, Plaintiffs seek declaratory and injunctive relief to ensure that Planned Parenthood Members that do not independently qualify as "prohibited entit[ies]" under the statute are able to continue submitting and receiving Medicaid reimbursements.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. § 702.  *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 57-58 (1st Cir. 2007); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006).

17.     The Court is authorized to issue the relief sought here under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the inherent equitable powers of this Court.  This Court has inherent equitable power to enjoin executive conduct that violates the Constitution.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (noting that federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials").

18.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e).  Plaintiff Planned Parenthood League of Massachusetts ("PPLM") resides in this district, and a substantial part of the events or omissions giving rise to this action occurred in this district.  PPLM is headquartered in Boston, Massachusetts; it operates four health centers—in Boston, Worcester, Marlborough,

and Springfield—that participate in the Medicaid program but which are barred from receiving federal Medicaid reimbursements under the Defund Provision.

## PARTIES TO THE ACTION

19.    **Plaintiff Planned Parenthood Federation of America** is a 501(c)(3) not-for-profit corporation organized under the laws of New York.  PPFA is a membership organization with 47 Members that have health centers in 47 states and the District of Columbia, as well as a telehealth presence in all 50 States.  PPFA and its Members share a mission of ensuring that regardless of income, insurance, gender identity, sexual orientation, or race, people can receive high-quality, inclusive, and comprehensive sexual and reproductive health care.  PPFA does not itself provide any health care but provides support to 47 Members that do, as explained below.

20.    Planned Parenthood Members provide medical services through nearly 600 health centers across the nation and serve millions of people each year by providing a wide range of sexual and reproductive health care, as well as other care.  An estimated one out of every three women and one in ten men nationally has received care from a Planned Parenthood Member at least once in their life.

21.    PPFA and its Members, along with national, state, and local Planned Parenthood 501(c)(4) social welfare organizations, have long been at the forefront of the movement for sexual and reproductive rights, advocating at the federal, state, and local levels to expand abortion access.  As the nation's leading advocates for sexual and reproductive health care and education, Planned Parenthood organizations advocate at the federal, state, and local levels to protect and expand access to services and information.  This includes pushing to codify the rights to abortion and contraception, block abortion bans, repeal the Hyde Amendment, and ensure access to emergency

COMPLAINT

contraception and medication abortion. Planned Parenthood Action Fund, a related 501(c)(4) organization, seeks to hold members of Congress politically accountable through its congressional scorecard, communicating with and activating constituents to educate their lawmakers about the importance of sexual and reproductive health care. Planned Parenthood Members and their related 501(c)(4) organizations play a similar role in state legislatures across the nation. Since the Supreme Court's ruling in *Dobbs*, Planned Parenthood Action Fund and Members' related 501(c)(4) organizations have actively supported successful campaigns for reproductive freedom ballot initiatives. Separately, Planned Parenthood Action Fund and other national and local Planned Parenthood advocacy and political organizations work to elect federal, state, and local officials who will support reproductive freedom and abortion access. Planned Parenthood Members, and when appropriate PPFA, are active litigants fighting to secure abortion access and rights for their patients in federal and state courts across the country.

22.    PPFA and its Members provide education and information to Members' patients and the general public about sexual and reproductive health, risks, and preventive measures, reaching approximately 1.3 million individuals in person with education and information in their communities—and even more people online. Planned Parenthood Member educators also train teachers, school staff, and other youth-serving professionals within their communities on critical topics such as age-appropriate youth pregnancy prevention and STI prevention.

23.    PPFA sues on behalf of itself and all of its Members. By excluding Planned Parenthood Members from Medicaid reimbursements, the Defund Provision injures PPFA. Patients have come to know and trust the Planned Parenthood name, and understand that they can count on Planned Parenthood Members for some of their most sensitive health care needs. The

COMPLAINT

exclusion will force its Members to abruptly withdraw care from patients who depend on Medicaid—that is, more than half of all Planned Parenthood Member patients—and compel the closure of health centers on which patients depend.  Not only will this harm the Planned Parenthood name and reputation, but ultimately, the exclusion strikes at PPFA's and its Members' shared mission of ensuring the provision of sexual and reproductive care, including abortion care, providing related educational services, promoting research on sexual and reproductive health, and advocating for public policies that guarantee access to such services.  All of these injuries stem from the enforcement of the Defund Provision, and all are redressable by a judicial declaration and injunction.  PPFA therefore has standing in its own right to challenge the exclusion, which drains the organization's resources and impairs its ability to carry out its mission.  *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395-98 (4th Cir. 2024).

24.    PPFA also has standing on behalf of its Members who participate in the Medicaid program because (1) its Members would otherwise have standing to sue in their own right; (2) the interests PPFA seeks to protect are germane to its purposes; and (3) neither the claims asserted, nor the relief requested, requires the participation in this lawsuit of each individual Planned Parenthood Member.

25.    **Plaintiff Planned Parenthood League of Massachusetts** is a 501(c)(3) not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts.  Its principal office is in Boston, Massachusetts.  PPLM operates four health centers in Massachusetts in Boston, Worcester, Marlborough, and Springfield; and a virtual health center that offers telehealth services via phone and video.

26.     PPLM is a separately incorporated, independently operated organization and a Planned Parenthood Member.

27.     PPLM delivers health care to more than 30,000 patients each year.  In 2024, PPLM provided patients with more than 20,500 birth control methods, including nearly 5,000 long-acting reversible contraceptives ("LARCs"), which are the most effective forms of birth control.  In that same year, PPLM performed more than 65,000 STI tests, which represents a substantial portion of the STI tests performed in Massachusetts.

28.     PPLM also provides its patients critical health education, especially about breast and cervical cancer screening, diagnosis, follow-up, and referral to medical specialists in the community.  PPLM provides health education services to the general public as well, offering age-appropriate and medically accurate sexual education programs in public schools and in the broader communities in which PPLM operates.

29.     Massachusetts is in great need of the services that PPLM provides.  Two of PPLM's health centers are in communities classified by the federal government as Medically Underserved Areas ("MUAs"), and three of PPLM's health centers are in communities classified by the federal government as Medical Care Health Professional Shortage Areas ("HPSAs").[3]  A substantial part of PPLM's education services are provided to individuals in communities experiencing significant health disparities. PPLM's health centers offer early morning, limited evening, and weekend hours along with walk-in appointments and same-day contraception, including highly effective LARCs.

---

[3]     HPSAs are designated by the Health Resources and Services Administration ("HRSA"), an agency of the U.S. Department of Health and Human Services ("HHS"), as having shortages of primary medical care, dental or mental health providers.  MUAs have a shortage of primary care health services for residents within a geographic area.

COMPLAINT

30.    A core part of PPLM's mission is to provide sexual and reproductive health care, including abortion, to individuals with low incomes.  In 2024, PPLM provided services to approximately 10,822 patients—nearly 35% of PPLM's patient base—who were enrolled in Medicaid.  In 2024 alone, PPLM provided through Medicaid more than 5,237 units of contraception (including 1,255 LARCs), 242 cervical screenings, 257 breast cancer exams, and 21,463 STI tests (yielding over 500 positive results that would have otherwise gone undiagnosed). In 2024, PPLM received a significant portion of its patient revenue (approximately 39%) from Medicaid reimbursements.

31.    PPLM clinics in recent years have served a significant portion of patients who seek reproductive health care from publicly funded clinics in Massachusetts, including 54% of Massachusetts patients that received family planning services through Medicaid.

32.    In 2024, PPLM referred more than 2,100 patients to other providers for a variety of types of care, including diagnosis and management of chronic diseases including cancer, diabetes, cardiovascular disease, mental health, obstetric and breast specialist care, human immunodeficiency virus ("HIV") care, infertility, and dermatology.  Many of those patients initially came to PPLM health care centers for other needs in addition to family planning services, and would likely not have received treatment for their illnesses if not for the PPLM staff, who were able to accurately diagnose their conditions and connect them with appropriate medical professionals.  PPLM also engages in advocacy activities to protect and expand access to sexual and reproductive health care, including abortion, and education.

33.    PPLM brings this action on behalf of itself and its patients.

COMPLAINT

34.    **Plaintiff Planned Parenthood Association of Utah ("PPAU")** is a 501(c)(3) not-for-profit corporation organized under the laws of Utah.  Its principal office is in Salt Lake City, Utah.  PPAU operates six health centers across the State of Utah, located in Ogden, Orem, Salt Lake City (which has two health centers), South Jordan, and West Valley City.  PPAU also offers some types of care through telehealth.

35.    PPAU is a separately incorporated, independently operated organization and a Planned Parenthood Member.

36.    PPAU provides a full range of sexual and reproductive health services, including well-person preventative care visits; breast exams; pap tests; STI testing; a wide range of U.S. FDA-approved contraception methods, including highly effective, long-acting reversible contraceptives; pregnancy testing; risk assessments for pregnant patients to screen for high-risk issues; referral services for pregnant patients; urinary tract infection treatment; cervical cancer and testicular cancer screening; fertility awareness services; vasectomies; and abortions.  All of PPAU's health centers generally offer same-day appointments and walk-in availability, and two of PPAU's health centers generally offer weekend, early morning, and evening hours.

37.    In 2024, PPAU provided health care to nearly 30,000 patients through more than 44,000 total visits to its health centers, including 19,341 birth control pills, 2,278 implantations of intrauterine devices, 12,303 pregnancy tests, 89 vasectomies, 1,592 pap tests, and 2,676 abortions.

38.    PPAU also provides comprehensive education about sexual and reproductive health. Through its research-based education programs, PPAU works to provide all Utahns with the accurate, reliable information they need to make responsible decisions and stay healthy. In 2024, PPAU's educators reached 5,106 individuals throughout Salt Lake County, Utah County,

and Summit County.  Four of PPAU's health centers are in communities classified by the federal government as HPSAs.

39.    Like all other eligible Planned Parenthood Members throughout the country, PPAU is a Medicaid-enrolled provider.  PPAU provides health care to patients who rely on Medicaid for health insurance and seeks reimbursement from Medicaid funds for the provision of eligible health care services.

40.    PPAU does not limit the number of Medicaid patients it serves.  Of the nearly 30,000 patients PPAU served in 2024, 2,096 were Medicaid-enrolled patients.  In federal fiscal year 2023, PPAU received $706,251 in Medicaid reimbursements.

41.    PPAU brings this action on behalf of itself and its patients.

42.    **Defendant Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services and is that agency's highest ranking official.  He is charged with overseeing the federal agency responsible for the Medicaid program and the Defund Provision.  He is sued in his official capacity.

43.    **Defendant U.S. Department of Health and Human Services** (including all subagencies over which HHS exercises legal control) is an executive department of the United States.

44.    **Defendant Mehmet Oz** is the Administrator for the Centers for Medicare & Medicaid Services.  He is charged with administering the Medicaid program and the Defund Provision.  *See* Section 71113(c) (appropriating funds "to the Administrator of the Centers for Medicare & Medicaid Services" "[f]or the purposes of carrying out this section").  He is sued in his official capacity.

45.    **Defendant Centers for Medicare & Medicaid Services** is an agency within the U.S. Department of Health and Human Services.

## THE RELATIONSHIP BETWEEN PPFA AND ITS MEMBERS

46.    PPFA is a mission-driven membership organization whose membership includes the 47 accredited Members.   Each Member is a separately incorporated 501(c)(3) organization with its own CEO, board of directors, staff, books, and operations.

47.    Under PPFA's governance structure, the PPFA Membership elects PPFA's Board of Directors; approves changes to PPFA's bylaws and membership standards; approves PPFA's long-range goals; and determines the amount each Member pays in annual dues.

48.    PPFA supports its Members in a variety of ways.  For example, PPFA administers the accreditation standards for the Membership, promulgates certain shared medical standards and guidelines, and provides leadership around certain shared policy and program initiatives.  PPFA also provides practical support such as technical assistance and consultant services, programmatic grants, and fundraising support.  While Members receive some grant and other funding through PPFA, overall, the vast majority of each Member's revenue comes from sources other than PPFA.

49.    In addition to maintaining separate corporate structures, PPFA and its Members maintain separate finances and day-to-day operations.  For example, PPFA and each member maintain separate general ledgers and file taxes separately from one another.  Each has separate payrolls and employee rosters, and PPFA has no role in its Members' respective staffing or employment decisions.

50.    PPFA membership is important to Members' ability to fulfill their missions.  PPFA licenses the use of the Planned Parenthood name and well-known trademark to each Member—a

name that sends a powerful message to the community that the Member stands for certain values and provides high-quality health care and educational services in furtherance of the shared Planned Parenthood mission.  Planned Parenthood Members are viewed in communities throughout the country as providing nonjudgmental, welcoming, and compassionate care to patients seeking health care, including sexual and reproductive health care.

51.    Planned Parenthood Members' structural independence means that no Member has control over the operations or decision-making processes of another.  The actions or policies of one Planned Parenthood Member do not legally or operationally bind the others.

52.    PPFA does not exercise control over any Member, or vice versa.

**PLANNED PARENTHOOD MEMBERS' ROLE IN PROVIDING CRITICAL SEXUAL AND REPRODUCTIVE HEALTH CARE SERVICES IN THE UNITED STATES**

53.    Collectively, the 47 Planned Parenthood Members provide care to more than 2 million patients each year.  An estimated one in three women and one in ten men have received care from a Planned Parenthood Member.  This number is even higher among individuals with Medicaid, 43% of whom have received services from a Member health center.

54.    All Planned Parenthood Members offer a wide range of sexual and reproductive health care, including contraception (including LARCs), contraceptive counseling, preventive care visits, physical exams, clinical breast exams, screening for cervical and breast cancer, STI screening, testing and treatment, pregnancy testing and counseling, pre-exposure prophylaxis for HIV prevention, the HPV vaccine, and health education services.  Most Planned Parenthood Members offer gender-affirming hormone therapy.  Planned Parenthood Members also provide abortion in every jurisdiction where it is lawful to do so.

17

55.    For fiscal year 2023 to 2024, Planned Parenthood Members provided approximately 9,400,000 services to 2,080,000 patients who visited Planned Parenthood Member health centers.  Planned Parenthood Members' health centers provided more than 350,000 pap tests and breast exams, 5,100,000 STI tests and treatments, and 400,000 abortions.  Planned Parenthood Member health centers also provided 2,200,000 birth control services.

56.    Planned Parenthood Members' expertise and specialization in family planning, evidence-based practices, and technology often make their health centers the top choice for individuals seeking high-quality sexual and reproductive health care.

57.    Planned Parenthood Members are providers of compassionate, non-judgmental, and culturally sensitive care related to reproductive health and sexuality.  Topics of this sort can be highly sensitive for patients, some of whom may find it difficult to discuss issues of sexuality or to seek treatment for reproductive- or sex-related conditions, such as STIs.  Indeed, because of their concerns about privacy and being judged, many individuals use Planned Parenthood Members as their provider for sexual and reproductive health care services even when they use other providers for their other health care needs.

58.    Patients often find Planned Parenthood Member health centers to be much more accessible than alternative providers—to the extent alternatives are even available in their communities, which is often not the case.  Most Planned Parenthood Member health centers offer extended (early morning, evening, or weekend) hours.  The availability of extended hours and same-day appointments is particularly important for many patients with low incomes who often work long or extended hours and have childcare responsibilities, and do not have the flexibility to attend appointments during the traditional 9-to-5 workday.

COMPLAINT

59.    Planned Parenthood Member health centers are significantly more likely than other publicly funded family-planning clinics to use a variety of protocols that enhance contraceptive method initiation and continuation.  For example, a recent survey conducted by the Guttmacher Institute reported that 99% of Planned Parenthood Member health centers provided at least ten reversible contraceptive methods on-site, compared with 63 to 90% of other provider types surveyed.  Planned Parenthood Member health centers were also more likely than all other types of clinics to provide a LARC method of contraception.

60.    PPFA Members also play a critical role in responding to public health crises.  For example, Members expanded their use of telehealth, including for medication abortion, in response to the COVID-19 pandemic.

61.    And after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization* led to the implementation of abortion bans in many states and thus an abortion access crisis, Planned Parenthood Members opened health centers in states where abortion remained legal close to the borders of states with abortion bans and expanded staffing and hours in access states.

62.    In connection with its mission to ensure access to sexual and reproductive health care, including abortion care, PPFA is committed to supporting the advancement of research and technology in sexual and reproductive health.  For example, PPFA and its Members have led and participated in research concerning contraceptive methods as well as human papillomavirus ("HPV") vaccine completion, sharing this research in journal articles and presentations at medical and public health conferences.

## PLANNED PARENTHOOD MEMBERS' SERVICE TO
## UNDERSERVED AREAS AND COMMUNITIES

63.    PPFA and its Members share a critical mission to ensure access to sexual and reproductive and complementary health care, including abortion, to individuals and communities that historically have faced barriers to access.  Many of PPFA and its Members' educational outreach efforts make a special effort to reach individuals who live in underserved areas and/or have low incomes.

64.    In many communities throughout the country, a Planned Parenthood Member health center is the only place that a patient can turn to for high-quality, compassionate, and affordable sexual and reproductive health care.  74% of Planned Parenthood Member health centers are located in rural areas, HPSAs, or MUAs.

65.    Planned Parenthood Member health centers also play an increasingly critical role in serving communities of color and in many cases are the only health centers located in such communities.  In the 2023-2024 reporting period, approximately 34% of Planned Parenthood Members' patients were white, 27% were Latino/a, 17% were Black, 12% did not disclose their race or their race was unknown, 4% were Asian American/Pacific Islander, 0.5% were American Indian/Alaskan Native, 4% were another race, and 2% were multiracial.  As this data shows, Planned Parenthood Members serve a disproportionate number of patients of color as compared to the U.S. population.

66.    Planned Parenthood's role in serving communities of color is especially important given the barriers to care that such communities often face.  In particular, Planned Parenthood Member health centers are a critical source of care for Black and Latina women, who disproportionately face barriers to preventive health screening.  Nearly half of Black women in the

20

United States have been to a Planned Parenthood Member health center.  And in 2023, a greater percentage of Latina women (approximately 15%) were uninsured compared to women of any other racial or ethnic group, and more than 16% lived in poverty.  Along those same lines, 6.9% of Black women were uninsured, and 16.8% lived in poverty during the same span.

67.    Many Planned Parenthood Member health centers have bilingual or multilingual staff; many also have access to interpretation and translation services.  PPFA and its Members often provide educational materials in English, Spanish, and other languages spoken by the patients in the communities they serve.

**PLANNED PARENTHOOD MEMBERS' SERVICE TO MEDICAID PATIENTS**

68.    Since 1965, Medicaid has provided health coverage for eligible families and individuals with low incomes.  Medicaid is a joint federal-state program under which the federal government provides financial assistance to participating States to help them furnish care to persons in need.  No State is required to participate, but if it does, it must comply with a range of federal statutes and regulations and must administer the program in accordance with federal law.  Currently, all 50 States and the District of Columbia participate in Medicaid.

69.    Eligible individuals who receive Medicaid may choose to obtain care at participating health care providers.  Health care providers are not required to accept Medicaid, and many non-Planned Parenthood Member providers do not accept Medicaid patients at all, or effectively limit the number of Medicaid patients whom they will serve.  This is primarily because Medicaid reimbursement rates have historically been well below those of Medicare or private insurance rates.

21

70.    For participating health care providers, Medicaid typically works by reimbursement. Specifically, the health care provider cares for the Medicaid-enrolled patient and submits to the Medicaid program a claim for a reimbursement for the specific covered health care services provided, and the Medicaid program then reimburses the provider. The majority of the funding for Medicaid is provided by the federal government, but the program is administered at the state level, with the amount of state funding and the exact way in which the program is administered varying from state to state. States have the option to require cost-sharing (including deductibles and copays) from beneficiaries, but those cost-sharing requirements are generally nominal and cannot be imposed for family planning services.

71.    Each year, Planned Parenthood Members collectively serve approximately two million people, more than half of whom receive care through Medicaid. Planned Parenthood Members provide their Medicaid patients with comprehensive sexual and reproductive health care services, such as STI/HIV screenings and treatments, pelvic exams, and contraception, including LARCs.

72.    As a result of their commitment to serving Medicaid patients whom many other providers would not serve, Planned Parenthood Members received more than one third of their total revenue from Medicaid reimbursements in federal fiscal year 2023. Some Members received the vast majority (over three quarters) of their total revenue from Medicaid reimbursements that year. By participating in the Medicaid program, Planned Parenthood Members can serve low-income patients at no cost to those patients and are thus able to ensure access to sexual and reproductive health care for communities in need.

COMPLAINT

## PLANNED PARENTHOOD'S ADVOCACY FOR, AND PROVISION OF, ABORTION SERVICES

73.     Consistent with—and indeed critical to—their core missions of ensuring access to comprehensive sexual and reproductive health care for all, PPFA and its Members advocate for access to safe and legal abortion for individuals who wish to terminate a pregnancy, and Members in states where it is legal provide abortions.  Abortion services represent a small fraction (4%) of the total services offered by Members collectively and are offered only at some health centers. The vast majority of the services provided by Members are preventive sexual and reproductive health care services, such as STI testing and treatment and contraceptive services.

74.     When a patient comes to a Planned Parenthood Member health center because they may be interested in seeking an abortion, consistent with sound medical practice, Planned Parenthood Members provide educational information to the patient about all the options available to them, including the option of a safe and legal abortion.

75.     In many communities, a Planned Parenthood Member is the only abortion provider, or is the only place where an individual can obtain an abortion without traveling long distances.  The difficulty of obtaining an abortion is made worse by the fact that nineteen states have an abortion ban in effect.  As a result, health centers across these states have shuttered, making it more difficult for patients to access a variety of other health care, including preventative health services.  In 2024, 155,000 people traveled out of their home state for abortion care.

76.     For decades, federal law has prohibited the use of federal funds for abortions except in narrow circumstances (*i.e.*, where the pregnant person's life would be endangered by carrying to term, or where the pregnancy is the result of rape or incest).  No federal funds, including

Medicaid funds, are used to reimburse Planned Parenthood Members for abortion services except under the extremely limited circumstances authorized by federal law.

### LEGISLATIVE HISTORY REAFFIRMS THAT THE DEFUND PROVISION SPECIFICALLY TARGETS PLANNED PARENTHOOD

77.     For over a decade, President Trump and his political allies in Washington have tried to coerce Planned Parenthood Members into abandoning the provision of abortion care, and to penalize Members and PPFA for advocating for abortion access.

78.     While these efforts are commonly referred to as efforts to "defund" Planned Parenthood, it bears emphasis that there is no line item in the federal budget for Planned Parenthood.  Rather, Planned Parenthood Members, like any other health care providers in the Medicaid program, provide services to their patients and then typically submit a claim for reimbursements to Medicaid to cover those services.  What the Defund Provision does is bar certain Planned Parenthood Members from receiving federal Medicaid funds and thus, in effect, from providing health care through the Medicaid program.

79.     The Trump Administration and its political allies have tried to pass this bill before. In 2017, Congress considered—and narrowly rejected—a bill that included language nearly identical to the Defund Provision.  It was clear then that that language was intended to target Planned Parenthood, and it remains clear now.

80.     In fact, the failed attempt to pass the same law dates back a decade, to August 2015, when then-candidate Trump was asked whether he would support shutting down the federal government to "get rid of Planned Parenthood money."  President Trump replied, "I would … I think you have to in this case."

COMPLAINT

81.    One month later, Trump stated emphatically that he was "not supporting Planned Parenthood."  He added that he would be "totally opposed to funding" Planned Parenthood as long as they provided abortions.

82.    In February 2016, Trump stated in a debate that he would end federal funding for Planned Parenthood, asserting that he would "defund it because [he's] pro-life."

83.    In September 2016, Trump wrote a letter to "Pro-Life Leader[s]," indicating that he was "committed to … [d]efunding Planned Parenthood as long as they continue to perform abortions."  Fast forward four years and Trump again wrote to "Pro-Life Leaders and Activists," promising to "[f]ully defund the big abortion industry such as Planned Parenthood of our tax dollars."

84.    In May 2017, President Trump became the first sitting president to single out Planned Parenthood and call for its "defunding."

85.    During President Trump's first term in office, there were also frequent congressional efforts to "defund" Planned Parenthood.  The Republican-led House sought to repeal a rule barring state and local governments from withholding Title X—a federal grant program that covers the provision of family planning services—funds from family planning providers that, like Planned Parenthood Member health centers, offered full sexual and reproductive health care services, including abortions.  H.R.J. Res. 43, 115th Cong. (2017); Compliance with Title X Requirements by Project Recipients in Selecting Subrecipients, 81 Fed. Reg. 91852 (Dec. 19, 2016) (codified at 42 C.F.R. pt. 59).  That rule was a response to more than a dozen attempts by states to "defund" Planned Parenthood by way of excluding its Members from receiving public funds.

COMPLAINT

86.    Both the House and Senate tried to "defund" Planned Parenthood as part of their efforts to overhaul the Affordable Care Act ("ACA"). 42 U.S.C. § 18001 *et seq.* The "American Health Care Act of 2017" and its Senate analog, the "Better Care Reconciliation Act of 2017," proposed restricting access to Medicaid reimbursements from family planning providers that offer abortion services, using substantially the same language as the Defund Provision. American Health Care Act of 2017, H.R. 1628, 115th Cong. (2017); S. Amend. 267, 115th Cong. (2017). Although H.R. 1628 did not expressly mention Planned Parenthood then, just as the Defund Provision does not now, the bill's supporters acknowledged that the legislation was designed to target Planned Parenthood. For example, during the March 24, 2017, floor debate on H.R. 1628, Representative Matt Gaetz "implore[d] [his] conservative colleagues to vote for this bill" because it would result in "$1.15 trillion in spending cuts" and would "defund[] Planned Parenthood." 163 Cong. Rec. H2373, H2409 (daily ed. Mar. 24, 2017) (statement of Rep. Gaetz). He then asked, "How long have we been fighting to defund Planned Parenthood?" underscoring that "defunding" Planned Parenthood was one of the bill's key objectives. *Id.* Later that day, Representative Kevin Brady likewise stated, "I am proud to defund Planned Parenthood once and for all." *Id.* at H2433. H.R. 1628 passed the House but stalled in the Senate.

87.    As drafted, H.R. 1628's definition of "prohibited entity" largely tracked that in the Defund Provision. H.R. 1628 applied only to family planning providers that provide abortions and received more than $350 million in Medicaid funds in fiscal year 2014. That number was no accident, but rather yet more proof of the intended target of the bill: Planned Parenthood Members collectively received over $350 million in Medicaid funds that year. No other organization or association came close.

88.     Because the Senate parliamentarian determined that "prohibit[ing]" only "Planned Parenthood from receiving Medicaid funds for one year" violated a Senate rule (the Byrd Rule),[4] the bill was then revised so as to purportedly bring one other unidentified entity within its scope. In the Senate version of the bill, the threshold for qualification was reduced from $350 million to $1 million for the sole purpose of evading the restrictions of the reconciliation process. While the Parliamentarian inexplicably allowed the bill to move forward with that change, there is no question that the true purpose of that bill was to express disapproval of and to punish Planned Parenthood.

89.     Although these congressional efforts to ban Planned Parenthood from receiving federal funding ultimately failed in 2017, President Trump then sought to permit states to accomplish what he and Congress could not. In 2018, for example, President Trump's HHS Secretary revoked guidance that had prohibited states from excluding providers from eligibility for Medicaid reimbursement because they also provided abortions. Letter from Brian Neale, Director, Ctr. for Medicare & CHIP Servs., and Alec Alexander, Director, Ctr. for Program Integrity, to State Medicaid Dirs. (Jan. 19, 2018).

90.     During the Biden Administration, congressional efforts to "defund" Planned Parenthood continued. House members introduced bills that openly sought to "defund" Planned Parenthood unless it certified that it would not provide abortions. For example, H.R. 128, 118th Cong. (2023), the "Defund Planned Parenthood Act of 2023," introduced by Representative Lauren Boebert (Colorado), and H.R. 371, 118th Cong. (2023), "Defund Planned Parenthood Act

---

[4]     S. Comm. on the Budget, 115th Cong., Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff (July 21, 2017), https://www.budget.senate.gov/imo/media/doc/Background%20on%20Byrd%20Rule%20decisions_7.21[1].pdf.

COMPLAINT

of 2023," proposed by Representative Michelle Fischbach (Minnesota), sought to restrict any federal funding for Planned Parenthood, or any of its affiliates or clinics, for one year unless it certified that its affiliates and clinics would not perform, and would not provide funds to entities that perform, abortions during that year.  In a press release announcing H.R. 128, Representative Boebert stated, "[t]he nation's largest abortion provider has no business receiving taxpayer dollars."[5]  Similarly, Representative Fischbach stated of her bill, "[o]rganizations like Planned Parenthood receive millions of hard-earned taxpayer dollars every year to provide abortions on demand."[6]  Other bills, like H.R. 6176, 118th Cong. (2023), introduced by Representative Robert B. Aderholt (Alabama), simply aimed "to prohibit Federal funding of Planned Parenthood Federation of America."  Similar bills were introduced in the Senate.[7]

91.     And saying the quiet part out loud, entities politically opposed to abortion released ads and other materials seeking to defund Planned Parenthood's Members in part because of the work of its related electoral organizations.  For example, Susan B. Anthony Pro-Life America announced the launch of a six-figure TV and digital ad campaign that followed sensational accusations about Planned Parenthood's abortion services with the conclusion, "all while they spend hundreds of millions supporting Democrats.  Stop forced taxpayer funding of the Big

---

[5]     Press Release, Rep. Lauren Boebert Introduces the Defund Planned Parenthood Act (Jan. 20, 2023), https://boebert.house.gov/media/press-releases/rep-lauren-boebert-introduces-defund-planned-parenthood-act.

[6]     Press Release, Rep. Fischbach Introduces the Defund Planned Parenthood Act and Protecting Life and Taxpayers Act (Jan. 19, 2023), https://fischbach.house.gov/press-releases?ID=67C83E37-B8FF-4E7C-AC0B-4EB21AAE68F9.

[7]     *See, e.g.*, Defund Planned Parenthood Act, S. 203, 119th Cong. (2025) (introduced by Sen. Paul (Kentucky)); H.R. 271, 119th Cong. (2025) (introduced by Rep. Fischbach (Minnesota)); Protecting Funding for Women's Health Care Act, S. 177, 119th Cong. (2025) (introduced by Sen. Ernst (Iowa)); H.R. 599, 119th Cong. (2025) (introduced by Rep. Aderholt (Alabama)).

COMPLAINT

Abortion industry.  Defund Planned Parenthood."[8]  Students for Life Actions "National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion" included, as its "Week Five Theme" a suggestion that its members contact their Senators to tell them that "Planned Parenthood is funding their political enemies," and specifically that"[a]head of last November's elections, they spent $69.5 million bolstering pro-abortion President Joe Biden & leading congressional Democrats."[9]

92.    The second Trump Administration picked up its efforts to "defund" Planned Parenthood right where the first left off.  Project 2025, a proposed "governing agenda" for the Trump administration organized by the Heritage Foundation, encouraged Congress to pass the "Protecting Life and Taxpayers Act," which "would accomplish the goal of defunding abortion providers such as Planned Parenthood."  Although President Trump distanced himself from Project 2025 during his 2024 campaign, its proposed policies track President Trump's actions targeting Planned Parenthood during his first term in office, are in line with his stated intention to "defund" Planned Parenthood because it provides abortion services, and have now been implemented through the Defund Provision.

93.    These efforts to "defund" Planned Parenthood culminate now with the enactment of the Defund Provision, which comes as no surprise.  Speaker Johnson confirmed in 2024, before the current congressional term began, that "defunding" Planned Parenthood continued to be at the

---

[8]    Press Release, Six-Figure Ad Campaign Exposes How Big Abortion's Substandard 'Care' Harms Women & Girls (July 1, 2025), https://sbaprolife.org/newsroom/press-releases/six-figure-ad-campaign-exposes-how-big-abortions-substandard-care-harms-women-girls.

[9]    Join Students for Life's National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion,' Students for LifeAction, https://www.studentsforlifeaction.org/defund/.

COMPLAINT

top of the Republican agenda in the House.  In an interview with Fox News at the end of 2024, Speaker Johnson confirmed while discussing budget cuts, that he was planning to "axe" funding for Planned Parenthood.[10]  On April 29, 2025, during a keynote address at a fundraising event, Speaker Johnson reiterated, "In the weeks ahead, the House is going to be working on the one big, beautiful bill . . . .  And we're absolutely making it clear to everybody that this bill is going to redirect funds away from Big Abortion."[11]  "Big Abortion" has long been used by anti-abortion groups as a derogatory synonym for Planned Parenthood.

94.    Other Members of Congress have made similar statements.  For example, Representative Christopher Smith called for the "defunding of Planned Parenthood" to penalize it for performing abortions.  171 Cong. Rec. E255 (2025) (statement of Rep. Smith).  And despite acknowledging that defunding Planned Parenthood "doesn't save money," Representative Andy Harris called on Congress to include reconciliation language to defund Planned Parenthood because "[w]e shouldn't be paying for institutions whose primary purpose is to do abortions."[12]

95.    Congress has now chosen to defund Planned Parenthood in the same way that failed in 2017.  The Defund Provision initially started with the $1 million eligibility threshold where the 2017 bill left off, but was again scaled down—this time to $800,000—again to overcome the Byrd Rule.  To the best of Plaintiffs' knowledge, this lower eligibility threshold may mean that a small

---

[10]    Speaker Mike Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*, YOUTUBE (Dec. 4, 2024), https://www.youtube.com/watch?v=VOM5wRs1WFc.

[11]    SBA Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*, YOUTUBE (Apr. 29, 2025), https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794.

[12]    Alice Ollstein, *Knives Are Out for Planned Parenthood. In All 3 Branches of Government*, POLITICO (Feb. 13, 2025), https://www.politico.com/newsletters/politico-nightly/2025/02/13/knives-are-out-for-planned-parenthood-in-all-3-branches-of-government-00204234.

COMPLAINT

number of additional entities have been swept into the statute's coverage as collateral damage. But the intent remains the same: to defund Planned Parenthood.

## THE SWEEPING EFFECTS OF THE DEFUND PROVISION

### Section 71113: Text and Purpose

96.     Section 71113, enacted through the reconciliation process, is the latest attempt to single out and penalize Planned Parenthood.

97.     The Defund Provision bars federal Medicaid funds from being "used to make payments" to a "prohibited entity" "for items and services furnished during the 1-year period beginning on the date of the enactment of this Act."

98.     The Defund Provision applies only to entities that meet the statutory definition of a "prohibited entity" "as of the first day of the first quarter beginning after the date of enactment of this Act." But it prohibits federal funds from being disbursed "for items and services furnished during the 1-year period beginning *on the date of the enactment of this Act*." Accordingly, even if one cannot know if an entity will qualify as a "prohibited entity" until next quarter, such a "prohibited entity" would be prohibited from receiving Medicaid reimbursements for any services provided as of July 4, 2025.

99.     By design, the Defund Provision defines "prohibited entity" in such a way as to specifically target Planned Parenthood. In particular, the statute defines "prohibited entity" to mean an entity, "including its affiliates, subsidiaries, successors, and clinics," that meets four criteria:

31

COMPLAINT

(1) it "provides for abortions," other than abortions in the case of rape or incest or where the woman's life is in danger;

(2) it "is an organization described in section 501(c)(3) of the Internal Revenue Code … and exempt from tax under section 501(a) of such Code";

(3) it "is an essential community provider described in" 45 C.F.R. § 156.235 "that is primarily engaged in family planning services, reproductive health, and related medical care"; and

(4) "for which the total amount of Federal and State expenditures under the Medicaid program … in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000."

100.    PPFA itself does not provide health care, including abortion care, and has never received Medicaid funds.  Nor is it "an essential community provider."  PPFA is therefore not a "prohibited entity" under the statute.

101.    But the statute's criteria are specifically drafted to target Planned Parenthood Members.  When taken together, to the best of Plaintiffs' knowledge, all but a small number of the entities that satisfy these criteria—that provide abortions, are 501(c)(3) organizations, are essential community providers, and received more than $800,000 in Medicaid funds in fiscal year 2023— are Planned Parenthood Members.  And there is no indication that Members of Congress were even aware that any other entity could qualify under this statute that was clearly designed to target Planned Parenthood alone.

102.    Underscoring that Congress targeted Planned Parenthood—and Planned Parenthood alone—is the fact that nearly all other *abortion* providers fall *outside* the scope of a "prohibited entity" under the statute by design.  That includes providers that are not non-profit

COMPLAINT

organizations, that are not essential community providers that primarily provide family planning and reproductive health services, and/or that did not receive more than $800,000 in Medicaid funds in fiscal year 2023. All those providers remain eligible to receive Medicaid funds, while Planned Parenthood Members are prohibited from doing so.

103.    Some Planned Parenthood Members, including PPLM, independently satisfy the requirements of the Defund Provision, and therefore qualify as "prohibited entit[ies]" under the statute.

104.    Other Planned Parenthood Members, including Plaintiff PPAU, fall outside the scope of this definition because they do not provide abortion services or did not receive over $800,000 in Medicaid funds during fiscal year 2023.

105.    These ten Members (the "Non-Qualifying Members") are also not "affiliates, subsidiaries, successors, or clinics" of any prohibited entity. Each Planned Parenthood Member is a separately incorporated and independently governed non-profit organization, with its own finances, board of directors, and operational structure. As such, one Planned Parenthood Member does not exercise control over any other Planned Parenthood Member such that they could be considered affiliates of one another under the statute. Nor are Planned Parenthood Members controlled by PPFA.

106.    But these Non-Qualifying Members can take no comfort in the plain text of the statute. Given the decade-plus focus on "defunding" set out above, there can be no question that they face a serious risk that the Defendants will willfully misinterpret the statute to disqualify them from receiving federal Medicaid funding, based solely on their association with PPFA and other Planned Parenthood Members.

**The Devastating and Irreparable Impact of the Defund Provision on
Plaintiffs and the Patients and Communities Members Serve**

107.     If not enjoined, the Defund Provision will have devastating effects on PPFA, its
Members, and the patients and communities that Members serve.

108.     The Defund Provision will jeopardize care for the more than 1,000,000 Planned
Parenthood Member patients who rely on Medicaid—approximately 50% of Planned Parenthood
Member patients.  As a direct result of the law, patients are no longer able to use Medicaid to
receive services at Planned Parenthood Member health centers.  Many will not be able to find
alternative providers—and thus will lose access to care altogether.  Even those who may be able
to obtain care from an alternative provider will face delays and disruptions in care, which can be
particularly devastating to their health.

109.     The Defund Provision will irreparably harm Plaintiff PPLM and the patients it
serves.  Because PPLM currently meets the requirements to be a "prohibited entity" under the
Defund Provision, and that status will not change between now and the "first day of the first quarter
beginning after the date of enactment of this Act," PPLM has been forced to stop seeking Medicaid
reimbursement upon the Defund Provision's enactment.  *See* Section 71113 (barring federal
Medicaid funds from being "used to make payments" to a "prohibited entity" "for items and
services furnished during the 1-year period beginning on the date of the enactment of this Act").

110.     If the Defund Provision is not enjoined, Plaintiff PPLM will be forced to cease
providing services to its Medicaid patients.  PPLM has nearly 150 scheduled appointments for
Medicaid patients across its health centers on July 7 and July 8 alone, and has been reaching out
to inform these patients they cannot use their Medicaid coverage for services at PPLM.  PPLM is
discussing options with patients to try to ensure their access to care, but many of those patients

34

will likely be unable to find another provider or will face such lengthy wait times that they will be forced to forgo services. Early estimates indicate that the Defund Provision will cause PPLM to lose approximately 35-40% of its annual health care revenue. As a result, PPLM will be forced to make substantial reductions to services, programs, and staffing, potentially up to 20-25%, and ultimately may have no choice but to close some of its health centers altogether. This will deny care not only to its Medicaid patients, but *all* of its patients at those health centers.

111.    The Defund Provision will also irreparably harm Plaintiff PPAU and the patients it serves. Because PPAU's health centers cannot afford to provide health care services free of charge, if the Defund Provision is not prevented from going into effect, patients will no longer be able to receive health care services through the Medicaid program at PPAU's health centers. PPAU has already had to turn away Medicaid patients who had appointments in its health centers on Saturday, July 5. And many of PPAU's Medicaid-enrolled patients may be unable to find another provider of affordable, high-quality sexual and reproductive health care in their area, much less one that sees Medicaid patients.

112.    In addition to the harms to PPAU's patients, PPAU will also be immediately and irreparably harmed by the Defund Provision. In federal fiscal year 2023, PPAU received $706,251 in Medicaid reimbursements. Even though this means that PPAU does not independently qualify as a "prohibited entity" under the Defund Provision, due to the threat that the government could determine PPAU is a "prohibited entity" based on its association with other Planned Parenthood Members, PPAU has had no choice but to stop seeking Medicaid reimbursement.

113.    Losing this revenue will force PPAU to lay off full-time staff, limit the health care services it provides, and potentially close health centers as a result. When the federal government

35

COMPLAINT

recently withheld $2.8 million in Title X funds from PPAU—approximately 20% of its overall revenue—PPAU was forced to lay off eighteen full-time staff members (approximately 20% of PPAU's staff) and close two health centers (approximately 20% of its health centers). PPAU will likely similarly have to make proportionate cuts to its health centers and staff if it cannot seek Medicaid reimbursements. Being unable to serve Medicaid patients also makes it more difficult for PPAU to accomplish its mission of ensuring access for Utahns to sexual and reproductive health care.

114.    Other Planned Parenthood Members and their patients will also suffer. Where eligible, Planned Parenthood Members provide care to patients enrolled in Medicaid, and care for all of their Medicaid patients will be jeopardized for the same reasons. Most of those patients face serious barriers to health care, and many will be unable to find alternative providers.

115.    For example, patients in California face especially devastating impacts. There are seven Planned Parenthood Members located in California,[13] operating 114 health centers throughout the State. Each of the seven California Planned Parenthood Members independently meets the requirements of being a "prohibited entity" under the Defund Provision.

116.    The California Members collectively provide care to roughly 700,000 patients, across 1.3 million patient visits, each year. The California Planned Parenthood Members offer a range of sexual and reproductive health care services, including the provision of birth control, including emergency contraception; testing and treatment of sexually transmitted infections;

---

[13]    The seven members are: Planned Parenthood Northern California ("PPNorCal"); Planned Parenthood Mar Monte ("PPMM"); Planned Parenthood California Central Coast ("PPCCC"); Planned Parenthood Los Angeles ("PPLA"); Planned Parenthood Pasadena and San Gabriel Valley ("PPSGV"); Planned Parenthood Orange and San Bernardino Counties ("PPOSBC"); and Planned Parenthood Pacific Southwest ("PPPSW").

pregnancy testing and services; breast and cervical cancer screenings; gender-affirming care, and abortion. In addition, all seven California Planned Parenthood Members offer education and counseling on sexual and reproductive health, reaching over 100,000 Californians every year.

117.    Over 80% of Planned Parenthood Member patients in California rely on California's Medicaid program ("Medi-Cal") and its related programs for their health care coverage. Current budget estimates show that federal funds cover around 60% of the total Medi-Cal program expenditures.

118.    As a result of the Defund Provision, Medicaid payments will be prohibited for the vast majority of services that the California Members provide to the more than 25,000 patients their health centers serve every week. Medicaid payments constitute approximately two thirds of the California Members' collective revenue.

119.    Without immediate relief, the seven California Planned Parenthood Members will be forced to close health centers and reduce hours, staff, and services, and Californians—whether enrolled in Medi-Cal or not—will lose important points of access for their sexual and reproductive health care needs.

120.    Closures of California Planned Parenthood Members' health centers would mean that there will be fewer family planning providers in the Medi-Cal program, leading to longer wait times and more barriers to care as Californians may need to travel significant distances to receive in-person care.

121.    Such closures will likely leave many patients with no other options from which to receive the health care they need. In California, Planned Parenthood Member health centers see approximately half of all patients in California served at a publicly funded clinic. Federally

qualified health centers are already struggling to meet a rapidly increasing demand for services and will be unable to absorb Planned Parenthood Members' patients. The California Primary Care Association ("CPCA"), which represents the community clinics in California, has stated that these clinics do not have the capacity to take on Planned Parenthood Members' patients.

122.    Across the country, Planned Parenthood Members' patients with low incomes, patients in rural areas, patients who are not proficient in English, and patients of color will disproportionately suffer the consequences of the Defund Provision. Those patients and communities already face serious barriers to health care that would only worsen if they cannot use Medicaid to receive services at Planned Parenthood Members' health centers, including because health centers are forced to close and others are forced to limit their hours or curtail their services.

123.    Indeed, Planned Parenthood Members provide an extraordinary proportion of the Nation's publicly funded sexual and reproductive health services. Moreover, Planned Parenthood Member health centers focus on sexual and reproductive health services; other publicly funded health centers may offer a broad range of primary and acute medical services, but lack the strong focus on sexual and reproductive health and experience providing that care that Planned Parenthood Members have. Put simply, other publicly funded health centers, already stretched to capacity, will not be able to make up the drastic shortfall in coverage that will result from the Defund Provision. The statute will thus create an immediate health care crisis for hundreds of thousands of patients, if not more.

124.    The adverse public health consequences of the gap in services that will result from the Defund Provision will be grave, leading to significant adverse public health outcomes, including, among other things, higher rates of STIs and more unintended pregnancies.

125.    If not enjoined, the Defund Provision will frustrate PPFA's and its Members' mission to ensure access to sexual and reproductive health care services to individuals regardless of their ability to pay.  PPLM, PPAU, and other Planned Parenthood Members face the immediate prospect of having to turn away patients, curtail services, terminate employees, and close health centers.  Even if the Defund Provision is held unconstitutional at the end of this lawsuit, absent a temporary restraining order and preliminary injunctive relief, Planned Parenthood Members would not be able to resume relationships with the patients that they lost, reconstitute the programs and services that were terminated, or recall the employees that were essential to serving those patients. Planned Parenthood Members' patients will also be harmed by the loss of their health care provider of choice, and even if they are able ultimately to find an alternative provider, will suffer from a loss of continuity of care with their established provider.

126.    If Member health centers are forced to curtail services or close as a result of the Defund Provision they could not be reopened without extensive additional investment in infrastructure.  Thus, even if in future years Members are permitted to obtain federal Medicaid reimbursement, such funds would not be sufficient to provide Planned Parenthood Members the capital needed to renew services and reopen clinics for the patients that they would have lost as a result of the Defund Provision.

127.    Planned Parenthood Members have a reputation among the patients and the communities they serve for offering reliable and comprehensive health care.  The disruption in services and care offered by PPLM, PPAU, and other Members as a result of the Defund Provision will diminish their reputations as providers of reliable and comprehensive health care.  It has taken years for Planned Parenthood Members to build such reputational capital.  Indeed, many Planned

Parenthood Members have been in their communities for decades.  Once disrupted, such reputational capital cannot be readily rebuilt.

128.     These harms to PPLM, PPAU, and other Planned Parenthood Members across the Nation will also harm PPFA.  By preventing Planned Parenthood Member health centers from serving Medicaid patients and other vulnerable patients with low incomes across the Nation, the Defund Provision strikes at the heart of PPFA's core mission of ensuring access for all to sexual and reproductive health care, including abortion, regardless of patients' ability to pay.  Although PPFA does not directly operate health care centers, it will face substantial reputational, operational, and mission-related injury if the Defund Provision is not enjoined.

129.     PPFA, its Members, and their patients have no adequate remedy at law.

### CLAIMS FOR RELIEF

### COUNT ONE
### ARTICLE ONE: BILL OF ATTAINDER

130.     Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

131.     The Constitution instructs Congress that "[n]o Bill of Attainder … shall be passed." U.S. Const. art. I, § 9, cl. 3.

132.     The Act constitutes an unconstitutional bill of attainder because the Defund Provision specifies and punishes PPFA and its Members without a judicial trial.

133.     While the Defund Provision does not identify Planned Parenthood by name, it defines "prohibited entity" specifically to target Planned Parenthood.

134.     The Defund Provision also uses language nearly identical to that proposed, but not enacted, in 2017.  The history and context surrounding that version of the bill, which is functionally

40

the same as the Defund Provision now enacted with respect to who is a "prohibited entity," clearly indicates that it was intended to exclude Planned Parenthood, and Planned Parenthood alone, from the Medicaid program.  Events since 2017, as well as the history and context of the Defund Provision itself, also demonstrate that the challenged law was intended to target Planned Parenthood.

135.    The Defund Provision specifically punishes Planned Parenthood Members by making them ineligible for Medicaid reimbursement.

136.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## COUNT TWO
## FIFTH AMENDMENT: EQUAL PROTECTION

137.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

138.    The equal protection component of the Due Process Clause of the Fifth Amendment requires that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

139.    By its terms, the Defund Provision reaches only "prohibited entit[ies]," which is defined to encompass Planned Parenthood.  As the statute's supporters have confirmed in public statements, that definition is designed to single out Planned Parenthood.

140.    The Defund Provision purposefully treats Planned Parenthood Members unlike other organizations that provide the same medical care.  Others who provide abortion and also

41

COMPLAINT

receive Medicaid payments for Medicaid-covered care are not similarly targeted by the Defund Provision and are not prohibited from receiving Medicaid funds as a result.

141.    The Defund Provision targets Planned Parenthood Members for unequal treatment because of their association with PPFA and each other.  Such unequal treatment burdens Planned Parenthood Members' fundamental right to free association under the First Amendment.  In particular, the Defund Provision singles Planned Parenthood Members out for unequal treatment based on their association with other providers of lawful abortion and PPFA, and based on their advocacy for access to sexual and reproductive health care, including abortion.  The Defund Provision does not similarly restrict other abortion providers' associational rights.

142.    The Defund Provision does not further a compelling government interest.  And even if it did, it does not use the least restrictive available means.

143.    The Defund Provision also does not further an important government interest.  And even if it did, it is not substantially related to achievement of an important governmental objective.

144.    Moreover, the Defund Provision does not even bear a rational relationship to any legitimate government interest.  The Defund Provision's ban on reimbursing Planned Parenthood Members for their non-abortion-related care does not rationally relate to a possible government interest.  Far from a legitimate interest, the Defund Provision is animated solely by animus—a moral disapproval of the political views and lawful activities of Planned Parenthood.  *See Romer v. Evans*, 517 U.S. 620, 632 (1996).

145.    The Defund Provision violates the equal protection component of the Due Process Clause of the Fifth Amendment by irrationally singling out Planned Parenthood for unfavorable

treatment.  *See Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 325-28 (M.D.N.C. 2012).

146.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## COUNT THREE
## FIRST AMENDMENT: RETALIATION

147.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

148.    "Congress shall make no law … abridging the freedom of speech."  U.S. Const. amend. I.  Congress cannot "punish or suppress disfavored expression."  *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024).  Nor can it retaliate against such expression.  *See Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see also Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014) ("It is well established that political discrimination … , including retaliation for a contrary political opinion, violates the freedom of belief and association protected by the First Amendment.").

149.    To state a First Amendment retaliation claim, a plaintiff must allege that it "'engaged in constitutionally protected conduct,'" was "'subjected to an adverse [government] action,'" and that "'the protected conduct was a substantial or motivating factor in the adverse action'" such that retaliatory animus was the but-for cause of the injury.  *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514-15 (1st Cir. 2023).

150.    PPFA and its Members engage in First Amendment protected activity.  They do so by advocating for access to sexual and reproductive health care, including the right to safe and

legal abortion.  Members associate with PPFA and one another to speak and act collectively where appropriate, and in furtherance of their common goals, exercising the associative right "implicit in the right to engage in activities protected by the First Amendment."  *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).

151.    The Defund Provision qualifies as an action adverse to PPFA and its Members. Quite simply, the Defund Provision punishes Planned Parenthood Members for their association with each other and with PPFA by excluding them from Medicaid reimbursements that they would otherwise be qualified to receive.  Stopping the flow of millions of dollars in reimbursements for provided medical services would "'deter a reasonably hardy individual'" from associating with Planned Parenthood or from advocating for the sexual and reproductive rights and other causes that Planned Parenthood champions.  *McCue v. Bradstreet*, 807 F.3d 334, 339 (1st Cir. 2015).

152.    That is by design.  The Defund Provision is obviously motivated by more than the provision of abortion, otherwise it would cover all abortion providers and not just target Planned Parenthood.  The history and context of the Defund Provision make clear that it treats Planned Parenthood Members—each of which is an independent corporation with its own leadership, board, finances, and autonomous operations— differently from other health care providers.  The statute plainly defunds Planned Parenthood Members because of their participation in the nation's most high-profile membership association of abortion providers, known for its advocacy for abortion rights and access across the country.  Context confirms the retaliatory animus underlying the Defund Provision.  Over a decade worth of failed attempts and public statements demonstrate that Congress passed the Defund Provision to target Planned Parenthood.

COMPLAINT

153.    Accordingly, Plaintiffs are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**COUNT FOUR**
**REQUEST FOR DECLARATORY JUDGMENT**
**(on behalf of PPAU and the Non-Qualifying Members)**

154.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

155.    The Defund Provision excludes "prohibited entities" from receiving federal Medicaid funds.  The statute defines "prohibited entities" to include entities that, among other things, provide abortion services and received more than $800,000 in Medicaid reimbursements in fiscal year 2023.

156.    Planned Parenthood Members that do not provide abortions or did not receive over $800,000 in Medicaid funds in fiscal year 2023 are not themselves "prohibited entities" under the Defund Provision.

157.    Under the plain meaning of the statute, Planned Parenthood Members that do not provide abortions or did not receive over $800,000 in Medicaid funds in fiscal year 2023 are not "affiliates, subsidiaries, successors, or clinics" of "prohibited entities" under Section 71113.

158.    Planned Parenthood Members are not owned or controlled by PPFA or by each other.

159.    Therefore, the Defund Provision does not apply to Planned Parenthood Members that do not provide abortions or did not receive over $800,000 in Medicaid funds in fiscal year 2023.

COMPLAINT

160.    Despite this, there is a substantial risk that Defendants will interpret the Defund Provision to prohibit these Non-Qualifying Members from receiving Medicaid funding solely based on their association with PPFA and other Members, even though they do not meet the statutory criteria for exclusion.  Interpreting the Defund Provision to cover the Non-Qualifying Members is aligned with President Trump's stated goal to "defund" Planned Parenthood, and so is a predictable interpretation for the Defendants to adopt.

161.    Because of this risk, the Non-Qualifying Members that do not independently satisfy the requirements of "prohibited entities" under the Defund Provision will nonetheless be forced to cease seeking Medicaid reimbursement or else risk being subject to enforcement based on allegations that they filed unlawful claims for reimbursement.

162.    The Non-Qualifying Members seek a declaration that the Defund Provision does not apply to Planned Parenthood Members that do not provide abortion services or did not receive more than $800,000 in Medicaid reimbursements during fiscal year 2023, and that such Non-Qualifying Members are not considered "prohibited entities" or "affiliates, subsidiaries, successors, or clinics" thereof under the Act.

163.    Accordingly, the Non-Qualifying Members are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**COUNT FIVE**
**UNCONSTITUTIONAL PENALTY ON CONSTITUTIONALLY PROTECTED**
**ACTIVITY UNDER THE FIRST AMENDMENT**
**(PLED IN THE ALTERNATIVE TO COUNT FOUR)**
**(on behalf of PPAU and the Non-Qualifying Members)**

46

164.    Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

165.    The Defund Provision violates the First Amendment to the United States Constitution by imposing an unconstitutional condition on the Non-Qualifying Members that do not provide abortion services or did not receive over $800,000 in Medicaid funds in fiscal year 2023, including but not limited to Plaintiff PPAU.

166.    To the extent the Defund Provision purports to deny those Non-Qualifying Members a benefit—eligibility for federal Medicaid funding—based on their association with PPFA and other Members, it impermissibly infringes upon the Non-Qualifying Members' First Amendment right of association.  If interpreted to apply to the Non-Qualifying Members, the Defund Provision would require the Non-Qualifying Members to surrender their right to associate with PPFA and other Members in order to maintain their eligibility for Medicaid reimbursements. Absent disassociation from PPFA and the Members, the Non-Qualifying Members would be barred from receiving federal funds if any of their purported "affiliates" provide abortions and received more than $800,000 in Medicaid funds in fiscal year 2023—even though they themselves do not meet that definition.

167.    There is "implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *United States Jaycees*, 468 U.S. at 622.  The Defund Provision purports to deny Plaintiff PPAU and other Non-Qualifying Members the ability to associate with PPFA and other Members in their work in advocating for, and providing, sexual and reproductive health care for all, including abortion.

168.     Accordingly, the Non-Qualifying Members are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**COUNT SIX**
**FIFTH AMENDMENT: VAGUENESS**
**(PLED IN THE ALTERNATIVE TO COUNT FOUR)**
**(on behalf of PPAU and the Non-Qualifying Members)**

169.     Paragraphs 1 through 129 above are incorporated and reasserted as if fully set forth herein.

170.     Since "clarity in regulation is essential," the Due Process Clause of the Fifth Amendment "requires the invalidation of laws that are impermissibly vague." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  First, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And second, laws must not invite "arbitrary and discriminatory enforcement." *Id.*

171.     Laws that "abut[] upon sensitive areas of basic First Amendment freedoms" must rigorously adhere to these requirements to ensure ambiguity does not chill protected speech or association.  *Grayned*, 408 U.S. at 109; *see also Fox*, 567 U.S. at 253-54 ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.").

172.     The Defund Provision is impermissibly vague as applied to certain Planned Parenthood Members.  While the statute leaves no doubt that it targets Planned Parenthood, the statute does not clarify whether it reaches each and every Planned Parenthood Member.  The statute defines "prohibited entity" to include "affiliates, subsidiaries, successors, and clinics," yet the

48

statute leaves those terms undefined.  It is ambiguous whether the statute reaches Planned Parenthood Members who do not provide abortions.  It is also ambiguous whether the statute reaches Members who did not receive more than $800,000 from Medicaid in the 2023 fiscal year.  In short, the Defund Provision leaves certain Planned Parenthood Members guessing—at great risk to themselves and their patients—whether their association with PPFA and other Planned Parenthood Members will jeopardize their participation in Medicaid.

173.    To the extent the Defund Provision's prohibition may encompass the Non-Qualifying Members, the Defund Provision implicates their associational freedoms that the First Amendment protects.  Where a statute implicates First Amendment rights, it must rigorously adhere to the vagueness doctrine's notice requirement and its prohibition on enabling arbitrary or discriminatory enforcement.

174.    The Defund Provision does not reasonably specify whom it regulates.  As such, it does not provide reasonable notice, and it delegates to enforcement officials the discretion to determine who is eligible to receive millions in Medicaid reimbursements.  Therefore, the Defund Provision is void for vagueness as applied to the Non-Qualifying Members who do not provide abortions and/or who did not receive more than $800,000 from Medicaid in the 2023 fiscal year.

175.    Accordingly, the Non-Qualifying Members are entitled to a declaratory judgment, judgment awarding them preliminary and permanent injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court

a)      Issue a declaratory judgment that the Defund Provision violates the Bill of Attainder Clause of the United States Constitution;

b)      Issue a declaratory judgment that the Defund Provision violates the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution;

c)      Issue a declaratory judgment that the Defund Provision violates the First Amendment to the United States Constitution;

d)      Issue a declaratory judgment that the Defund Provision does not apply to Planned Parenthood Members that do not provide abortions or did not receive more than $800,000 in Medicaid funds in fiscal year 2023, and/or else that the Defund Provision is unconstitutional as applied to the Non-Qualifying Members because it violates their freedom of association and is unconstitutionally vague;

e)      Issue a declaratory judgment that the Defund Provision is not a lawful or proper basis for terminating Planned Parenthood Members from Medicaid programs.

f)      Issue a declaratory judgment that all Planned Parenthood Members may continue to seek and obtain reimbursements for eligible care provided to Medicaid recipients, and that requests for such reimbursements shall constitute lawful claims under Planned Parenthood Members' respective Medicaid Provider Agreements;

g)      Issue a declaratory judgment that Planned Parenthood Members are entitled to retain Medicaid reimbursements for eligible care provided to Medicaid recipients while an injunction is in place, even if such injunction is later reversed;

COMPLAINT

h)      Issue temporary, preliminary, and permanent injunctive relief, without bond, restraining the enforcement, operation, and execution of the Defund Provision, by enjoining Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants from enforcing, threatening to enforce, or otherwise applying the provisions of the Defund Provision against any Planned Parenthood Members, even if the injunction is later reversed, or for seeking and retaining Medicaid reimbursement for such services;

i)      Order Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants to take all steps necessary to ensure that Medicaid reimbursements continue to be disbursed to Planned Parenthood Members in the customary manner and timeframes, including reimbursements for services provided while an injunction is in place;

j)      Retain jurisdiction after judgment for the purpose of resolving any future disputes over the effect of any injunctive relief this Court may issue, including if injunctive relief is granted and later reversed;

k)      Award Plaintiffs their costs, attorney's fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

l)      Grant such further relief as this Court deems just and proper.

COMPLAINT

Dated:  July 7, 2025

Respectfully submitted,

/s/ Sharon K. Hogue

Emily Nestler*
PLANNED PARENTHOOD
  FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW
Washington, D.C.  20005
Tel.: (202) 973-4800
emily.nestler@ppfa.org

Sharon K. Hogue, BBO# 705510
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
sharon.hogue@wilmerhale.com

Jennifer Sandman*
C. Peyton Humphreville*
Kyla Eastling*
PLANNED PARENTHOOD
  FEDERATION OF AMERICA, INC.
123 William Street
New York, NY 10038
Tel.: (212) 441-4363
jennifer.sandman@ppfa.org
peyton.humphreville@ppfa.org
kyla.eastling@ppfa.org

Alan Schoenfeld*
Cassandra A. Mitchell*
Alex W. Miller*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com

Albinas J. Prizgintas*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
albinas.prizgintas@wilmerhale.com

*Application for pro hac vice forthcoming

Counsel for Plaintiffs

52

COMPLAINT

## CERTIFICATE OF SERVICE

Counsel for Plaintiffs certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated:  July 7, 2025

*/s/ Sharon K. Hogue*
Sharon K. Hogue, BBO# 705510

COMPLAINT