# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.; PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS; and PLANNED PARENTHOOD ASSOCIATION OF UTAH, | Case No. 1:25-cv-11913 |
| Plaintiffs, | Oral Argument Requested Expedited Hearing Requested |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MEHMET OZ, in his official capacity as ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES; and CENTERS FOR MEDICARE & MEDICAID SERVICES, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

STATEMENT OF THE CASE......................................................................................3

    A.      Planned Parenthood's Service To The Community.................................3

            1.      Planned Parenthood's mission, structure, and advocacy work ...................3

            2.      Planned Parenthood Members provide sexual and reproductive health care throughout the Nation...................................5

            3.      Service and reimbursement under the Medicaid program ...........................6

    B.      The Sweeping Purpose And Effect Of The Defund Provision: To Target And Punish Planned Parenthood...................................8

            1.      Legislative history of the Defund Provision ...............................8

            2.      The Defund Provision: text and purpose ...................................13

            3.      The devastating impact of the Defund Provision.......................................15

STANDARD OF REVIEW ..........................................................................................18

ARGUMENT ...............................................................................................................19

I.      Plaintiffs Are Likely To Succeed On The Merits Of Their Claims .................19

    A.      The Defund Provision Is An Unconstitutional Bill Of Attainder .........................19

            1.      The Defund Provision specifies Planned Parenthood..............................20

             2.      The Defund Provision punishes Planned Parenthood..............................21

             3.      The Defund Provision does not afford Planned Parenthood a trial ..........24

    B.      The Defund Provision Violates Equal Protection ...................................24

    C.      The Defund Provision Unconstitutionally Retaliates Against Planned Parenthood's Exercise Of Its First Amendment Rights.........................................28

    D.      The Non-Qualifying Members Are Likely To Succeed On Their Additional Claims ...................................29

            1.      Declaratory relief is warranted to prevent enforcement against Non-Qualifying Members that do not independently qualify as "prohibited entit[ies]" ...................................30

            2.      Without the declaratory relief requested, the Defund Provision is unconstitutionally vague ...................................33

            3.      Without the declaratory relief requested, the Defund Provision violates the Non-Qualifying Members' First Amendment rights.............35

II.     Plaintiffs And Their Patients Will Suffer Irreparable Injury Absent Injunctive Relief, And The Balance Of Equities And Public Interest Favor An Injunction ...................................37

    A.      Plaintiffs And Their Patients Face Irreparable Injury...........................................38

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION for TRO & PI

B.      The Balance Of Equities And Public Interest Favor Granting Injunctive Relief.................................................................................................................44

III.    Injunctive Relief As To All Planned Parenthood Members Is Necessary, And No Bond Should Be Required .........................................................................................45

CONCLUSION....................................................................................................................48

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Agency for International Development v. Alliance for Open Society International*,
570 U.S. 205 (2013) ........................................................................................35, 36, 37

*Akebia Therapeutics, Inc. v. Azar*,
976 F.3d 86 (1st Cir. 2020)...............................................................................................19

*Alexander v. Choate*,
469 U.S. 287 (1985)............................................................................................................6

*Banks v. Booth*,
468 F. Supp. 3d 101 (D.D.C. 2020).................................................................................41

*Barton v. Clancy*,
632 F.3d 9 (1st Cir. 2011).........................................................................................28, 29

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985).........................................................................................................24

*Consolidated Edison Co. of New York, Inc. v. Pataki*,
292 F.3d 338 (2d Cir. 2002)......................................................................................21, 24

*Coquico, Inc. v. Rodriguez-Miranda*,
562 F.3d 62 (1st Cir. 2009).............................................................................................19

*Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers,
Warehousemen, & Packers*,
679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) ........46, 47, 48

*Cummings v. Missouri*,
71 U.S. 277 (1866)...........................................................................................................22

*Doe v. Noem*,
2025 WL 1099602 (D. Mass. Apr. 14, 2025) ................................................................48

*Does 1-6 v. Mills*,
16 F.4th 20 (1st Cir. 2021)...............................................................................................44

*Dr. José S. Belaval, Inc. v. Peréz-Perdomo*,
465 F.3d 33 (1st Cir. 2006)..............................................................................................43

*Eisenstadt v. Baird*,
405 U.S. 438 (1972)..........................................................................................................25

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................39

*Ex parte Young,*
    209 U.S. 123 (1908) ............................................................................................46

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ............................................................................................34

*Florida Youth Conservation Corps., Inc. v. Stutler,*
    2006 WL 1835967 (N.D. Fla. June 30, 2006) ...................................................21

*Fowler Packing Co. v. Lanier,*
    844 F.3d 809 (9th Cir. 2016) .......................................................................23, 24

*Francisco Sánchez v. Esso Standard Oil Co.,*
    572 F.3d 1 (1st Cir. 2009) ..................................................................................46

*Gattineri v. Town of Lynnfield,*
    58 F.4th 512 (1st Cir. 2023) ...............................................................................28

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ............................................................................................34

*Harris v. Board of Supervisors, Los Angeles County,*
    366 F.3d 754 (9th Cir. 2004) .............................................................................41

*Harris v. McRae,*
    448 U.S. 297 (1980) ..............................................................................................8

*Healy v. James,*
    408 U.S. 169 (1972) ............................................................................................26

*Hunt v. Washington State Apple Advertising Commission,*
    432 U.S. 333 (1977) ............................................................................................45

*In re Finnacial Oversight & Management Board for Puerto Rico,*
    110 F.4th 295 (1st Cir. 2024) .............................................................................45

*International Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc.,*
    925 F.2d 6 (1st Cir. 1991) ..................................................................................47

*International Confections Co. v. Z Capital Group, LLC,*
    2023 WL 335285 (6th Cir. Jan. 20, 2023) ........................................................31

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ............................................................................................35

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION for TRO & PI

*Koontz v. St. Johns River Water Management District,*
  570 U.S. 595 (2013).................................................................................36

*Kramer v. Union Free School District No. 15,*
  395 U.S. 621 (1969).................................................................................25

*League of Women Voters of United States v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016)......................................................................41

*Lozman v. City of Riviera Beach,*
  585 U.S. 87 (2018)...................................................................................28

*Massachusetts Ass'n of Older Americans v. Sharp,*
  700 F.2d 749 (1st Cir. 1983)....................................................................45

*Massachusetts ex rel. Dep't of Public Welfare v. Secretary of Health & Human Services,*
  749 F.2d 89 (1st Cir. 1984)...................................................................8, 22

*McCue v. Bradstreet,*
  807 F.3d 334 (1st Cir. 2015)....................................................................29

*Medina v. Planned Parenthood South Atlantic,*
  --- S. Ct. ---, 2025 WL 1758505 (June 26, 2025) ...................................44

*NAACP v. Alabama ex rel. Patterson,*
  357 U.S. 449 (1958).................................................................................26

*National Education Ass'n v. U.S. Dep't of Education,*
  2025 WL 1188160 (D.N.H. Apr. 24, 2025)..............................................35

*National Rifle Ass'n v. Vullo,*
  602 U.S. 175 (2024).................................................................................28

*Nixon v. Administrator of General Services,*
  433 U.S. 425 (1977)............................................................................21, 22

*Nken v. Holder,*
  556 U.S. 418 (2009).................................................................................44

*Orkin v. Albert,*
  557 F. Supp. 3d 252 (D. Mass. 2021) .....................................................18

*Perry v. Sindermann,*
  408 U.S. 593 (1972).................................................................28, 35, 36, 37

*Pineda v. Skinner Services, Inc.,*
  22 F.4th 47 (1st Cir. 2021).......................................................................47

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

*Planned Parenthood Arizona, Inc. v. Betlach*,
    899 F. Supp. 2d 868 (D. Ariz. 2012) ...............................................................47

*Planned Parenthood Gulf Coast, Inc. v. Kliebert*,
    141 F. Supp. 3d 604 (M.D. La. 2015), *aff'd sub nom. Planned Parenthood*
    *of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017)...................................44

*Planned Parenthood of Central & Northern Arizona v. Arizona*,
    718 F.2d 938 (9th Cir. 1983) ..........................................................................35

*Planned Parenthood of Central & Northern Arizona v. Arizona*,
    789 F.2d 1348 (9th Cir. 1986), *aff'd mem. sub nom. Babbit v. Planned Parenthood*
    *Federation*, 479 U.S. 925 (1986) ...................................................................35

*Planned Parenthood of Central North Carolina v. Cansler*,
    877 F. Supp. 2d 310 (M.D.N.C. 2012) ...............................................21, 23, 37

*Planned Parenthood of Greater Texas Family Planning & Preventative Health Services,*
    *Inc. v. Smith*,
    236 F. Supp. 3d 974 (W.D. Tex. 2017), *vacated sub nom. Planned Parenthood*
    *of Greater Texas Family Planning & Preventative Health Services, Inc. v.*
    *Kauffman*, 981 F.3d 347 (5th Cir. 2020)..........................................................47

*Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dep't of Health*,
    794 F. Supp. 2d 892 (S.D. Ind. 2011), *aff'd in part & rev'd in part on other*
    *grounds*, 699 F.3d 962 (7th Cir. 2012) .............................................................44

*Planned Parenthood of Kansas v. Andersen*,
    882 F.3d 1205 (10th Cir. 2018) ..................................................................41, 47

*Planned Parenthood of Kansas v. Mosier*,
    2016 WL 3597457 (D. Kan. July 5, 2016), *aff'd in part, vacated in part sub nom.*
    *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205 (10th Cir. 2018) ................47

*Planned Parenthood South Atlantic v. Baker*,
    326 F. Supp. 3d 39 (D.S.C. 2018), *aff'd*, 941 F.3d 687 (4th Cir. 2019) ...........................43

*Planned Parenthood Southeast, Inc. v. Bentley*,
    141 F. Supp. 3d 1207 (M.D. Ala. 2015) ...........................................................43

*Plyler v. Doe*,
    457 U.S. 202 (1982)........................................................................................26

*Rinaldi v. Yeager*,
    384 U.S. 305 (1966)........................................................................................27

*Rio Grande Community Health Center, Inc. v. Rullan*,
    397 F.3d 56 (1st Cir. 2005).........................................................................39, 43

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984)........................................................................................26, 29

*Rocket Learning, Inc. v. Rivera-Sanchez,*
  715 F.3d 1 (1st Cir. 2013)........................................................................................26

*Romer v. Evans,*
  517 U.S. 620 (1996)........................................................................................27

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
  102 F.3d 12 (1st Cir. 1996)........................................................................................19

*Rust v. Sullivan,*
  500 U.S. 173 (1991)........................................................................................36

*Ryan v. U.S. Immigration & Customs Enforcement,*
  974 F.3d 9 (1st Cir. 2020)........................................................................................19

*Saenz v. Roe,*
  526 U.S. 489 (1999)........................................................................................27

*SBT Holdings, LLC v. Town of Westminster,*
  547 F.3d 28 (1st Cir. 2008)........................................................................................27

*SeaRiver Maritime Financial Holdings, Inc. v. Mineta,*
  309 F.3d 662 (9th Cir. 2002)........................................................................................20

*Selective Service System v. Minnesota Public Interest Research Group,*
  468 U.S. 841 (1984)........................................................................................20, 21, 22

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
  699 F.3d 1 (1st Cir. 2012)........................................................................................39

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)........................................................................................33

*U.S. Dep't of Agriculture v. Moreno,*
  413 U.S. 528 (1973)........................................................................................27

*United States v. Brown,*
  381 U.S. 437 (1965)........................................................................................19, 22

*United States v. Lovett,*
  328 U.S. 303 (1946)........................................................................................20, 22

*United States v. Nason,*
  269 F.3d 10 (1st Cir. 2001)........................................................................................31

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

*Vaquería Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009).........................................................................38

*Village of Willowbrook v. Olech*,
    528 U.S. 562 (2000)...................................................................................27

*Xiaomi Corp. v. Department of Defense*,
    2021 WL 950144 (D.D.C. Mar. 12, 2021).................................................31

## STATUTES, RULES, AND REGULATIONS

45 C.F.R. § 156.235 ...........................................................................................14

2 U.S.C. § 644...................................................................................................9

42 U.S.C. § 1320a-3(a)(3)................................................................................33

42 U.S.C. § 1320a-7...........................................................................................7

42 U.S.C. § 1320a-7a..........................................................................................7

42 U.S.C. § 1395w-25(d)(4)............................................................................33

42 U.S.C. § 1396a(a)(23)...................................................................................7

U.S. Const. amend. I.........................................................................................29

U.S. Const. art. I, § 9, cl. 3.......................................................................20, 25

Utah Code Ann. § 16-10a-102(2) ....................................................................32

## OTHER AUTHORITIES

163 Cong. Rec. H1951 (daily ed. Mar. 9, 2017) (statement of Rep. Barr)....................................15

163 Cong. Rec. H2373 (daily ed. Mar. 24, 2017) (statement of Rep. Gaetz).....................9, 10, 15

163 Cong. Rec. H2433 (daily ed. Mar. 24, 2017) (statement of Rep. Brady) .........................10, 15

163 Cong. Rec. H4113 (daily ed. May 4, 2017) (statement of Rep. Dunn) ................................15

171 Cong. Rec. E255 (2025) (statement of Rep. Smith) ...............................................13

171 Cong. Rec. H2219 (daily ed. May 21, 2025) (statement of Rep. DeGette)...........................16

171 Cong. Rec. H2230 (daily ed. May 21, 2025) (statement of Rep. Ocasio-Cortez) ..................16

171 Cong. Rec. H2240 (daily ed. May 21, 2025) (statement of Rep. Trahan).............................16

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

171 Cong. Rec. S2869 (daily ed. May 13, 2025) (statement of Sen. Sanders)...........................16

Alice Ollstein, *Knives Are Out for Planned Parenthood. In All 3 Branches of Government*, POLITICO (Feb. 13, 2025), https://www.politico.com/newsletters/politico-nightly/2025/02/13/knives-are-out-for-planned-parenthood-in-all-3-branches-of-government-00204234 ..................................................................................13

American Health Care Act, H.R. 1628, 115th Cong. (2017).....................................9, 10

*Black's Law Dictionary* (12th ed. 2024).....................................................32, 33

Cong. Budget Off, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline* (June 29, 2025), https://www.cbo.gov/publication/61534 ........................24

Defund Planned Parenthood Act, S. 203, 119th Cong. (2025).......................................11

Defund Planned Parenthood Act of 2023, H.R. 128, 118th Cong. (2023) ...........................11

Defund Planned Parenthood Act of 2023, H.R. 371, 118th Cong. (2023) ...........................11

Donald J. Trump (@realDonaldTrump), X (Mar. 24, 2017, 8:23 a.m. ET), https://x.com/realdonaldtrump/status/845249587178819584?.......................................15

H.R. 271, 119th Cong. (2025)..........................................................................11

H.R. 599, 119th Cong. (2025)..........................................................................11

H.R. 6176, 118th Cong. (2023)........................................................................11

H.R. Rep. No. 119-113 (2025).........................................................................16

Jamie Joseph, *Defund 'Big Abortion' Industry That Thrived Under Biden, 150 Pro-life Groups Urge Congress*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/defund-big-abortion-industry-thrived-under-biden-150-pro-life-groups-urge-congress ...........................................................12

Join Students for Life's National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion,' Students for Life Action, https://www.studentsforlifeaction.org/defund/ ...........................................................12

Michael T. Morley, *Erroneous Injunctions*, 71 EMORY L.J. 1137 (2022)....................................47

Press Release, Rep. Fischbach Introduces the Defund Planned Parenthood Act and Protecting Life and Taxpayers Act (Jan. 19, 2023), https://fischbach.house.gov/press-releases?ID=67C83E37-B8FF-4E7C-AC0B-4EB21AAE68F9 ...........................................................11

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

Press Release, Rep. Lauren Boebert Introduces the Defund Planned Parenthood
Act (Jan. 20, 2023), https://boebert.house.gov/media/press-releases/rep-
lauren-boebert-introduces-defund-planned-parenthood-act ...............................................11

Press Release, Six-Figure Ad Campaign Exposes How Big Abortion's
Substandard 'Care' Harms Women & Girls (July 1, 2025),
https://sbaprolife.org/newsroom/press-releases/six-figure-ad-campaign-
exposes-how-big-abortions-substandard-care-harms-women-girls...................................12

Protecting Funding for Women's Health Care Act, S. 177, 119th Cong. (2025)........................11

S. Amend. 267, 115th Cong. (2017) ...........................................................................................9

S. Comm. on the Budget, 115th Cong., Background on the Byrd Rule Decisions
from the Senate Budget  ,Committee Minority Staff (July 21, 2017)
https://www.budget.senate.gov/imo/media/doc/Background%20on%20By
rd%20Rule%20decisions_7.21[1].pdf ...............................................................................10

SBA Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*,
YOUTUBE (Apr. 29, 2025),
https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794......................................12

Speaker Mike Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*,
YOUTUBE (Dec. 4, 2024), https://www.youtube.com/watch?v=VOM5wRs1WFc...........12

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

## INTRODUCTION

Planned Parenthood Federation of America ("PPFA"), on behalf of itself and all 47 of its independent members (the "Members," and with PPFA, "Planned Parenthood"), as well as two of those Members, move for a temporary restraining order and preliminary injunction against enforcement of Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14 (the "Defund Provision").  Using criteria designed specifically to target and punish Planned Parenthood, the Defund Provision categorically prohibits certain Planned Parenthood Members from being reimbursed with federal funds under the Medicaid program for health care services they provide to their patients.  With no reason other than plain animus, the law will prevent Planned Parenthood Members from providing vital—indeed, lifesaving—care to more than one million patients.  This statute is unconstitutional and will inflict irreparable harm on Planned Parenthood Members and their patients, as well as PPFA.

The Defund Provision is emphatically not about federal funding for abortion.  Under longstanding federal law, federal funds may not be used to provide abortions (except in the extremely narrow circumstances permitted under the Hyde Amendment).  The Defund Provision is instead a naked attempt to leverage the government's control over funds to punish Planned Parenthood.  It does so not only because of Planned Parenthood Members' long history of providing legal abortions to patients across the country, but also because of Planned Parenthood's unique role in advocating for policies to protect and expand access to sexual and reproductive health care, including abortion.  This legislative attack is unconstitutional and cannot stand.

In targeting and seeking to punish Planned Parenthood, the Defund Provision is an unconstitutional bill of attainder.  And the Defund Provision violates Plaintiffs' right to Equal Protection because it treats Planned Parenthood Members differently than any other health care provider in a manner that fails any level of scrutiny.  It also violates the First Amendment by

1

retaliating against Planned Parenthood for its role as the leading advocate for access to reproductive health care, including the right to safe and legal abortion.  In addition, the Defund Provision cannot be read to apply to Planned Parenthood Members who do not independently satisfy its requirements, but rather satisfy them only if considered together with other, independent Planned Parenthood Members—and if it were, such a reading would further violate those Members' constitutional rights of association and due process.

The Defund Provision will have severe adverse effects on the health and welfare of millions of patients.  Many of Planned Parenthood Members' million-plus Medicaid patients will lose access to care at Planned Parenthood Member health centers altogether, depriving them of essential services such as testing and treatment for sexually transmitted infections and cancer screenings. In many communities, no remotely comparable Medicaid providers stand ready to absorb these patients.  And because many of these Medicaid patients do not have access to other health care providers, they may be forced to forgo medical care entirely.  Planned Parenthood Members will have no choice but to reduce services, terminate employees, and close health centers—causing many patients *outside* the Medicaid program to lose access to their health care providers of choice. Many of those patients live in underserved areas where Planned Parenthood Members are the sole provider of reproductive health services.

The Defund Provision poses a dire threat to Planned Parenthood Members and their patients, as well as PPFA, and its grave harm is already being felt today.  The Defund Provision was enacted on July 4, 2025, and took effect immediately.  Through the creation of a "prohibited entity" label with criteria designed to target Planned Parenthood, the Defund Provision prohibits Planned Parenthood Members from receiving reimbursements through Medicaid "beginning on

the date of the enactment of this Act."[1]  Some Planned Parenthood Members had to immediately begin turning Medicaid-insured patients away.  As a result, every day that the Defund Provision remains in effect, Planned Parenthood Members are forced to cancel patient appointments and help patients find other providers as best they can—despite knowing that many patients will not be able to get remotely equivalent care, or any timely care at all.  The remaining Members have been forced to stop submitting reimbursements for services provided to Medicaid patients, which will make it impossible to continue providing the care their patients need.  For these reasons, the Defund Provision's impact—if not enjoined immediately—will be nothing short of a public health crisis.

## STATEMENT OF THE CASE

### A.    Planned Parenthood's Service To The Community

#### 1.    Planned Parenthood's mission, structure, and advocacy work

PPFA is a national membership organization whose mission is to support the provision of comprehensive, high-quality sexual and reproductive health care, to educate the public about sexual and reproductive health, and to advocate for access to sexual and reproductive health care. *See* Ex. 1, Declaration of Kim Custer ("Custer Decl.") ¶¶ 7, 12.

---

[1]     The Defund Provision also purports to define a "prohibited entity" based on providing abortions as of October 1, 2025 (that is, "the first day of the first quarter beginning after the date of enactment").  This creates potential confusion as to how the immediate payment prohibition interacts with the fact that the identity of "prohibited entities" cannot be determined with certainty until a later date.  Because the bill states that effective immediately "no federal funds that are considered direct spending" may be used to make payments to a prohibited entity,  and because Planned Parenthood entities will provide abortions as of October 1, Planned Parenthood Members have been forced to stop submitting claims for Medicaid reimbursement as of "the date of enactment" and require emergency injunctive relief in order to resume.

PPFA has 47 independently incorporated and operated Members including Plaintiff-Members Planned Parenthood League of Massachusetts ("PPLM") and Planned Parenthood Association of Utah ("PPAU"). Compl. ¶¶ 19, 25, 35; *see also, e.g.*, Custer Decl. ¶¶ 7, 9. Its Members collectively operate nearly 600 health centers across the Nation. Custer Decl. ¶ 21. Although each Member focuses on the distinct needs of its own community, Members share the mission of providing comprehensive reproductive health care to all patients, regardless of ability to pay. *See, e.g.*, Custer Decl. ¶ 12; Ex. 2, Declaration of Dominique Lee ("Lee Decl.") ¶ 21 (PPLM); Ex. 3, Declaration of Shireen Ghorbani ("Ghorbani Decl.") ¶ 19 (PPAU).

Each Member is an independent, autonomous non-profit organization and is separately incorporated and governed. Custer Decl. ¶ 9; Lee Decl. ¶ 10; Ghorbani Decl. ¶¶ 1, 9. Each Member has its own CEO and board of directors, and manages its own finances, legal responsibilities, and operations. *See* Custer Decl. ¶¶ 9, 16; Lee Decl. ¶ 10; Ghorbani Decl. ¶ 9. This structural independence means that PPFA does not control the operations or decision-making of its Members, and Members similarly do not control each other. Custer Decl. ¶¶ 17-18. The actions or policies of one Planned Parenthood Member do not legally or operationally bind the others. The Planned Parenthood name, however, "sends a powerful message to the community that the Member stands for certain values and provides health care and educational services of high quality." *Id.* ¶ 15.

PPFA and its Members, along with national, state, and local Planned Parenthood 501(c)(4) social welfare organizations, have long been at the forefront of the movement for reproductive rights, advocating at the federal, state, and local levels to expand abortion access. This includes pushing to codify the rights to abortion and contraception, block abortion bans, repeal the Hyde Amendment, and ensure access to emergency contraception and medication abortion. Custer Decl.

¶¶ 12, 19.  Planned Parenthood Action Fund, a related 501(c)(4) organization, seeks to hold members of Congress politically accountable through its congressional scorecard, communicating with and activating constituents to educate their lawmakers about the importance of sexual and reproductive health care.  Planned Parenthood Members and their related 501(c)(4) organizations play a similar role in state legislatures across the Nation.  Since the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, Planned Parenthood Action Fund and Members' related 501(c)(4) organizations have successfully campaigned for reproductive freedom ballot initiatives.  Separately, Planned Parenthood Action Fund and other national and local Planned Parenthood advocacy and political organizations work to elect federal, state, and local officials who will support abortion access.  Custer Decl. ¶¶ 19, 74.

> ### 2.    Planned Parenthood Members provide sexual and reproductive health care throughout the Nation

Planned Parenthood Members play a pivotal role in the delivery of sexual and reproductive health care to millions of people in the United States each year.  Custer Decl. ¶ 21.  An estimated one out of every three women and one in ten men nationally has received care from a Planned Parenthood Member.  *Id.*  In federal fiscal year 2023, Members served more than 2 million patients and provided approximately 9.4 million services, including cancer examinations, contraceptives, testing and treatment for sexually transmitted infections ("STIs"), gender-affirming hormone therapy, and abortion where it is legal.  *Id.* ¶ 23.  Those services are often life-affirming or even life-saving for patients and prevent serious adverse consequences for the broader public health of the Member's community.  *See id.* ¶¶ 23-26, 36.  In fiscal year 2023, Members provided more than 5.1 million STI tests and treatments, 426,000 cancer screenings and prevention services, and 2.2 million birth control services.  *Id.* ¶ 23.  During that same period, Members also provided over 400,000 abortions—approximately 4% of their services nationwide.  *Id.*.

Planned Parenthood Members play a special role in providing care in low-income and historically underserved communities.  *See* Custer Decl. ¶¶ 24-26; *see* Ex. 5, Declaration of Claire Brindis ("Brindis Decl.") ¶¶ 21-22.  Sixty-five percent of Members' patients have incomes at or below 150 percent of the federal poverty level.  Custer Decl. ¶ 25.  In many communities, a Planned Parenthood Member health center is the only place to which a patient can turn for sexual and reproductive health care.  *Id.* ¶ 24; *see also* Brindis Decl. ¶ 26; *infra* p. 7.  Planned Parenthood Member health centers are also often more convenient and accessible than other providers.  Custer Decl. ¶ 33; *see, e.g.*, Lee Decl. ¶ 22; Ghorbani Decl. ¶ 11; Brindis Decl. ¶¶ 23-25, 34, 70.  For example, Planned Parenthood Member health centers are often able to see patients on a walk-in basis, and many offer early morning, evening, and weekend hours.  Custer Decl. ¶¶ 33-35.  Members also offer telehealth services, which can make access to health care more convenient for all patients, and can be especially beneficial for patients with disabilities, in remote areas, who lack access to reliable transportation, or who have inflexible schedules.  *Id.* ¶ 35.  Members also offer a comprehensive range of services unavailable from many other providers and deliver these services in a culturally-sensitive manner.  *Id.* ¶¶ 30-32, 53; *see also* Brindis Decl. ¶¶ 23-25.

### 3.    Service and reimbursement under the Medicaid program

Medicaid is a joint federal-state program under which the federal government provides financial assistance to States to help them finance health care for eligible families and individuals with low incomes.  *See Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985).  Although the program is administered at the state level, the majority of Medicaid funding is provided by the federal government.  *See* Custer Decl. ¶ 41; Brindis Decl. ¶ 15.  The Secretary of Health and Human Services has the power to enforce Medicaid provider requirements.  42 U.S.C. §§ 1320a-7, 1320a-7a.  Medicaid typically works by reimbursement.  Brindis Decl. ¶ 19.  For example, a patient enrolled in Medicaid may visit a health care provider for birth control, an STI test, a cervical cancer

examination, and other covered care.  The provider will then submit a reimbursement claim to a State Medicaid agency for the services provided.  The process by which providers enroll in Medicaid differs by State.  While States can establish qualification criteria, such as licensing, enrollment processes, and performance standards, federal law establishes the general principle that beneficiaries must be able to access any qualified provider, which has been interpreted to mean that providers cannot be arbitrarily excluded from participating in Medicaid.  *See* 42 U.S.C. § 1396a(a)(23).

As part of their commitment to low-income and underserved communities, Planned Parenthood Members participate in Medicaid programs in every state where they are able—46 of 47 Members in the 43  States where Members have health centers.  Compl. ¶ 7 n.2; Custer Decl. ¶ 43.  No Member limits the number of Medicaid patients that it will see.  Compl. ¶ 7; Custer Decl. ¶ 43.  In contrast, as a result of low reimbursement rates, many other health care providers may implement policies that effectively limit the number of Medicaid patients they serve or choose not to participate in Medicaid at all.  Custer Decl. ¶ 42.  As a result, in many communities, a Planned Parenthood Member health center is the only place where individuals can receive sexual and reproductive health care services through the Medicaid program.  *Id.* ¶¶ 24, 26, 46.

Planned Parenthood Members collectively serve over 1 million Medicaid patients each year.  Custer Decl. ¶¶ 5, 43.  Over half of the patients who receive care at Planned Parenthood Member health centers rely on Medicaid for their health care, and half of visits to Planned Parenthood Member health centers are covered by Medicaid.  *Id.* ¶ 43.  Serving Medicaid patients is a critical way in which Planned Parenthood Members carry out their missions of providing comprehensive reproductive health care to all patients, regardless of their ability to pay.  In the

2023 federal fiscal year, Medicaid reimbursements for services provided to Medicaid patients constituted more than one-third of Planned Parenthood Members' aggregate revenue. *Id.* ¶ 44.

With extremely narrow exceptions, federal law has long prohibited the use of federal funds, including Medicaid funds, for abortions. *See Mass. ex rel. Dep't of Pub. Welfare v. Sec'y of Health & Hum. Servs.*, 749 F.2d 89, 95 (1st Cir. 1984) (discussing *Harris v. McRae*, 448 U.S. 297, 308-09 (1980)). As a result, no federal funds, including Medicaid funds, are used to reimburse Planned Parenthood Members for abortions, except under the narrow circumstances authorized by federal law. Custer Decl. ¶ 45; Lee Decl. ¶ 26.

**B.      The Sweeping Purpose And Effect Of The Defund Provision: To Target And Punish Planned Parenthood**

**1.      Legislative history of the Defund Provision**

The Defund Provision represents the culmination of a decades-long effort to use the government's power over funds to coerce and punish Planned Parenthood for being the face of the movement to protect access to sexual and reproductive health care, including abortion. Members of Congress and the Executive Branch have repeatedly and expressly made clear their intent to coerce Planned Parenthood Members into abandoning the provision of abortion and to punish Planned Parenthood for its nationwide abortion-rights advocacy. Although commonly referred to as efforts to "defund" Planned Parenthood, there is no line item in the federal budget for Planned Parenthood. Rather, Planned Parenthood Members, like any other health care providers in the Medicaid program, provide eligible services to their patients and then submit a claim for reimbursement to cover those services. *See* Custer Decl. ¶ 41. What the Defund Provision does— through the creation of a "prohibited entity" label with criteria designed to target Planned Parenthood—is bar Planned Parenthood Members from receiving reimbursement through federal Medicaid funds and thus, in effect, from providing health care to Medicaid patients.

During President Trump's first term in office, Congress frequently attempted to "defund" Planned Parenthood.  *See* Compl. ¶¶ 86-87.  Most notably, in 2017, Congress considered—and rejected by one vote—a bill that included language nearly identical to the Defund Provision.  *See* American Health Care Act, H.R. 1628, 115th Cong. (2017); S. Amend. 267, 115th Cong. (2017).  It was clear then that that language was intended to target Planned Parenthood, and it is still clear now.  Like the Defund Provision challenged here, H.R. 1628 did not use the words "Planned Parenthood."[2]  But there was no question that the bill was designed to target Planned Parenthood, as the bill's supporters expressly acknowledged.  For example, during the March 24, 2017, floor debate on H.R. 1628, Representative Matt Gaetz (Florida) "implore[d] [his] conservative colleagues to vote for this bill" because it would "defund[] Planned Parenthood."  163 Cong. Rec. H2373, H2409 (daily ed. Mar. 24, 2017) (statement of Rep. Gaetz).  He then asked, "How long have we been fighting to defund Planned Parenthood?" emphasizing that "defunding" Planned Parenthood was one of the bill's key objectives.  *Id.*  Later that day, Representative Kevin Brady (Texas) likewise stated, "I am proud to defund Planned Parenthood once and for all."  *Id.* at H2433 (statement of Rep. Brady).  H.R. 1628 passed the House but stalled in the Senate.

As drafted, H.R. 1628 and other prior versions of the bill applied only to entities that provided abortions and received more than $350 million in Medicaid funds in fiscal year 2014.

---

[2]     Congress's decision to describe Planned Parenthood in the bill, rather than name it explicitly, was apparently a result of the reconciliation process.  Under a parliamentary rule known as the "Byrd Rule," a reconciliation bill may not include provisions "'extraneous' to reconciliation's basic purpose of implementing budget changes."  *See* 2 U.S.C. § 644.  Presumably, and despite the unequivocal acknowledgments that the bill targeted Planned Parenthood, expressly naming Planned Parenthood in the statutory language would have given lie to the claim that the bill addressed a budgetary issue, instead of "extraneous" social policy, as both H.R. 1628 and this Act are reconciliation bills.  Nonetheless, as explained above and below, H.R. 1628, like its successor, the Defund Provision, is plainly directed at Planned Parenthood—as supporters of this statutory language have emphasized for years.

Compl. ¶ 88.  That number was no accident, but rather yet more proof of the intended target of the bill: Planned Parenthood Members collectively received over $350 million in Medicaid funds that year.  Custer Decl. ¶ 48.  No other organization or group came close.  But the Senate parliamentarian determined that "prohibit[ing]" only "Planned Parenthood from receiving Medicaid funds for one year"[3] violated the Byrd Rule, which prohibits extraneous (*i.e.*, nonbudgetary) matters from being included in reconciliation legislation under the Senate rules for that process.  Thus, in the Senate version of the bill, the threshold for qualification was reduced from $350 million to $1 million, purportedly to bring one other unidentified entity within its scope. *See* S. Amend. 340 to S. Amend. 267 to H.R. 1628.  In any event, there is no question that the true purpose of that bill, like the challenged enactment here, was to express disapproval of and punish Planned Parenthood.

Undeterred by the failed 2017 legislation, congressional efforts to "defund" Planned Parenthood continued.  House members introduced bills that sought to "defund" Planned Parenthood unless it certified that it would not provide abortions.  Compl. ¶ 91.  For example, H.R. 128, 118th Cong. (2023), the "Defund Planned Parenthood Act of 2023," introduced by Representative Lauren Boebert (Colorado), and H.R. 371, 118th Cong. (2023), the "Defund Planned Parenthood Act of 2023," proposed by Representative Michelle Fischbach (Minnesota), sought to restrict any federal funding for Planned Parenthood, or any of its "affiliates or clinics," for one year unless it certified that its affiliates and clinics would not perform, and would not provide funds to entities that perform, abortions during that year.  In a press release announcing H.R. 128, Representative Boebert stated, "[t]he nation's largest abortion provider has no business

---

[3]     S. Comm. on the Budget, 115th Cong., Background on the Byrd Rule Decisions from the Senate Budget Committee Minority Staff (July 21, 2017), https://www.budget.senate.gov/imo/media/doc/Background%20on%20Byrd%20Rule%20decisions_7.21[1].pdf.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

receiving taxpayer dollars."[4]    Similarly, Representative Fischbach stated of her bill, "[o]rganizations like Planned Parenthood receive millions of hard-earned taxpayer dollars every year to provide abortions on demand."[5]    Other bills, like H.R. 6176, 118th Cong. (2023), the "Protect Funding For Women's Health Care Act," introduced by Representative Robert B. Aderholt (Alabama), simply aimed "to prohibit Federal funding of Planned Parenthood Federation of America."    Similar bills have been introduced by members of the Senate and the House this term.[6]    And saying the quiet part out loud, entities politically opposed to abortion have released ads and other materials seeking to defund Planned Parenthood Members in part because of the work of Planned Parenthood advocacy and political organizations.[7]

---

[4]    Press Release, Rep. Lauren Boebert Introduces the Defund Planned Parenthood Act (Jan. 20, 2023), https://boebert.house.gov/media/press-releases/rep-lauren-boebert-introduces-defund-planned-parenthood-act.

[5]    Press Release, Rep. Fischbach Introduces the Defund Planned Parenthood Act and Protecting Life and Taxpayers Act (Jan. 19, 2023), https://fischbach.house.gov/press-releases?ID=67C83E37-B8FF-4E7C-AC0B-4EB21AAE68F9.

[6]    *See, e.g.*, Defund Planned Parenthood Act, S. 203, 119th Cong. (2025) (introduced by Sen. Paul (Kentucky)); H.R. 271, 119th Cong. (2025) (introduced by Rep. Fischbach (Minnesota)); Protecting Funding for Women's Health Care Act, S. 177, 119th Cong. (2025) (introduced by Sen. Ernst (Iowa)); H.R. 599, 119th Cong. (2025) (introduced by Rep. Aderholt (Alabama)).

[7]    For example, Susan B. Anthony Pro-Life America announced the launch of a six-figure TV and digital ad campaign that followed sensational accusations about Planned Parenthood Members' abortion services with the conclusion, "all while they spend hundreds of millions supporting Democrats.    Stop forced taxpayer funding of the Big Abortion industry.    Defund Planned Parenthood."    Press Release, Six-Figure Ad Campaign Exposes How Big Abortion's Substandard 'Care' Harms Women & Girls (July 1, 2025), https://sbaprolife.org/newsroom/press-releases/six-figure-ad-campaign-exposes-how-big-abortions-substandard-care-harms-women-girls.    Students for Life Action's "National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion" included, as its "Week Five Theme" a suggestion that its members contact their Senators to tell them that "Planned Parenthood is funding their political enemies," and specifically that"[a]head of last November's elections, they spent $69.5 million bolstering pro-abortion President Joe Biden & leading congressional Democrats."    Join Students for Life's National Month of Mobilization to DEFUND Planned Parenthood & Big Abortion,' Students for Life Action, https://www.studentsforlifeaction.org/defund/.

These efforts to "defund" Planned Parenthood now culminate with the enactment of the Defund Provision. *See* Compl. ¶ 93. Before the current congressional term began, Speaker Johnson stated that "defunding" Planned Parenthood continued to be at the top of the Republican agenda in the House; later, while discussing budget cuts, he confirmed that he was planning to "axe" funding for Planned Parenthood.[8] On April 29, 2025, during a keynote address at a fundraising event for an anti-abortion group, Speaker Johnson reiterated, "In the weeks ahead, the House is going to be working on the One, Big, Beautiful Bill…. And we're absolutely making it clear to everybody that this bill is going to redirect funds away from Big Abortion,"[9] a long-used pejorative for Planned Parenthood among anti-abortion groups.[10] On the House floor, Representative Christopher Smith (New Jersey) called for the "defunding of Planned Parenthood" to penalize it for performing abortions. 171 Cong. Rec. E255 (2025) (statement of Rep. Smith). And despite acknowledging that defunding Planned Parenthood "doesn't save money," Representative Andy Harris (Maryland) called on Congress to include reconciliation language to defund Planned Parenthood because "[w]e shouldn't be paying for institutions whose primary purpose is to do abortions."[11]

---

[8]     Speaker Mike Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*, YOUTUBE (Dec. 4, 2024), https://www.youtube.com/watch?v=VOM5wRs1WFc.

[9]     SBA Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*, YOUTUBE (Apr. 29, 2025), https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794.

[10]    *See, e.g.*, Jamie Joseph, *Defund 'Big Abortion' Industry That Thrived Under Biden, 150 Pro-life Groups Urge Congress*, FOX NEWS (Mar. 26, 2025), https://www.foxnews.com/politics/defund-big-abortion-industry-thrived-under-biden-150-pro-life-groups-urge-congress (letter from anti-abortion groups encouraging Congress to "cut[] funding for Big Abortion, including Planned Parenthood," and then only citing statistics and claims about Planned Parenthood).

[11]    Alice Ollstein, *Knives Are Out for Planned Parenthood. In All 3 Branches of Government*, POLITICO (Feb. 13, 2025), https://www.politico.com/newsletters/politico-nightly/2025/02/13/knives-are-out-for-planned-parenthood-in-all-3-branches-of-government-00204234.

Now, Congress has chosen to attempt to defund Planned Parenthood in the same way that failed in 2017. The Defund Provision initially started with the $1 million eligibility threshold where the 2017 bill left off, but was again scaled down—this time to $800,000—to overcome the Byrd Rule. Compl. ¶ 95. To Planned Parenthood's knowledge, this lower eligibility threshold may mean that a small number of additional entities have been swept into the statute's coverage. *Id.* But then, as now, the intent remains the same: to defund Planned Parenthood.

### 2.    The Defund Provision: text and purpose

Through a contrived formulation designed to target Planned Parenthood without expressly referring to it, the Defund Provision prohibits federal funds from being made available under Medicaid to a "prohibited entity" for "services furnished during the 1-year period beginning on the date of the enactment of this Act."[12] Effective immediately, this Defund Provision bars Planned Parenthood Members from being reimbursed for providing services to patients under the federal Medicaid program.

The statute defines a "prohibited entity" as "an entity"—"including its affiliates, subsidiaries, successors, and clinics," which are undefined terms in the statute—that meets four criteria:

> (1) it "provides for abortions," other than abortions in the case of rape or incest or where the pregnant patient's life is in danger;
>
> (2) it is a 501(c)(3) not-for-profit, tax-exempt organization;

---

[12]    While the Defund Provision defines a "prohibited entity" "as of the first day of the first quarter beginning after the date of enactment of this Act," it prohibits federal funds from being disbursed "for items and services furnished during the 1-year period beginning *on the date of the enactment of this Act*." Section 71113(a), (b)(1)(A) (emphasis added). Accordingly, even if one cannot know if an entity will qualify as a "prohibited entity" until next quarter, such a "prohibited entity" would be prohibited from receiving Medicaid reimbursements for any services provided as of July 4, 2025.

(3) it "is an essential community provider described in" 45 C.F.R. § 156.235 "that is primarily engaged in family planning services, reproductive health, and related medical care"; and

(4) "for which the total amount of Federal and State expenditures under the Medicaid program … in fiscal year 2023 made directly … to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000."

Some Planned Parenthood Members, including PPLM, independently satisfy the requirements of the Defund Provision, and therefore qualify as "prohibited entit[ies]" under the statute. *See* Custer Decl. ¶ 47; Lee Decl. ¶ 29. Others, including PPAU, either do not provide abortion services or did not receive over $800,000 in Medicaid funds during fiscal year 2023 and therefore do not independently meet this definition (the "Non-Qualifying Members"). *See* Ghorbani Decl. ¶ 20; Custer Decl. ¶ 63.

What is clear, however, is that each of the statute's criteria for exclusion is specifically drafted to target Planned Parenthood Members. When taken together, the overwhelming majority of the entities that satisfy these four conjunctive statutory criteria—*i.e.*, that provide abortions, are 501(c)(3) organizations, are essential community providers primarily engaged in family planning services, reproductive health, and related medical care, and received more than $800,000 in Medicaid funds in fiscal year 2023—are Planned Parenthood Members. Meanwhile, the Defund Provision excludes from its scope virtually all other abortion providers, including those providers that are for-profit organizations, that are not essential community providers primarily engaged in family planning and reproductive health services, or that did not receive more than $800,000 in Medicaid funds in fiscal year 2023. As the plain text of the Defund Provision alone makes clear, its intended effect was to prevent Planned Parenthood Members from receiving Medicaid funds. That is reaffirmed by statements from President Trump and members of Congress about earlier

(and functionally identical) versions of this statutory language that failed to pass in 2017.[13]  And it is further reaffirmed by statements from members of Congress opposing the bill in the current congressional term—statements that none of the supporters of the Defund Provision even attempted to dispute.[14]

### 3.    The devastating impact of the Defund Provision

The Defund Provision, if not enjoined, will have devastating effects on Planned Parenthood Members and their patients, as well as PPFA.

The Defund Provision will jeopardize Planned Parenthood Members' ability to provide necessary and often life-saving care to their patients, especially their most vulnerable patients who are in need of health care.  Custer Decl. ¶ 54.  Most immediately, the Defund Provision will

---

[13]    *See, e.g.*, 163 Cong. Rec. H4113, H4143 (daily ed. May 4, 2017) (statement of Rep. Dunn) ("This act … defunds Planned Parenthood."); 163 Cong. Rec. H2373, H2409 (daily ed. Mar. 24, 2017) (statement of Rep. Gaetz) ("This legislation … defund[s] Planned Parenthood.  How long have we been fighting to defund Planned Parenthood?"); *id.* at H2414 (statement of Rep. Marshall) ("This bill eliminates funding for Planned Parenthood."); *id.* at H2425 (statement of Rep. Brady) ("I am pleased to say this bill defunds Planned Parenthood."); *id.* at H2433 (statement of Rep. Brady) ("I am proud to defund Planned Parenthood once and for all."); 163 Cong. Rec. H1951, H1956 (daily ed. Mar. 9, 2017) (statement of Rep. Barr) (the law "blocks Federal funds from Planned Parenthood"); *see also* Donald J. Trump (@realDonaldTrump), X (Mar. 24, 2017, 8:23 a.m. ET), https://x.com/realdonaldtrump/status/845249587178819584? ("The irony is that the Freedom Caucus, which is very pro-life and against Planned Parenthood, allows P.P. to continue if they stop this plan!").

[14]    *See, e.g.*, 171 Cong. Rec. H2219, H2226 (daily ed. May 21, 2025) (statement of Rep. DeGette) ("[T]he bill … defunds Planned Parenthood, which means if this bill passes, 1 million Americans will have no pap smears.  They will have no breast cancer screenings.  They will have no well-women visits."); *id.* at H2230-2231 (statement of Rep. Ocasio-Cortez) ("Republicans have put this bill together, rushed it together in a matter of hours ….  They are defunding Planned Parenthood ….  [T]hey voted to defund Planned Parenthood and take away healthcare from 13.7 million Americans."); *id.* at H2340 (statement of Rep. Trahan) ("[T]his bill … is a targeted attack on Planned Parenthood … without even naming the organization, by using vague criteria clearly designed to single them out."); 171 Cong. Rec. S2869, S2886 (daily ed. May 13, 2025) (statement of Sen. Sanders) ("[T]his bill essentially defunds Planned Parenthood, which provides vital healthcare to millions of women."); *see also* H.R. Rep. No. 119-113, at 9 (2025) (describing unsuccessful motion by Rep. Scanlon to "strike[] the section that defunds Planned Parenthood").

jeopardize care for the more than 1 million Planned Parenthood Member patients who are enrolled in Medicaid and who will no longer be able to use Medicaid to receive services at Planned Parenthood Member health centers.  *Id.* ¶¶ 4-5, 49-55; Lee Decl. ¶ 35; Ghorbani Decl. ¶¶ 20-21; Ex. 4, Declaration of Jenna Tosh ("Tosh Decl.") ¶¶ 44-47.  Many of those patients, particularly those in areas designated by the federal government as lacking access to primary care services, will not be able to find alternative providers, and thus will lose access to care altogether.  Custer Decl. ¶¶ 4-5, 52-56; Lee Decl. ¶¶ 36-38; Ghorbani Decl. ¶¶ 22-23; Tosh Decl. ¶¶ 52-54; *see infra* p. 41.  And even for patients who live in areas with other providers, there is no way such providers will be able to fill the gaps left by the reduced capacity and/or closures of Planned Parenthood Member health centers in those areas.  Custer Decl. ¶¶ 49-56; Brindis Decl. ¶¶ 35-59.

Due to the immense role Planned Parenthood Members play in providing services, other publicly supported clinics in some states would have to more than double their caseloads to meet the needs of patients currently served by Planned Parenthood Members.  Brindis Decl. ¶¶ 40-41.  And even if those patients were eventually able to find care elsewhere, they will face disruptions in care to the serious detriment of their health—for example, undetected STIs and cancers, or unintended pregnancies.  Custer Decl. ¶ 56.  All in all, the Defund Provision's impact is not simply a matter of redirecting patients from Planned Parenthood Members' clinics to other providers; it will without doubt mean that many patients do not receive the care they need when they need it.

The Defund Provision will also result in drastic revenue shortfalls for many Planned Parenthood Members.  *See* Custer Decl. ¶¶ 60-64.  In many states, Planned Parenthood Members provide services to large numbers of Medicaid patients, and in turn rely heavily on receiving Medicaid reimbursements for those services.  In the aggregate, more than one-third of Members' total revenue is from Medicaid reimbursements for services provided; some members receive the

vast majority of their health services revenue from Medicaid reimbursement. *Id.* ¶ 44. Should Members be unable to serve Medicaid patients, they will be forced to terminate employees, curtail services, and close health centers—with grave consequences for thousands of patients served at those centers. *Id.* ¶¶ 47, 54-55; Tosh Decl. ¶¶ 46-48. For example, PPLM anticipates needing to reduce overall costs by 20 to 25%. Lee Decl. ¶ 40. PPAU anticipates that it will likely have to lay off full-time staff, limit the services it provides, and potentially close health centers in areas with few options for Medicaid patients. Ghorbani Decl. ¶¶ 22-24. And even if funding is later restored, these harms will have lasting, long-term effects, as it is extremely difficult, time-consuming, and expensive to reopen health centers once closed—often prohibitively so. Tosh Decl. ¶ 46.

Other Planned Parenthood Members and their patients will be harmed in similar—and sometimes more sweeping—ways. Compl. ¶¶ 114-22; *see* Custer Decl. ¶¶ 60-64. California presents a particularly devastating example. Seven Planned Parenthood Members operate 115 health centers in California, collectively providing care to over 700,000 patients each year. Tosh Decl. ¶ 19. Over 80% of Planned Parenthood Member patients in California rely on California's Medicaid (Medi-Cal) program for their health care coverage. *Id*. ¶ 4. California Planned Parenthood Member health centers collectively provide approximately $425 million of services annually to patients covered by Medi-Cal and related programs, and 77%, or $328 million worth of services, are reimbursed using federal funds. *Id.* ¶ 38. These Members see almost half of the 1.2 million contraceptive care clients served by safety-net family planning centers in the State. *Id.* ¶ 50. If not enjoined, the Defund Provision will require Planned Parenthood California Members to reduce services, lay off many of their 3,000 employees, and close clinics. *Id.* ¶¶ 45, 48. Such closures in turn will significantly reduce access to health care across the State, with no hope that other publicly funded providers will be able to fill the gap. *Id.* ¶¶ 47-52.

The expert declaration of Dr. Claire Brindis, Distinguished Professor Emerita in the Department of Pediatrics and the Department of Obstetrics, Gynecology and Reproductive Health Sciences at the University of California, San Francisco, underscores the harms that will directly result from the Defund Provision.  As she explains, the statute creates an immediate health crisis for—at a minimum—over a million Medicaid patients who may no longer be able to obtain services at Planned Parenthood Member health centers.  Brindis Decl. ¶ 35.  Other publicly funded health care providers, already stretched to capacity, do not provide the same services and will not be able to make up the shortfall in coverage.  *See id.* ¶¶ 35-59.  That loss in access to reproductive health care will, in turn, lead to a broader public health crisis.  *See id.* ¶¶ 60-62.  As Dr. Brindis explains, the Defund Provision will lead to (among other consequences) higher rates of STIs and unintended pregnancies.  *Id.* ¶¶ 63-81.  Moreover, the Defund Provision will likely result in an increased number of abortions due to the decreased access to contraceptives and the corresponding increase in the number of unintended pregnancies.  *Id.* ¶ 71.  These harms will be costly not only physically for patients, including mothers and children, but also fiscally for society.  *Id.* ¶¶ 67-73. Dr. Brindis's opinions are buttressed by state-level defunding experiences that have demonstrated the negative effect on health outcomes resulting from restrictions on patient access to Planned Parenthood Members.  *Id.* ¶¶ 87-107; Custer Decl. ¶¶ 65-73.

The harms to Planned Parenthood Members across the country will also harm PPFA itself—including by striking at the heart of PPFA and the Members' core mission of ensuring access to vital sexual and reproductive health care for all.  Custer Decl. ¶¶ 59, 78-79.

## STANDARD OF REVIEW

The legal standard applicable to temporary restraining orders is "'the same as for a preliminary injunction.'"  *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021).  A party

seeking a preliminary injunction or temporary restraining order must demonstrate that four interests are in its favor:

> (i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest.

*Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009). The first factor—likelihood of success on the merits—is the "most important" and serves as the "sine qua non" of the analysis. *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020). But "an inquiring court need not conclusively determine the merits of the movant's claim" at the preliminary injunction stage; rather, it must "simply … evaluate the likelihood vel non that the movant ultimately will prevail on the merits." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). In addition, "an attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Here, all four factors tip sharply in Plaintiffs' favor.

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

#### A.    The Defund Provision Is An Unconstitutional Bill Of Attainder

The Defund Provision is Congress's attempt to punish Planned Parenthood for being, for generations, the Nation's foremost advocate for sexual and reproductive rights and, if its Members are treated collectively, the only nationwide abortion provider. That makes the Defund Provision a bill of attainder, in violation of U.S. Const. art. I, § 9, cl. 3. The Bill of Attainder Clause is intended to prohibit "trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965). It makes plain that legislatures must accomplish their objectives "by rules of general applicability"

and "cannot specify [those] upon whom the sanction it prescribes is to be levied." *Id.* at 461. Because the Defund Provision singles out Planned Parenthood for punishment, it is an unconstitutional bill of attainder.

There are three elements of an unconstitutional bill of attainder: "[1] specification of the affected persons, [2] punishment, and [3] lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 847 (1984). Each is satisfied here.

### 1.    The Defund Provision specifies Planned Parenthood

The Defund Provision plainly specifies Planned Parenthood as its object. Though not explicitly named, Planned Parenthood is the "easily ascertainable" target of the law. *United States v. Lovett*, 328 U.S. 303, 315 (1946). The statutory definition of "prohibited entity" was designed to target Planned Parenthood specifically—stacking qualifications until nearly all of the entities covered are Planned Parenthood Members. *Supra* pp. 13-15. And the legislative history and context confirm that this was the intent.[15] *Supra* pp. 8-13. Statutes gerrymandered to target one group meet the specification requirement. *See SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 669-70 (9th Cir. 2002) ("A statute need not identify an individual or group by name to incur suspicion."). Because the Defund Provision specifies Planned Parenthood in all but name, this element of the test is satisfied.

---

[15]    Among other things, the legislative history demonstrates that the nearly identical 2017 bill was initially drafted so that only Planned Parenthood Members were captured. Then and continuing through the Defund Provision's eventual enactment of the same functional language, the requirement for the amount of Medicaid funds received was incrementally decreased specifically to avoid Byrd Rule problems, until it could squeak through the Senate Parliamentarian process. Capturing another entity as collateral damage in order to get around the Byrd Rule does not change the bottom line here: that Planned Parenthood was the clear target of the bill.

### 2.     The Defund Provision punishes Planned Parenthood

The Defund Provision also imposes "punishment" on Planned Parenthood.  Courts consider three factors to determine whether legislation inflicts punishment: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'"  *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475-76, 478 (1977)).  None of those inquiries is dispositive, *see Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 350 (2d Cir. 2002), but here, the Defund Provision meets all three.

First, the statute falls within the historical meaning of legislative punishment.  Traditional forms of punishment forbidden by the Bill of Attainder Clause include "legislative bars to participation by individuals or groups in specific employments or professions."  *Selective Serv. Sys.*, 468 U.S. at 852.  By barring Medicaid reimbursement, the Defund Provision prevents Planned Parenthood Members from continuing to serve Medicaid patients, the consequence of which "would be to put plaintiff[s] out of business, or at least to put plaintiff[s] out of the business in which [they have] been engaged to date."  *Fla. Youth Conservation Corps., Inc. v. Stutler*, 2006 WL 1835967, at *1 (N.D. Fla. June 30, 2006).  Categorically excluding Planned Parenthood Members from their longstanding participation in Medicaid "is analogous to legislation that prohibits a person or entity from engaging in certain employment, which courts have historically found to be associated with punishment."  *Planned Parenthood of Cent. N.C. v. Cansler*, 877 F. Supp. 2d 310, 324 (M.D.N.C. 2012) ("*PPCNC*") (holding that state law prohibiting Planned Parenthood organizations from receiving government funds was an unconstitutional bill of attainder).  Indeed, just as the Supreme Court held in *Lovett* that a statute barring the appropriation

of federal funds for the salaries of specific government employees was a bill of attainder, so too the Defund Provision is not "a mere appropriation measure," but rather is a "proscription from any opportunity to serve" the public. *Lovett*, 328 U.S. at 305 n.1, 313, 316.[16]

Second, the Defund Provision does not advance any nonpunitive legislative purpose. *See Nixon*, 433 U.S. at 475-76. The legislative history and context reflect only a plain intent to punish. *See supra* pp. 8-13. But to the extent the government seeks to save the Defund Provision by invoking some other purpose after the fact, there are, at best, only two even conceivable interests the government might assert: (1) preventing federal funds from being used for abortion; and (2) saving the government money. Neither provides the government any help because neither relates to the actual statutory text.

The Defund Provision does not prevent taxpayer dollars from paying for abortions. Under the Hyde Amendment, federal law for decades has prohibited federal Medicaid money from funding abortions except in the narrowest of circumstances. *See Mass. ex rel. Dep't of Pub. Welfare v. Sec'y of Health & Hum. Servs.*, 749 F.2d 89, 95 (1st Cir. 1984). Medicaid is traditionally a fee-for-service program, *see supra* pp. 6-8, in which providers are reimbursed on a service-by-service basis for the eligible services they provide. Federal Medicaid flatly does not

---

[16]    It is of no matter that "prohibited entity" is defined in the Defund Provision "as of" a later date. "Punishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct." *Selective Serv. Sys.*, 468 U.S. at 851-52 (citing *Brown*, 381 U.S. at 458-59). The impetus behind the Defund Provision is, in any event, Congress' disapproval of the *prior* conduct of Planned Parenthood Members—specifically, decades of providing and advocating for access to abortion care. Nor does attaching the statutory definition to a later date "leave[] open *perpetually* the possibility of qualifying for aid," *id.* at 853 (emphasis added), as the prohibition against receiving Medicaid reimbursements begins "on the date of the enactment," and nothing in the Defund Provision suggests that Planned Parenthood Members have a continuing ability to avoid its effects. *See Cummings v. Missouri*, 71 U.S. 277, 318 (1866) (striking state constitutional amendment as an unconstitutional bill of attainder, despite individuals' ability to avoid employment prohibitions by stating under oath that they had not given aid or comfort to the Confederacy because the oath requirement was retrospective).

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

cover abortions except within the Hyde Amendment's narrow exceptions (which are repeated in the Defund Provision).  Thus, rather than restricting federal Medicaid funding for abortion, the Defund Provision categorically prohibits Medicaid reimbursement for all the contraception, screening and treatment for cancer, STIs, and other *non*-abortion medical services of the "prohibited entit[ies]."  Moreover, unlike Planned Parenthood Members, the Defund Provision leaves nearly every other abortion provider in the country eligible for Medicaid reimbursements for the non-abortion medical services *they* provide.  *See PPCNC*, 877 F. Supp. 2d at 324.  Thus, the statute targets Planned Parenthood, not abortion.

Nor can the law be justified based on the purported interest of saving the government money.  In fact, the Congressional Budget Office (the "CBO") concluded that the Defund Provision's one year defund will actually *increase* government expenditures by $52 million over the course of ten years.  *See* Cong. Budget Off, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline* (June 29, 2025), https://www.cbo.gov/publication/61534 (hereinafter "CBO Report").  Regardless, even if the Defund Provision were purportedly to save money, it would not be permissible for Congress to target entities for funding cuts in an arbitrary way, as discussed further below in Section I.B (equal protection).

For these reasons, there is no legitimate justification for barring Planned Parenthood Members from receiving federal Medicaid reimbursements.  The absence of a legitimate justification is sufficient, in and of itself, to establish that it is "at least conceivable that the … legislature intended to punish Plaintiffs."  *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 818 (9th Cir. 2016).  Here, the government's punitive intent is more than just conceivable, but rather confirmed by the history and context of the Defund Provision.  *See supra* pp. 8-15.

Third, the legislative record is replete with evidence of intent to punish Planned Parenthood. "Outright statements of punitive intent are not necessary [to prove congressional intent to punish]; instead, [courts] look for evidence permitting an inference of punitive intent." *Fowler Packing Co.*, 844 F.3d at 818. But here, congressional supporters of the Defund Provision made their intentions clear, expressly reaffirming their point was to target Planned Parenthood. *See supra* pp. 8-13. These punitive expressions further demonstrate that the Defund Provision is focused solely on punishment, rather than on any legitimate legislative purpose. *See Consol. Edison Co.*, 292 F.3d at 355 ("[T]he stated intent of at least some legislators—most notably one of the floor managers of the legislation—to punish [the plaintiff] reinforces [the] conclusion that a substantial part of the legislation cannot be justified by any legislative purpose but punishment.").

### 3. The Defund Provision does not afford Planned Parenthood a trial

There can be no question that the Defund Provision punishes Planned Parenthood without a trial. Indeed, the absence of any trial is a necessity for the Defund Provision to have its intended effect, which is to punish Planned Parenthood's lawful activities—providing legal abortions and exercising the right to advocate for access to abortion and other forms of sexual and reproductive healthcare. Because it singles out Planned Parenthood for punishment without a judicial trial, the Defund Provision is an unconstitutional bill of attainder in violation of U.S. Const. art. I, § 9, cl. 3.

### B. The Defund Provision Violates Equal Protection

The Defund Provision also violates the Fifth Amendment's equal protection guarantee. Equal protection directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). By design, the Defund Provision prohibits Planned Parenthood Members from receiving Medicaid payments while leaving other similar providers untouched. *See supra* pp. 14-15. It defines "prohibited entity" using a combination of conjunctive criteria that rule out nearly every other medical provider participating

in Medicaid except Planned Parenthood Members. *Id.* This differential treatment "impinges upon fundamental freedoms," triggering heightened scrutiny. *Eisenstadt v. Baird*, 405 U.S. 438, 447 n.7 (1972); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 (1969). And regardless, the Defund Provision cannot survive any level of scrutiny.

First, the Defund Provision is subject to strict scrutiny because it impinges on Planned Parenthood's First Amendment right of association. The history and context of the Defund Provision make clear that it treats Planned Parenthood Members—each of which is an independent corporation with its own leadership, board, finances, and autonomous operations—differently from other health care providers simply because they associate with PPFA and each other. *See supra* pp. 8-13 (citing legislative history); *supra* pp. 3-5 (explaining Planned Parenthood's federation structure).

The design of the Defund Provision itself demonstrates that its prohibition is not just about providing abortion. If it were, the Defund Provision would apply to more than just Planned Parenthood Members and nearly no one else. Instead, Congress enacted a provision that leaves virtually all abortion providers who participate in Medicaid—*other than Planned Parenthood Members*—unaffected. Nor is this defund even directed at organizations who received over $800,000 Medicaid dollars in fiscal year 2023, since providers above that threshold, even those providing abortions, may nevertheless continue to count on Medicaid payments so long as they are not a 501(c)(3) not-for-profit that is an essential community provider "primarily engaged in family planning services, reproductive health, and related medical care." *See* Section 71113(b)(1)(A). And underscoring the point of these multiple requirements, the Defund Provision refers to a "nationwide health care provider network"—an undefined term that, despite failing to accurately describe Planned Parenthood's structure, appears intended to refer to Planned

Parenthood's visible and unique membership association, through which its Members provide health care to Medicaid-insured patients across the nation. Section 7113(b)(1)(B).

In short, despite refraining from using the Planned Parenthood name, the statute plainly defunds Planned Parenthood Members for a reason that uniquely applies to them—their participation in the Nation's largest and most high-profile membership association of abortion providers. The fundamental associational right is protected by the First Amendment. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984) (the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others" which is "an indispensable means of preserving other individual liberties."); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958) (recognizing right "to engage in association for the advancement of beliefs and ideas"); *Healy v. James*, 408 U.S. 169, 185-86 (1972).

"Classifications that impinge on 'fundamental rights,' including free speech rights, are subject to strict scrutiny and will only be upheld if 'precisely tailored to serve a compelling governmental interest.'" *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 9 n.6 (1st Cir. 2013) (quoting *Plyler v. Doe*, 457 U.S. 202, 217 (1982)). The Defund Provision cannot meet this standard and indeed could not survive any level of scrutiny. As discussed above in Section I.A (bill of attainder), the Defund Provision does not serve a legitimate purpose, much less is it narrowly tailored to achieve a compelling one. It does not prevent taxpayer dollars from paying for abortions. Rather than save money, the CBO has determined that the Defund Provision will actually cost the government money overall. CBO Report, *supra* pp. 23-24. Even if the Defund Provision did reduce government spending, a classification does not survive an equal protection challenge simply by saving the government money. *See Saenz v. Roe*, 526 U.S. 489, 507 (1999)

("[T]he State's legitimate interest in saving money provides no justification for its decision to discriminate among equally eligible citizens.").  Congress might shrink Medicaid expenditures by disqualifying patients with blonde hair, but such a classification would nevertheless be arbitrary and unconstitutional.

The true design of the Defund Provision is to punish Planned Parenthood because of its unique role in providing abortions and advocating for abortion rights and access across the country. *See supra* pp. 9-15, 21-25.  At its core and in context, the law is "inexplicable by anything but animus." *Romer v. Evans*, 517 U.S. 620, 632 (1996).  Such a "bare … desire to harm" a group is not a legitimate, much less compelling, reason for singling them out.  *Id.* at 634 ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a 'bare … desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." (alterations and emphasis in original) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).

Even if rational basis review applied, such improper justifications would still mean that the Defund Provision is unlawful.  At the very least, equal protection demands "some rationality in the nature of the class singled out." *Rinaldi v. Yeager*, 384 U.S. 305, 308-09 (1966).  Fueled solely by ill will, the Defund Provision targets Planned Parenthood Members for exclusion from federal Medicaid reimbursement while allowing the vast majority of other clinics that provide the same services, including abortions, to participate fully in Medicaid.  Planned Parenthood "has been intentionally treated differently from others similarly situated," and "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34-35 (1st Cir. 2008).

**C.     The Defund Provision Unconstitutionally Retaliates Against Planned Parenthood's Exercise Of Its First Amendment Rights**

Targeting Planned Parenthood for its political stances on reproductive health, the Defund Provision also runs afoul of the First Amendment.  As that Amendment provides, "Congress shall make no law … abridging the freedom of speech[.]"  U.S. Const. amend. I.  Congress cannot "punish or suppress disfavored expression," *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024), or retaliate against such expression, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).  As such, "the government may not deprive an individual of a 'valuable government benefit[]' in retaliation for his or her exercise of First Amendment rights," *Barton v. Clancy*, 632 F.3d 9, 23 (1st Cir. 2011), including the right to free speech and of association.  "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).  The Defund Provision undertakes to do just that by terminating Medicaid funding for Planned Parenthood Members and next to no one else.

To state a First Amendment retaliation claim, a plaintiff must allege that it (1) "'engaged in constitutionally protected conduct,'" was (2) "'subjected to adverse [government] action,'" and (3) that "'the protected conduct was a substantial or motivating factor in the adverse action'" such that retaliatory animus was the but-for cause of the injury.  *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514-15 (1st Cir. 2023).  All three elements are satisfied here.

First, PPFA and its Members engage in First Amendment protected activity.  They do so by advocating (together with national, state, and local Planned Parenthood 501(c)(4) social welfare organizations) for policies to protect and expand access to sexual and reproductive health care, including abortion.  And to speak and act together, Members associate with PPFA and with one

another, exercising the associative right "implicit in the right to engage in activities protected by the First Amendment." *U.S. Jaycees*, 468 U.S. at 622.

Second, terminating Medicaid eligibility constitutes an adverse action. The Defund Provision punishes Planned Parenthood Members for their association with each other and with PPFA, *see supra* Part I.B (equal protection), by stopping the flow of hundreds of millions of dollars in Medicaid reimbursements that they would otherwise qualify to receive—a denial of a "valuable government benefit." *Clancy*, 632 F.3d at 23. With that much at stake, such a disqualification would "'deter a reasonably hardy individual'" from associating with Planned Parenthood or from advocating for the protection and expansion of access to sexual and reproductive health care, including abortion. *McCue v. Bradstreet*, 807 F.3d 334, 339 (1st Cir. 2015).

As discussed above, Planned Parenthood's visible and unique membership association, which serves its mission on a nationwide scale, sets it apart. Intentional animus against Planned Parenthood's message and mission animates the Defund Provision, *see supra* pp. 8-15, 28-29, and Planned Parenthood Members' association with each other and PPFA is the reason they have been carved out for differential treatment, *see supra* pp. 25-27. Taken together, both the statute's text and historical context demonstrate retaliatory animus, a desire to pressure caregivers who associate with Planned Parenthood and its mission of promoting reproductive health to those in need. *Supra* pp. 25-29. Tainted by this animus, the Defund Provision violates the First Amendment.

### D. The Non-Qualifying Members Are Likely To Succeed On Their Additional Claims

The Defund Provision is unconstitutional and should be enjoined as to all Planned Parenthood Members. But even if the Defund Provision were otherwise lawful on its face, it would still not lawfully exclude ten Planned Parenthood Members, including Plaintiff PPAU, from Medicaid. *See* Custer Decl. ¶ 63; Ghorbani Decl. ¶ 18. First, the Non-Qualifying Members—who

either do not provide abortions or did not receive more than $800,000 in fiscal year 2023—are neither "prohibited entit[ies]" nor "affiliates, subsidiaries, successors, or clinics" thereof.  Yet, because the Non-Qualifying Members face a credible fear of enforcement, notwithstanding the plain language of the statute, they have no choice but to immediately stop submitting claims for Medicaid reimbursement absent injunctive relief from the Court.  *See* Ghorbani Decl. ¶¶ 20-21. Second, should the Court determine that the Non-Qualifying Members are nonetheless covered by the Defund Provision, the statute as so construed is unconstitutional because it is unconstitutionally vague and violates their First Amendment right to association.

1.    **Declaratory relief is warranted to prevent enforcement against Non-Qualifying Members that do not independently qualify as "prohibited entit[ies]"**

As explained, the Defund Provision defines a "prohibited entity" as one that, among other things, "provides for abortions" and received more than $800,000 in Medicaid reimbursements in fiscal year 2023.  Three Planned Parenthood Members that participate in Medicaid do not provide abortion services because it is not legal where their health centers are located.  Custer Decl. ¶ 63. Other Planned Parenthood Members, including Plaintiff PPAU, received less than $800,000 in Medicaid reimbursements in fiscal year 2023.  *Id.*; Ghorbani Decl. ¶ 18.  These Non-Qualifying Members therefore do not independently qualify as "prohibited entit[ies]" under the Defund Provision.  However, because of the government's long history of targeting Planned Parenthood at both the federal and state level, the Non-Qualifying Members seek declaratory relief confirming that they are not "prohibited entit[ies]" so that they can seek Medicaid reimbursement without threat of unwarranted enforcement actions.

No reasonable interpretation of the terms "affiliates, subsidiaries, successors, [or] clinics" should lead to the conclusion that one Planned Parenthood Member's status as a "prohibited entity" means that an entirely separate Member should be excluded from Medicaid.

First, one Planned Parenthood Member is not an "affiliate[]" of another.  Congress is assumed to know and adopt "the widely accepted legal definitions of meanings associated with the specific words enshrined in the statute," and courts "[p]redictably" will "turn to *Black's Law Dictionary* to glean the most widely accepted legal meaning" of the term in question.  *United States v. Nason*, 269 F.3d 10, 15-16 (1st Cir. 2001).  Here, *Black's Law Dictionary* speaks clearly, focused on the core requirement of "control": an "affiliate" is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."  "Affiliate," *Black's Law Dictionary* (12th ed. 2024).  Such a definition—capturing circumstances in which one entity controls another, or two entities are under common control of a third—is used consistently across a wide range of contexts.  *See, e.g.*, *Int'l Confections Co. v. Z Cap. Grp., LLC*, 2023 WL 335285, at *2 (6th Cir. Jan. 20, 2023) (many State and federal laws define affiliate "in similar ways," specifically where "[a]ny 'person that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, the person specified'") (quoting Utah Code Ann. § 16-10a-102(2)); *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *6-7 (D.D.C. Mar. 12, 2021) ("overwhelming weight of authority" supports a definition of affiliate where one company is "effectively controlled by another or associated with others under common ownership or control").

"Control" is in turn typically defined to require an entity to own or manage another.  *See, e.g.*, "Control," *Black's Law Dictionary* (12th ed. 2024) ("The direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee").  Defining "control" in terms of one entity's actual ownership or management of another is consistent across many contexts, including in the Medicaid Act for purposes of determining whether one entity can

31

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

be terminated from Medicaid or otherwise sanctioned for the conduct of a different entity. *See, e.g.*, 42 U.S.C. § 1320a-3(a)(3) (defining "person with an ownership or control interest" to include entities where a sanctioned person has a direct or indirect "ownership interest of 5 per centum or more in the entity," who "is an officer or director of the entity, if the entity is organized as a corporation," or who "is a partner in the entity, if the entity is organized as a partnership"); 42 U.S.C. § 1395w-25(d)(4) ("[C]ontrol is presumed to exist if one party, directly or indirectly, owns, controls, or holds the power to vote, or proxies for, not less than 51 percent of the voting rights or governance rights of another.").

There is no relationship of affiliation or control between different Planned Parenthood Members, as no Planned Parenthood Member owns or manages any other. Members are separately incorporated, have separate leadership and boards, separate staffs on separate payrolls, and file their taxes as individual organizations. *See* Custer Decl. ¶¶ 9, 16. One Member has no ownership interest in another, nor any say so in how the other Member conducts its day-to-day operations. Nor is there such a relationship between PPFA and its Members. Guidance and support flow in both directions between PPFA and its Members, with the Members appointing PPFA's Board of Directors and approving changes to PPFA's bylaws and membership standards, and PPFA in turn providing technical assistance and support to assist Members in fulfilling their missions. *See id.* ¶¶ 10, 13, 15.[17]

The Non-Qualifying Members are also not "subsidiaries, successors, or clinics" of other Planned Parenthood Members. One Member is not "controlled by another by owning more than

---

[17]    PPFA itself is also not a "prohibited entity"—it is not an "essential community provider," it does not "provide[] for abortions," and it did not receive any funds from Medicaid. Nor are the Members "affiliates" of PPFA, as PPFA does not own or control them, or vice versa.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

50% of voting stock." *See* "Subsidiary," *Black's Law Dictionary* (12th ed. 2024).[18]  Nor is one Member an entity that has "succeed[ed] to the rights or the place of another" Member.  *See* "Successor," *Black's Law Dictionary* (12th ed. 2024).  And while individual Members operate their own clinics, the clinic of one Member has no relationship to any other Member.

Although the Defund Provision does not apply to the Non-Qualifying Members based on the plain meaning of the statute, the threat that the Defund Provision will be enforced against these Members is "sufficiently imminent" to require immediate relief from this court.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  This Court should therefore use its power under the Declaratory Judgment Act to issue an order declaring that the Non-Qualifying Members are neither "prohibited entit[ies]," nor "affiliates, subsidiaries, successors, [or] clinics" of a "prohibited entity" under the Defund Provision.

### 2.    Without the declaratory relief requested, the Defund Provision is unconstitutionally vague

If the Court decides it cannot provide declaratory relief finding that the Defund Provision does not apply to the Non-Qualifying Members on its face, then the statute's remaining ambiguity is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment.  Absent clarity, the Non-Qualifying Members cannot reasonably determine whether the Defund Provision applies to them, and it fails to provide them with notice or fair warning of how it may be enforced against them.  The vague definition of "prohibited entit[ies]" puts the Non-Qualifying Members in the untenable position of choosing either to forgo Medicaid funding or risk an arguable violation of the statute, thereby chilling otherwise lawful activity.  Indeed, Non-Qualifying Member Plaintiff

---

[18]    Non-Qualifying Members are also not subsidiaries of PPFA, but that is not relevant under the statute.  As explained in *supra* n.17, PPFA is not a "prohibited entity."  As such, even if Members were subsidiaries of PPFA (they are not), that would not make them subsidiaries of a "prohibited entity."

PPAU has already had to stop submitting Medicaid reimbursement requests for this very reason. *See* Ghorbani Decl. ¶¶ 20-21; *see Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The Supreme Court has recognized that vague laws may cause "citizens to 'steer far wider of the unlawful zone' … than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Laws, regulations, or executive actions may thus be "void for vagueness if [their] prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. Two values animate this doctrine. First, vague laws fail to provide "fair warning" to those who may be subject to them. *Id.* And second, vague laws invite "arbitrary and discriminatory enforcement." *Id.* Since vague laws have a chilling effect, concerns are heightened when the challenged law "abut[s] upon sensitive areas of basic First Amendment Freedoms." *Id*. at 109 (alteration in original).

Here, the Defund Provision contravenes both values that undergird the vagueness doctrine. By failing to define the full scope of "prohibited entit[ies]," the Defund Provision fails to provide the Non-Qualifying Members with fair warning whether they will fall under the scope of the law or as to what they would have to do in order to fall outside of the statute's coverage. Would a Member have to somehow distance or disassociate itself from PPFA to no longer be considered a prohibited entity? Or would Members' medical directors have to stop meeting to discuss recent medical studies or evidence-based best practices? These concerns are only further heightened because they implicate these Members' First Amendment rights of association. *See Grayned*, 408 U.S. at 109.

"When a law fails to provide 'minimal guidelines' governing its enforcement, it may sweep in so much conduct that enforcement decisions become based on the 'personal predilections' of the person or entity bringing the enforcement action."  *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).  The Trump Administration's expressed desire to "defund" Planned Parenthood underscores the risk of arbitrary or discriminatory enforcement of the Defund Provision where it lacks defined boundaries expressly clarifying the meaning of "prohibited entity."

### 3.  Without the declaratory relief requested, the Defund Provision violates the Non-Qualifying Members' First Amendment rights

Under decades of precedent, the government may not exclude an entity from a government program or deny a benefit—here, Medicaid reimbursements—because it engages in protected expressive and associational activity outside of the Medicaid program.  *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 214-17 (2013) ("*AOSI*"); *Perry*, 408 U.S. at 597; *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 942-43 (9th Cir. 1983) ("*PPCNA I*"); *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 789 F.2d 1348, 1351 (9th Cir. 1986) ("*PPCNA II*"), *aff'd mem. sub nom. Babbit v. Planned Parenthood Fed'n*, 479 U.S. 925 (1986). Yet that is exactly what the Defund Provision would do if enforced against the Non-Qualifying Members.

The government cannot use its resources to pressure people into abandoning their constitutional rights—"'a result which [it] could not command directly.'"  *Perry*, 408 U.S. at 597 (alteration in original).  The unconstitutional conditions doctrine acts as the check that prevents the government from doing that.  *Id.*  Under settled law, the government "'may not deny a benefit to a person because he exercises a constitutional right'"—regardless of whether he has any

entitlement to that benefit in the first place.  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *see AOSI*, 570 U.S. at 214; *Perry*, 408 U.S. at 597.

Although the government may "impose limits on the use of [its] funds to ensure they are used in the manner Congress intends," *AOSI*, 570 U.S. at 213, the relevant constitutional distinction "is between conditions that define the limits of government spending programs—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate [activity] outside the contours of the program itself." *Id.* at 214-15.  Supreme Court precedent illustrates this distinction and also makes clear that the Defund Provision crosses the constitutional line.

In *Rust v. Sullivan*, for example, the Supreme Court upheld a restriction on the use of Title X funds for abortion and abortion counseling because that restriction governed only "the scope of the Title X *project's* activities," and left clinics able "to pursue abortion-related activities when they are not acting under the auspices of the Title X project."  500 U.S. 173, 196, 198 (1991) (emphasis added).  *Rust* reaffirmed, however, that it would be unlawful for the government to place "a condition on the *recipient* of the subsidy rather than on a particular program or service" because such a maneuver would "effectively prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197 (emphasis in original).  Consistent with *Rust*, the Supreme Court in *AOSI* struck down a government condition because it restricted constitutionally protected activity by a grantee *outside* the scope of a government program— requiring grant recipients to pledge to oppose prostitution and sex trafficking.  570 U.S. at 210-11. *AOSI* held the condition unconstitutional because it went beyond how the grant money was used, and instead compelled "a grant recipient to adopt a particular belief as a condition of funding." *Id.* at 218.

If it covers the Non-Qualifying Members, the Defund Provision is an unconditional condition because it denies benefits based on the exercise of the right to associate with PPFA and other Members in furtherance of their collective expression. *See supra* pp. 25-29. The only reason the Non-Qualifying Members would arguably be covered by the Defund Provision is because of their association with PPFA and other Members. Indeed, because they do not independently qualify already, it seems the only change these Members could actually make to avoid defunding would be to stop being members of—*i.e.*, stop their association with—Planned Parenthood. That is the definition of an unconstitutional condition.

Moreover, the constitutionally protected activity the government seeks to punish and suppress here—the association between PPFA and its Members, and their advocacy for abortion rights and access—clearly occurs "outside the contours of" the Medicaid program. *AOSI*, 570 U.S. at 215. Therefore, the Defund Provision, if interpreted broadly, "must be doing something more—and it is." *AOSI*, 570 U.S. at 218. The statute would seek to leverage federal Medicaid funding to coerce Non-Qualifying Members to halt their association with Planned Parenthood "on [their] own time and dime," producing a result Congress could not command directly. *Id.*; *see Perry*, 408 U.S. at 597. Under an unbroken line of Supreme Court authority, this effort to leverage federal funds violates the First Amendment. *See PPCNC*, 877 F. Supp. 2d at 319-20.

## II. PLAINTIFFS AND THEIR PATIENTS WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF, AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

The harmful effects of the Defund Provision on Planned Parenthood Members and their patients, PPFA, and public health generally can scarcely be overstated. Planned Parenthood Members will have to turn away the over a million Medicaid-covered patients who rely on them annually for health care needs. Planned Parenthood provides an extraordinary proportion of the Nation's publicly funded reproductive health services, and other providers who accept Medicaid-

MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TRO & PI

insured patients are already stretched to capacity in many of the areas Planned Parenthood Members serve.  As a result, many patients simply will not be able to obtain timely care elsewhere, with grave consequences to both individuals and the public health.  Planned Parenthood Members will lose more than one third of their collective total care revenue and, as a result, will be forced to drastically cut back operations, including curtailing hours and services and eventually closing clinics.  Custer Decl. ¶ 4.  This will, in turn, result in millions of patients being unable to receive the vital health care services they need.

The government, by contrast, will suffer no cognizable harm from preliminary injunctive relief, which would simply allow Planned Parenthood Members to continue providing care as they have done for decades.  And PPFA and its Members have no remedy at law; if Members are denied Medicaid reimbursement while this litigation is pending, they cannot recover damages against the government later.  These circumstances easily establish the conditions for a temporary restraining order and preliminary injunction.

### A.    Plaintiffs And Their Patients Face Irreparable Injury

Planned Parenthood Members and their patients, as well as PPFA, will suffer irreparable injury if the Defund Provision is not enjoined.  "[T]the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits."  *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009).  Whatever the standard, Plaintiffs meet it.  The irreparable injuries are immediate, jarring, and grave.

As a threshold matter, the deprivation of Plaintiffs' constitutional rights itself constitutes irreparable injury.  *See Vaqureía Tres Monjutas, Inc.*, 587 F.3d at 484 (noting that certain constitutional violations, such as infringement of free speech, are "more likely to bring about irreparable harm").  In particular, "[t]he loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 11, 15 (1st Cir. 2012) (where plaintiffs seeking a preliminary injunction "have made a strong showing of likelihood of success on the merits of their First Amendment claim … "[t]here is no need for an extensive analysis of [the irreparable harm] element," as such harm is "presumed"). This alone is sufficient to justify preliminary injunctive relief.

On the ground, absent immediate relief, the impacts on Planned Parenthood Members and their patients will be devastating. Medicaid reimbursements for services provided account for more than one third of the total revenue that Planned Parenthood Members collectively receive each year. Custer Decl. ¶ 44. If Planned Parenthood Members are barred from receiving federal Medicaid reimbursement for their services, Members across the country will be forced to reduce the hours and vital programs they offer, terminate staff members, and eventually close health centers. *See* Custer Decl. ¶¶ 4, 54-57, 78; Lee Decl. ¶¶ 40-42; Ghorbani Decl. ¶¶ 6, 24; Tosh Decl. ¶¶ 45-48; *see also* Compl. ¶¶ 110, 113, 119, 122, 125. Health centers that close during the pendency of this litigation may never be able to reopen. *See* Tosh Decl. ¶ 46. And even if the Members could resume their services, their close relationship with patients will have been severely disrupted, making patients less likely to return. *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76-77 (1st Cir. 2005) (finding irreparable harm where health center faced substantial loss of business resulting from government's failure to pay Medicaid reimbursements, and "any shut down of [the center] would adversely affect hundreds of Medicaid patients").

Absent prompt injunctive relief, the Defund Provision will inevitably result in vast numbers of patients not receiving the health care they need. Most immediately, it will jeopardize care for the over a million Planned Parenthood Member patients who receive health services through

Medicaid, many of whom will no longer be able to receive services through Planned Parenthood Members.  Brindis Decl. ¶ 35; Custer Decl. ¶¶ 49-50.  And changes to health center services and hours, or eventual health center closures, jeopardize access to healthcare for *all* of the patients— Medicaid eligible and non-Medicaid eligible—served at those centers.  Custer Decl. ¶¶ 54-55; *supra* pp. 16-19.  In many cases, patients who receive care at Planned Parenthood Member health centers have no alternative provider in their communities.  Custer Decl. ¶¶ 24-29; Lee Decl. ¶¶ 36-38; Brindis Decl. ¶ 39; Tosh Decl. ¶¶ 51-52, 54.  In many others, alternative providers are an inadequate substitute for a Planned Parenthood Member provider because they do not provide comparable services—in particular, they do not provide the same degree of expertise in reproductive health care and the same emphasis on compassionate and nonjudgmental care.  Custer Decl. ¶¶ 31-37, 53; Lee Decl. ¶ 39; Tosh Decl. ¶¶ 25, 29, 54-57; Brindis Decl. ¶¶ 25, 38.  Nor are they as accessible—often with substantial wait times and more limited hours—which can pose a serious barrier to care, especially for patients with low incomes.  Custer Decl. ¶ 33; Lee Decl. ¶¶ 38-39; Brindis Decl. ¶¶ 41, 44, 59; Tosh Decl. ¶¶ 47, 54.  And even where other suitable providers exist, such providers do not have nearly the capacity necessary to fill the vast gap that will be left by defunded Planned Parenthood Members.  Brindis Decl. ¶¶ 35-43.

These effects will result in patients facing significant delays to receiving care, or losing access to care altogether, potentially to the serious detriment of their health.  Brindis Decl. ¶¶ 11, 35, 57-62.  These adverse consequences are likely to include, among others, more unintended and therefore, riskier pregnancies; *id.* ¶¶ 62-73; an increase in the number of sexually transmitted infections; *id.* ¶¶ 74-81; and cancer and other serious health issues going undetected; *id.* ¶¶ 84-86.  Notably, during fiscal year 2023, PPFA Members provided more than 426,000 cancer screenings and other diagnostic procedures, resulting in early detection of cancer or abnormalities.  Brindis

Decl. ¶ 84.  Without care, STIs will go undetected or be detected later, leading to higher rates of STIs and more severe consequences for patients experiencing these diseases, such as pelvic inflammatory diseases and future infertility.  *Id.* ¶ 62.

There can be no question that this is irreparable harm.  *See, e.g.*, *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) ("A disruption or denial of … patients' health care cannot be undone after a trial on the merits." (internal quotations omitted)); *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (irreparable harm where individuals would experience complications and other adverse effects due to delayed medical treatment); *Banks v. Booth*, 468 F. Supp. 3d 101, 123 (D.D.C. 2020) (same).  The forced contraction in Planned Parenthood Members' mission of providing vital health care to the community likewise unquestionably constitutes irreparable harm to them and to PPFA.  *See, e.g.*, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where "new obstacles unquestionably make it more difficult for the [plaintiffs] to accomplish their primary mission").

In California, for example, nearly 1 million patients rely on Planned Parenthood Member health centers for care.  Planned Parenthood Members' health centers in California are the backbone of the Medi-Cal program's network of sexual and reproductive health care providers and collectively provide approximately $425 million of services annually to patients that are covered by Medi-Cal and its related programs.  Tosh Decl. ¶ 38.  Over 80% of patients served by the California Planned Parenthood Member health centers are enrolled in Medi-Cal and related programs, and approximately 77% of the total cost of services provided to this population are reimbursed using federal funds—a total of $328 million.  *Id.* ¶¶ 37-38.  The devastating, irreparable

injury that these health centers and the patients they serve would experience if the Defund Provision is allowed to remain in effect cannot be overstated.

Like the other Members, PPLM and PPAU are already facing harm from the Defund Provision. Because PPLM currently meets the requirements to be a "prohibited entity" under the Defund Provision, and that status will not change between now and the "first day of the first quarter beginning after the date of enactment of this Act," PPLM has been forced to stop seeking Medicaid reimbursement upon the Defund Provision's enactment. Lee Decl. ¶ 35. If the Defund Provision is not enjoined, PPLM will be forced to cease providing services to its Medicaid patients, many of whom will likely be unable to find another provider or will face such lengthy wait times that they will be forced to forgo services. *Id.* ¶¶ 35-38. PPLM has nearly 150 scheduled appointments for Medicaid patients across its health centers on July 7 and 8 (today and tomorrow) alone and has already begun reaching out to patients to inform them they cannot use their Medicaid coverage for services at PPLM. *Id.* ¶ 4. Many of these patients cannot afford to self-pay for their care and will not be able to access timely, high-quality care at another provider that accepts Medicaid. *Id.* ¶¶ 35-39. The Defund Provision will cause PPLM to lose approximately $4.5 million in annual revenue, which is approximately 39% of its medical services revenue. *Id.* ¶¶ 29-30. As a result, PPLM will be forced to rapidly reduce its overall costs by 20 to 25% by curtailing its staff, hours, and services. *Id.* ¶ 40. This will deny care not only to its Medicaid patients, but for all of its patients at those health centers. *Id.* ¶¶ 41-42. PPLM projects that the Marlborough Health Center would be vulnerable to closure within about twelve months after losing Medicaid funds. *Id.* ¶ 41.

Even though PPAU does not independently qualify as a "prohibited entity" under the Defund Provision, due to the threat that the government could determine PPAU is a "prohibited entity" based on its association with other Planned Parenthood Members, PPAU has had no choice

but to stop seeking Medicaid reimbursement upon the Defund Provision's enactment.  Ghorbani Decl. ¶ 20.  Because PPAU's health centers cannot afford to provide health care services free of charge, if the Defund Provision is not prevented from going into effect, PPAU will be forced to turn away patients who rely on Medicaid for health insurance and cannot afford to pay otherwise. *Id.* ¶ 21.  And many of PPAU's Medicaid-enrolled patients may be unable to find another provider of affordable sexual and reproductive health care in their area, much less one that sees Medicaid patients.  *Id.* ¶ 22.  In federal fiscal year 2023, PPAU received $706,251 in Medicaid reimbursements. *Id.* ¶ 18.  Losing this revenue will force PPAU to lay off full-time staff, limit the health care services it provides, and potentially close health centers as a result.  *Id.* ¶ 24.  When the federal government recently withheld $2.8 million in Title X funds from PPAU— approximately 20% of its overall revenue—PPAU was forced to lay off 18 full-time staff members (approximately 20% of PPAU's staff) and close two health centers (approximately 20% of its health centers).  *Id.*  PPAU will likely have to make similar proportionate cuts to its health centers and staff if it cannot seek Medicaid reimbursements.  *Id.*

The First Circuit has expressly recognized that where government action threatens disruption of Medicaid patients' access to health care services, preliminary injunctive relief is warranted.  *See Rio Grande Cmty. Health Ctr.,* 397 F.3d at 76-77; *see also Dr. José S. Belaval, Inc. v. Peréz-Perdomo*, 465 F.3d 33, 36 n.2 (1st Cir. 2006) (discussing irreparable injury to community health center resulting from government's failure to make Medicaid payments).  Courts have routinely and specifically recognized that government action excluding Planned Parenthood Members from Medicaid leads to irreparable harm.[19]  The only difference between

---

[19]    *See, e.g.*, *Planned Parenthood S. Atl. v. Baker*, 326 F. Supp. 3d 39 (D.S.C. 2018), *aff'd*, 941 F.3d 687 (4th Cir. 2019); *Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207,

those cases and this one is the scale of harm: instead of State action attacking one or two Planned

Parenthood Members, the Defund Provision threatens all of the Members—and threatens to leave

patients across the Nation without the vital and urgent care they need.

## B.    The Balance Of Equities And Public Interest Favor Granting Injunctive Relief

The third and fourth factors—the balance of relevant hardships and the public interest—

"merge when the [g]overnment is the opposing party." *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir.

2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Here, the balance of equities and the

public interest strongly weigh in favor of preliminary injunctive relief.

As explained, the public health consequences of defunding Planned Parenthood Members

will be dire.  The Defund Provision will force Planned Parenthood Members to curtail services

and close health centers, jeopardizing their patients' care. *Supra* pp. 16-19.  Put simply, the Defund

Provision will substantially decrease access to reproductive health care across the Nation.  Brindis

Decl. ¶¶ 57, 60-63, 82.  That substantial decrease in access to care will, in turn, lead to a broader

public health crisis.  *See id.* ¶¶ 35, 62; Custer Decl. ¶¶ 65-73.  These damaging public health

consequences mean that entry of an immediate injunction is urgently needed.

By contrast, the federal government will suffer no injury upon the grant of a temporary

restraining order or preliminary injunction.  Planned Parenthood Members have provided care

under the Medicaid program for decades. *See supra* pp. 6-8.  The government cannot credibly

claim that it will suffer injury by preserving that status quo.  Nor can the government contend that

---

1225, 1229 (M.D. Ala. 2015); *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d
604, 650, 530) (M.D. La. 2015), *aff'd sub nom. Planned Parenthood of Gulf Coast, Inc. v. Gee*,
862 F.3d 445 (5th Cir. 2017); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of
Health*, 794 F. Supp. 2d 892, 912-13 (S.D. Ind. 2011), *aff'd in part & rev'd in part on other
grounds*, 699 F.3d 962 (7th Cir. 2012).  These cases have been abrogated on other grounds by
*Medina v. Planned Parenthood S. Atl.*, --- S. Ct. ---, 2025 WL 1758505 (June 26, 2025).

the public interest outweighs the harms to PPFA and its Members here.  *See Mass. Ass'n of Older Ams. v. Sharp*, 700 F.2d 749, 750, 753-54 (1st Cir. 1983) (discussing Medicaid program's purpose of providing assistance to the most needy, and holding that "[t]ermination of [Medicaid] benefits that causes individuals to forgo such necessary medical care … far outweighs" the government's mere "loss of public funds" in the form of Medicaid payments).  Planned Parenthood Members provide greatly needed medical care to over 1 million Medicaid patients each year.  Ensuring those patients remain with their provider of choice during this litigation would alone be enough to satisfy the public interest prong—not to mention those other patients who would lose access to care altogether as a result of health center closures.

### III.  INJUNCTIVE RELIEF AS TO ALL PLANNED PARENTHOOD MEMBERS IS NECESSARY, AND NO BOND SHOULD BE REQUIRED

In light of the irreparable injury that the Defund Provision will inflict on Planned Parenthood Members—each represented here by PPFA—this Court should enjoin the statute's operation as to all Planned Parenthood Members.  Under settled law, membership organizations have standing to seek relief on behalf of their members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's interest, and (c) neither the claim asserted nor the relief requested requires the participation of members in the lawsuit."  *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 308 (1st Cir. 2024) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  That is easily established here: PPFA's members have standing to sue in their own right (and indeed, two join this case), the interests at issue in this case go to the core of PPFA's existence, and relief enjoining the application of the Defund Provision to all Members does not require their participation in this lawsuit.

These irreparable harms and the nature of the Defund Provision further warrant the Court ordering, as part of the preliminary relief sought here, that all Planned Parenthood Members can continue to seek and retain Medicaid reimbursements for medical services provided for the duration of the Court's order.  Absent such an order, Planned Parenthood Members cannot obtain complete relief and will continue to suffer irreparable harm.  This is because of the risk that, following any future adverse ruling, Defendants or others would seek to hold Planned Parenthood Members liable for valid claims submitted during the pendency of a preliminary injunction. Although such efforts would themselves be unlawful, the relief requested here is necessary to dispel the chilling effect those actions would have on Planned Parenthood Members' continued participation in Medicaid during this litigation.  And because "the purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved," *Francisco Sánchez v. Esso Std. Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009), this Court has the authority to craft its order to ensure the status quo is in fact preserved—here, Planned Parenthood Members' ongoing, decades-long participation in Medicaid and ability to serve patients insured through Medicaid with full confidence that they can receive and retain reimbursements for the birth control visits, STI screening and treatment, cancer screenings, and other care provided under an injunction.[20]

Finally, this Court should also exercise its substantial discretion to waive any injunction bond under Rule 65(c).  *See Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000-01 (1st Cir. 1982), *rev'd on*

---

[20]    *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 147-48 (1908) (plaintiff must be able to test the legality of government action in court without fear that an unsuccessful effort would produce "penalties for disobedience" that are "so enormous … as to intimidate … from resorting to the courts"); Michael T. Morley, *Erroneous Injunctions*, 71 EMORY L.J. 1137, 1144 (2022) ("[E]ven an erroneous injunction that is no longer in effect permanently limits the manner and extent to which a wrongfully enjoined party may retroactively enforce its rights against the plaintiff for the plaintiff's actions while the injunction was in force.").

*other grounds*, 467 U.S. 526 (1984); *Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991) (identifying "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond"). First, the federal government will not incur any damages from the injunction. *See Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021). Because Medicaid reimbursements are for care patients are entitled to receive and have paid for through the Medicaid program, courts issuing preliminary injunctions in cases involving targeted defundings of Planned Parenthood Members have waived bond or required only a nominal bond. *See Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Smith*, 236 F. Supp. 3d 974, 999-1000 (W.D. Tex. 2017), *vacated sub nom. Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) (waiving bond because injunction would not harm state's budget where it would be required to pay reimburse other providers for services provided to Medicaid patients); *Planned Parenthood of Kan. v. Mosier*, 2016 WL 3597457, at *25 (D. Kan. July 5, 2016) ("The Court finds no evidence of financial harm to the State if the Court does not require a bond."), *aff'd in part, vacated in part sub nom. Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018); *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 887 (D. Ariz. 2012) (requiring only nominal bond where preliminary injunction would "not cause the Defendants to suffer any monetary damages"). Indeed, it would make no sense to require bond in the amount of Medicaid reimbursements Members will receive when, even if an injunction is later reversed, Members will be entitled to keep those payments, as Plaintiffs ask this Court to expressly find and order. Second, this case directly affects the public interest, and "no bond is required in suits to enforce important federal rights or 'public interests.'" *Crowley*, 679 F.2d at 1000. Third, we will be denied effective

review if required to post a bond; each has attested that it cannot post a bond to match the federal

funds at stake.  Custer Decl. ¶ 82; Lee Decl. ¶ 43; Ghorbani Decl. ¶ 26; *see Doe v. Noem*, 2025

WL 1099602, at *20 n.33 (D. Mass. Apr. 14, 2025) (considering "the hardship that a bond

requirement would impose on the applicant").  Finally, Planned Parenthood's likelihood of success

on the merits weighs in favor of no bond.  *See Crowley*, 679 F.2d at 1000 n.25.

## CONCLUSION

Plaintiffs' motion for a temporary restraining order and preliminary injunction should be

granted.

Dated:  July 7, 2025

Respectfully submitted,

_/s/ Sharon K. Hogue_

Emily Nestler*
PLANNED PARENTHOOD
  FEDERATION OF AMERICA, INC.
1110 Vermont Avenue, NW
Washington, D.C.  20005
Tel.: (202) 973-4800
emily.nestler@ppfa.org


Jennifer Sandman*
C. Peyton Humphreville*
Kyla Eastling*
PLANNED PARENTHOOD
  FEDERATION OF AMERICA, INC.
123 William Street
New York, NY 10038
Tel.: (212) 441-4363
jennifer.sandman@ppfa.org
peyton.humphreville@ppfa.org
kyla.eastling@ppfa.org

Sharon K. Hogue, BBO# 705510
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000
Fax: (617) 526-5000
sharon.hogue@wilmerhale.com


Alan E. Schoenfeld*
Cassandra A. Mitchell*
Alex W. Miller*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com
cassie.mitchell@wilmerhale.com
alex.miller@wilmerhale.com


Albinas J. Prizgintas*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: (202) 663-6000
Fax: (202) 663-6363
albinas.prizgintas@wilmerhale.com

*Application for pro hac vice forthcoming*

*Counsel for Plaintiffs*

# ADDENDUM

## SEC. 71113.  FEDERAL PAYMENTS TO PROHIBITED ENTITIES.

(a) IN GENERAL.—No Federal funds that are considered direct spending and provided to carry out a State plan under title XIX of the Social Security Act or a waiver of such a plan shall be used to make payments to a prohibited entity for items and services furnished during the 1-year period beginning on the date of the enactment of this Act, including any payments made directly to the prohibited entity or under a contract or other arrangement between a State and a covered organization.

(b) DEFINITIONS.—In this section:

(1) PROHIBITED ENTITY.—The term "prohibited entity" means an entity, including its affiliates, subsidiaries, successors, and clinics—

(A) that, as of the first day of the first quarter beginning after the date of enactment of this Act—

(i) is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;

(ii) is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations (as in effect on the date of enactment of this Act), that is primarily engaged in family planning services, reproductive health, and related medical care; and

(iii) provides for abortions, other than an abortion—

(I) if the pregnancy is the result of an act of rape or incest; or

(II) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed; and

(B) for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

ADDENDUM TO
MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TRO & PI

(2) DIRECT SPENDING.— The term ''direct spending'' has the meaning given that term under section 250(c) of the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. 900(c)).

(3) COVERED ORGANIZATION.—The term ''covered organization'' means a managed care entity (as defined in section 1932(a)(1)(B) of the Social Security Act (42 U.S.C. 1396u–2(a)(1)(B))) or a prepaid inpatient health plan or prepaid ambulatory health plan (as such terms are defined in section 1903(m)(9)(D) of such Act (42 U.S.C. 1396b(m)(9)(D))).

(4) STATE.—The term "State" has the meaning given such term in section 1101 of the Social Security Act (42 U.S.C. 1301).

ADDENDUM TO
MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TRO & PI

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Plaintiffs certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiffs hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

Dated:  July 7, 2025

*/s/ Sharon K. Hogue*
Sharon K. Hogue, BBO #705510