# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC., *et al.*,

        *Plaintiffs*,

   v.

ROBERT F. KENNEDY, JR., in his official
capacity as SECRETARY OF THE U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, *et al.*,

        *Defendants*.

No. 1:25-cv-11913-IT

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
# FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................ 3

I.     The Medicaid Program ................................................................................... 3

II.    Section 71113 of the One Big Beautiful Bill ................................................... 4

III.    This Litigation................................................................................................. 5

STANDARD OF REVIEW ............................................................................................. 7

ARGUMENT .................................................................................................................. 7

I.     The Facial Constitutional Challenges Are Baseless (Counts One to Three). .................... 9

    A.    Section 71113 Is Not a Bill of Attainder. ................................................ 9

    B.    Section 71113 Does Not Amount to First Amendment Retaliation. ..................... 15

    C.    Section 71113 Does Not Violate Equal Protection. ................................ 20

II.    The "Non-Qualifying Members" Have No Viable Claims (Counts Four to Six). ............ 23

    A.    Plaintiffs' Request for Declaratory Relief Is Procedurally Improper.................... 24

    B.    Section 71113 Could Apply to the Non-Qualifying Members............................. 27

    C.    The Non-Qualifying Members' Contingent Constitutional Claims Fail In Any Event. ................................................................................................ 30

III.    Plaintiffs Have Not Established Irreparable Harm. ........................................... 36

    A.    Plaintiffs Demonstrate No Irreparable Harm to Planned Parenthood.................. 36

    B.    Planned Parenthood Cannot Demonstrate Irreparable Harm Based on Alleged Harm to Third Parties........................................................................ 39

    C.    Planned Parenthood's Asserted Harms Are Not Imminent and Would Not Be Redressed by Its Requested Injunction...................................... 40

IV.    The Balance of Equities and the Public Interest Favor the Government. ......................... 42

V.    A Bond Should Accompany Any Injunctive Relief. ......................................... 43

VI.    Any Injunctive Relief Should Be Stayed Pending Appeal................................. 44

i

CONCLUSION.................................................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
    585 U.S. 579 (2018)...................................................................................................... 19

*ACORN v. United States,*
    618 F.3d 125 (2d Cir. 2010) ......................................................................................... 13

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of
    Columbia,*
    846 F.3d 391 (D.C. Cir. 2017) ..................................................................................... 32

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013)............................................................................................ 9, 14, 35

*Akebia Therapeutics, Inc. v. Azar,*
    443 F. Supp. 3d 219 (D. Mass. 2020), *aff'd*, 976 F.3d 86 (1st Cir. 2020) ................ 37

*Am. Bus Ass'n v. Rogoff,*
    649 F.3d 734 (D.C. Cir. 2011).......................................................................................22

*Arkansas Dep't of Health and Human Servs. v. Ahlborn,*
    547 U.S. 268 (2006)......................................................................................................... 3

*Babbitt v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979)...................................................................................................... 25

*Baker Cnty. Med. Servs., Inc. v. U.S. Att'y Gen.,*
    763 F.3d 1274 (11th Cir. 2014) .................................................................................... 32

*Banks v. Booth,*
    468 F. Supp. 3d 101 (D.D.C. 2020) ............................................................................... 4

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983)...................................................................................................... 23

*Bowen v. Kendrick,*
    483 U.S. 1304 (1987)..................................................................................................... 42

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021)...................................................................................................... 20

*California v. Texas,*
    593 U.S. 659 (2021).................................................................................................25, 27

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ........................................................................... 37

*City of Renton v. Playtime Theaters, Inc.*,
   475 U.S. 41 (1986) ........................................................................................... 17

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
   48 F.3d 618 (1st Cir. 1995) ............................................................................. 40

*Communist Party of U.S. v. Subversive Activities Control Bd.*,
   367 U.S. 1 (1961) ............................................................................................. 10

*Cordi-Allen v. Conlon*,
   494 F.3d 245 (1st Cir. 2007) ...................................................................... 21, 22

*Crocs, Inc. v. Jinjiang Hobibear Shoes & Clothing Co.*,
   No. 25-CV-180 (JMF), 2025 WL 1519114 (S.D.N.Y. May 28, 2025) ................... 27

*Ctr. for Reprod. L. & Pol'y v. Bush*,
   304 F.3d 183 (2d Cir. 2002) ...................................................... 19, 21, 22, 35

*Cummings v. Missouri*,
   71 U.S. (4 Wall.) 277 (1866) ................................................. 11, 12, 13

*Dep't of Educ. v. California*,
   145 S. Ct. 966 (2025) ....................................................................................... 44

*Dep't of Homeland Security v. D.V.D.*,
   No. 24A1153, 2025 WL 1832186 (U.S. July 3, 2025) ........................................ 41

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
   887 F.2d 275 (D.C. Cir. 1989) ........................................................................ 35

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022) .................................................................. 1, 9, 22, 33

*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ......................................................................................... 27

*Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*,
   465 F.3d 33 (1st Cir. 2006) ............................................................................. 40

*Elgin v. U.S. Dep't of Treasury*,
   641 F.3d 6 (1st Cir. 2011) ................................................................................ 11

*Engquist v. Or. Dep't of Agric.*,
    553 U.S. 591 (2008) .................................................................... 23

*Ex parte Garland*,
    71 U.S. (4 Wall.) 333 (1866) ...................................................... 13

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ....................................................... 20, 21, 23

*FCC v. League of Women Voters of California*,
    468 U.S. 364 (1984) .................................................................... 35

*Flemming v. Nestor*,
    363 U.S. 603 (1960) ........................................................ 13, 14, 15

*Fletcher v. Peck*,
    10 U.S. 87 (1810) ....................................................................... 17

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) .................................................................... 15

*Franklin Mem'l Hosp. v. Harvey*,
    575 F.3d 121 (1st Cir. 2009) ...................................................... 32

*Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart*,
    864 F.2d 551 (7th Cir. 1988) ............................................ 17, 18, 19

*Free Speech Coal., Inc. v. Paxton*,
    606 U.S. ---, 2025 WL 1773625 (U.S. June 27, 2025) ........... 23

*Gattineri v. Town of Lynnfield*,
    58 F.4th 512 (1st Cir. 2023) ....................................................... 18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .................................................................... 32

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
    366 F.3d 754 (9th Cir. 2004) ..................................................... 40

*Hartman v. Moore*,
    547 U.S. 250 (2006) .................................................................... 19

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) .................................................................... 45

*Huawei Techs. USA, Inc. v. United States*,
    440 F. Supp. 3d 607 ......................................................................................... 13

*In re Hubbard*,
    803 F.3d 1298 (11th Cir. 2015) ...................................................................... 17

*Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo*,
    18 F.4th 38 (1st Cir. 2021) .............................................................................. 43

*Int'l Paper Co. v. Town of Jay*,
    928 F.2d 480 (1st Cir. 1991) ............................................................................ 24

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) .......................................................................................... 35

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ........................................................................... 39

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 39

*Lozman v. City of Riviera Beach*,
    585 U.S. 87 (2018) ............................................................................................ 18

*Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*,
    485 U.S. 360 (1988) ................................................................................. 9, 22, 34

*Maher v. Roe*,
    432 U.S. 464 (1977) .......................................................................................... 14

*Maryland v. King*,
    567 U.S. 1301 (2012) ........................................................................................ 43

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
    367 F.3d 68 (1st Cir. 2004) .............................................................................. 37

*McClelland v. Katy Indep. Sch. Dist.*,
    63 F.4th 996 (5th Cir. 2023) ............................................................................ 31

*McCue v. Bradstreet*,
    807 F.3d 334 (1st Cir. 2015) ............................................................................ 18

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
    742 F.2d 442 (8th Cir. 1984) ........................................................................... 32

*Mt. Healthy City Sch. Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977) ............................................................................. 19

*NB ex rel. Peacock v. District of Columbia,*
    794 F.3d 31 (D.C. Cir. 2015) ............................................................... 31

*N.C. State Conf. of the NAACP v. Raymond,*
    981 F.3d 295 (4th Cir. 2020) ............................................................... 20

*N.H. Hemp Council, Inc. v. Marshall,*
    203 F.3d 1 (1st Cir. 2000) .................................................................... 26

*N.H. Lottery Comm'n v. Rosen,*
    986 F.3d 38 (1st Cir. 2021) ............................................................. 25, 26

*Narragansett Indian Tribe v. Guilbert,*
    934 F.2d 4 (1st Cir. 1991) .................................................................... 37

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ............................................................................. 33

*Nat'l Rifle Ass'n v. Vullo,*
    602 U.S. 175 (2024) ............................................................................. 18

*Nat'l Treasury Emps. Union v. Trump,*
    No. 25-5157, 2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025) ............ 43

*Nat'l Urb. League v. Trump,*
    2025 WL 1275613 (D.D.C. May 2, 2025) ............................................. 32

*Nieves-Marquez v. Puerto Rico,*
    353 F.3d 108 (1st Cir. 2003) .................................................................. 7

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) ................................................................... 9, 12, 15

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................... 7, 42

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ............................................................................. 18

*Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.,*
    915 F.2d 59 (2d Cir. 1990) .............................................................. 19, 35

*Planned Parenthood of Cent. & N. Ariz. v. Arizona,*
    718 F.2d 938 (9th Cir. 1983) ................................................................. 36, 37

*Planned Parenthood of Cent. & N. Ariz. v. Arizona,*
    789 F.2d 1348 (9th Cir. 1986) ..................................................................... 36

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Human Servs.,*
    Civ. No. 25-1334, 2025 WL 178100 (D.D.C. June 26, 2025) .................................. 39

*Planned Parenthood of Kan. v. Andersen,*
    882 F.3d 1205 (10th Cir. 2018) ................................................................... 40

*R.R. Comm'n of Tex. v. Pullman Co.,*
    312 U.S. 496 (1941) ................................................................................ 35

*Reddy v. Foster,*
    845 F.3d 493 (1st Cir. 2017) ....................................................................... 25

*Rio Grande Community Health Center, Inc. v. Rullan,*
    397 F.3d 56 (1st Cir. 2005) ......................................................................... 40

*Romer v. Evans,*
    517 U.S. 620 (1996) ................................................................................ 24

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ......................................................................... *passim*

*Seafreeze Shoreside, Inc v. U.S. Dep't of Interior,*
    Case No. 1:22-cv-11091-IT, 2023 WL 3660689 (D. Mass. May 25, 2023) ........................ 37

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.,*
    468 U.S. 841 (1984) ......................................................................... *passim*

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) .......................................................................... 7

*Skelly Oil Co. v. Phillips Petroleum Co.,*
    339 U.S. 667 (1950) ................................................................................ 27

*Smith v. City of Chicago,*
    457 F.3d 643 (7th Cir. 2006) ....................................................................... 24

*Somerville Public Schools v. McMahon,*
    139 F.4th 63 (1st Cir. 2025) ........................................................................ 42

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ..................................................................................... 25

*Town of Castle Rock v. Gonzalez,*
   545 U.S. 748 (2005) ..................................................................................... 32

*Trump v. CASA, Inc.,*
   No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ...................................... 39, 42

*Tyngsboro Sports II Solar, LLC v. Nat'l Grid USA Serv. Co.,*
   88 F.4th 58 (1st Cir. 2023) ............................................................................ 27

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.,*
   775 F.3d 128 (2d Cir. 2014) .......................................................................... 43

*United States v. Brown,*
   381 U.S. 437 (1965) ........................................................................... 11, 12, 13

*United States v. Lovett,*
   328 U.S. 303 (1946) ..................................................................................... 13

*United States v. O'Brien,*
   391 U.S. 367 (1968) ................................................................................ 15, 17

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
   587 F.3d 464 (1st Cir. 2009) ......................................................................... 38

*Vazquez Perez v. Decker,*
   No. 18-CV-10683 (AJN), 2019 WL 4784950 (S.D.N.Y. Sept. 30, 2019) ............... 28

*Village of Willowbrook v. Olech,*
   528 U.S. 562 (2000) ..................................................................................... 21

*Walt Disney Parks & Resorts U.S., Inc. v. DeSantis,*
   716 F. Supp. 3d 1216 (N.D. Fla. 2024), *appeal dismissed,* No. 24-10342,
   2024 WL 3593934 (11th Cir. June 18, 2024) ................................................... 17

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ..................................................................................... 37

*Wilder v. Virginia Hosp. Ass'n,*
   496 U.S. 498 (1990) ..................................................................................... 42

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................. 7, 37, 40

*Wis. Gas Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ............................................................... 37

**Constitutional Provisions**

U.S. Const. art VI, cl. 2 ............................................................................. 42

**Statutes**

12 U.S.C. § 338 ........................................................................................ 34

26 U.S.C. § 414 ........................................................................................ 34

28 U.S.C. § 1331 ...................................................................................... 27

28 U.S.C. § 2201 ...................................................................................... 27

29 U.S.C. § 1301 ...................................................................................... 34

42 U.S.C. § 1304 ........................................................................................ 4

42 U.S.C. § 1320b-2 ............................................................................. 4, 38

42 U.S.C. § 1396 *et seq.*............................................................................ 3

42 U.S.C. § 1396 ........................................................................................ 3

42 U.S.C. § 1396a ...................................................................................... 3

42 U.S.C. § 1396b ................................................................................. 3, 42

One Big Beautiful Bill Act,
   Pub. L. No. 119-21 § 71113(b)(1)(A), 139 Stat. 72 (2025) ............... 4, 5, 10

**Rules**

Fed. R. Civ. P. 65 ................................................................................. 27, 43

**Regulations**

2 C.F.R. § 180.905 .................................................................................... 28

42 C.F.R. § 430.30 ...................................................................................... 4

42 C.F.R. § 430.42 .................................................................................... 42

42 C.F.R. § 433.304 ........................................................................................................ 42

42 C.F.R. § 433.316 ........................................................................................................ 42

45 C.F.R. § 95.19 ...................................................................................................... 4, 38

48 C.F.R. § 2.101 ........................................................................................................... 28

**<u>Other Authorities</u>**

*Affiliate*, *Black's Law Dictionary* (12th ed. 2024) ........................................................ 28

*Affiliate*, Merriam-Webster Dictionary,
    https://www.merriam-webster.com/dictionary/affiliate ........................................... 28

*Control*, *Black's Law Dictionary* (12th ed. 2024) ................................................. 28, 29

Dana DiFilippo, *With Federal Funding At Risk, Abortion-Rights Supporters Turn to State,*
    *Private Donors*, N.J. Monitor (July 3, 2025),
    https://newjerseymonitor.com/2025/07/03/with-federal-funding-at-risk-abortion-rights-
    supporters-turn-to-state-private-donors/ ................................................................. 44

Hart & Wechsler, The Federal Courts and the Federal System 841 (7th ed. 2015) ..................... 27

H.R. 1 ............................................................................................................................... 15

Planned Parenthood Direct, Terms of Use (rev. Jan. 1, 2024),
    https://perma.cc/HEG5-HX675 ............................................................................... 30

PPFA, Annual Report 2023–2024 (2024),
    https://perma.cc/XN6R-4UPF ................................................................................. 30

PPNM Bylaws (updated Nov. 15, 2010),
    https://perma.cc/L3DR-LHR5 ................................................................................. 29

## INTRODUCTION

Both houses of Congress passed a budget reconciliation bill—the One Big Beautiful Bill—and the President signed that bill into law. Among many other decisions about how to allocate limited federal funds, one provision of the bill restricts the types of entities that may receive federal Medicaid funds. In particular, that provision directs that certain tax-exempt organizations and their affiliates may not receive federal Medicaid funds for a one-year period if they continue to provide elective abortions. In other words, the bill stops federal subsidies for Big Abortion.

All three democratically elected components of the Federal Government collaborated to enact that provision consistent with their electoral mandates from the American people as to how they want their hard-earned taxpayer dollars spent. But Plaintiffs—Planned Parenthood Federation of America ("PPFA") and its members (together, "Planned Parenthood")—now want this Court to reject that judgment and supplant duly enacted legislation with their own policy preferences. Indeed, they demand emergency injunctive relief forcing the Government to continue to support them with taxpayer funds. That request is legally groundless and must be firmly rejected.

Planned Parenthood's chief claims seek to facially invalidate the so-called "Defund Provision." Those constitutional claims are utterly meritless. They assert that the provision is a bill of attainder—even though it neither targets nor punishes Planned Parenthood; it merely declines to fund entities (not limited to Planned Parenthood) that perform elective abortions. They claim the provision retaliates against them for advocating for abortion—but the law turns on *action*, not *advocacy*. And they invoke equal protection, but offer no viable theory of discrimination. At bottom, Planned Parenthood relies on invented abortion-only jurisprudence the Supreme Court has discarded. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022).

Pivoting from those sweeping theories, Planned Parenthood suggests that a small number of its members would not independently qualify as prohibited entities under the bill—because they

do not themselves provide abortions or did not historically receive significant funding from Medicaid—but are concerned they will be swept into the prohibition by virtue of their affiliation with PPFA and its other members. They argue that the Defund Provision, properly construed, does not cover them—or, in the alternative, that it is unconstitutional if it does. Those are the only claims on which the Court's Amended *ex parte* TRO found a likelihood of success. Planned Parenthood presses those contingent constitutional claims only as to a small subset of its members, yet this Court nonetheless granted interim relief enjoining the law as to *all* Plaintiffs. Even if these claims did have a likelihood of success, that could not justify the relief that the Court granted, or the sweeping preliminary injunction that Planned Parenthood seeks.

Regardless, those fallback claims fail on multiple grounds. For one thing, any dispute over whether the Defund Provision applies to particular entities is premature: The Government has yet to construe or apply the provision (let alone threaten to enforce it against these members), nor has there been any fact discovery. And whether any particular entity is "prohibited" under the statute cannot even be determined until October 1, 2025. In this posture, Planned Parenthood cannot seek a declaration that the provision does not apply to particular members, let alone a preliminary injunction to that effect. There is no ripe Article III controversy, and Plaintiffs have no cause of action to seek preemptive relief based on a potential dispute over statutory construction or the application of the statute to particular facts. That also means there is no occasion to reach the contingent constitutional claims Planned Parenthood asserts on behalf of those members. But they are baseless on the merits too, seeking to elevate standard statutory language about corporate form into a constitutional concern.

Beyond the futility of the claims on the merits, Planned Parenthood fails to demonstrate imminent irreparable harm to justify an injunction, asserting only classically reparable economic

injury and irrelevant potential harm to patients, who are third parties not before this Court. And the balance of the equities and public interest firmly favor the Government's interest in enforcing a statute duly enacted by Congress and signed by the President, especially because (as the Amended TRO observed), third-party patients can always seek Medicaid-eligible services from other providers. Plaintiffs' request for a preliminary injunction should be denied.

## BACKGROUND

### I.    The Medicaid Program

Enacted in 1965, Medicaid is a cooperative federal-state program in which the Federal Government supplies funding to states to assist them in providing medical assistance to specified categories of low-income individuals. 42 U.S.C. § 1396 *et seq*. Each state that elects to participate must submit a plan to the Secretary of Health and Human Services ("HHS"), who has delegated his authority under the Medicaid statute to the Centers for Medicare & Medicaid Services ("CMS"), for approval. *Id*. §§ 1396, 1396a; *Arkansas Dep't of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). If the plan is approved, the state is entitled to Medicaid funds from the Federal Government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. 42 U.S.C. § 1396b(a)(1).

Medicaid provider payment occurs at the state level. Declaration of Anne Marie Costello ("Costello Decl.") ¶ 7. In general, CMS does not pay providers directly. *Id.* Rather, providers seek reimbursement from the states, or, in the case of a managed care delivery system, from a health plan the state has contracted with, and states receive federal funding from the Government. *Id.* ¶¶ 3–4, 15, 17–19. Federal funding for Medicaid, called federal financial participation (or "FFP") is partly paid to the states in advance of any services provided through "initial grant awards" at the beginning of each quarter based on CMS-reviewed state expenditure estimates. *Id.* ¶ 3. Once the advanced funding request is approved, the state can draw down the federal advance for the allotted

3

amount as costs are incurred. 42 C.F.R. § 430.30(d)(3). Those initial awards are later reconciled to actual state expenditures, which states provide through a quarterly statement called Form CMS-64. Costello Decl. ¶ 5. Form CMS-64 is a summary of actual expenditures. *Id.* ¶ 6. It does not include individual claims-level expenditures. *Id.* After receiving the Form CMS-64 from the states, CMS takes up to six months to reconcile the initial grants provided to states and state draw-downs from that amount with the quarterly state submissions. *See id.* ¶¶ 5, 13.

Although states provide the Form CMS-64 on a quarterly basis, the Social Security Act allows states to claim FFP for Medicaid expenditures within two years of the date of the expenditure. *Id.* ¶ 14; *see also* 42 U.S.C. § 1320b-2(a). There are also exceptions to that two-year deadline, including for claims that result from a court-ordered retroactive payment and claims for which the Secretary determines there was good cause for the state's failure to file a claim within the two-year time period. Costello Decl. ¶ 14; 42 C.F.R. § 95.19.

## II.    Section 71113 of the One Big Beautiful Bill

In enacting Medicaid, Congress reserved the "right to alter, amend, or repeal any provision" of the program. 42 U.S.C. § 1304. Since then, Congress has periodically enacted new legislation to align the Medicaid program with new priorities and to account for changes in the marketplace.

Congress once again amended the Medicaid program as part of the One Big Beautiful Bill Act, which President Trump signed into law on July 4, 2025. Pub. L. No. 119-21, 139 Stat. 72 (2025). Specifically, Section 71113 directs that no Medicaid funds "shall be used to make payments to a prohibited entity for items and services furnished during the 1-year period beginning on the date of the enactment of this Act[.]" A "prohibited entity" is "an entity, including its affiliates, subsidiaries, successors, and clinics—

(A)    [T]hat, as of [October 1, 2025],

4

      (i)      is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;

      (ii)     is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations . . . ., that is primarily engaged in family planning services, reproductive health, and related medical care; and

      (iii)    provides for abortions, other than an abortion—

            (I)      if the pregnancy is the result of an act of rape or incest; or

            (II)    in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed; and

(B)     for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

Pub. L. No. 119-21, § 71113.

## III.    This Litigation

Just three days after the bill was enacted, Plaintiffs—Planned Parenthood Federation of America, Inc. ("PPFA"), on behalf of itself and its 47 members, along with two of those members, Planned Parenthood League of Massachusetts ("PPLM") and Planned Parenthood Association of Utah ("PPAU")—filed this action challenging Section 71113, which they refer to as the "Defund Provision." *See* Complaint for Declaratory and Injunctive Relief, Doc. No. 1.

The complaint contains six causes of action. The first three assert facial constitutional challenges to Section 71113 on behalf of all Plaintiffs. Count One alleges that the provision constitutes a bill of attainder because it supposedly targets Planned Parenthood for punishment. *Id.* ¶¶ 130–36. Count Two claims that the provision violates the equal protection component of the Due Process Clause of the Fifth Amendment because it supposedly discriminates irrationally. *Id.*

¶¶ 137–46. And Count Three asserts a First Amendment claim on the theory that Congress was substantially motivated by illicit retaliatory animus. *Id.* ¶¶ 147–53.

The next three counts relate more narrowly to Section 71113's language that defines a prohibited entity to include its "affiliates," even if those affiliates would not themselves qualify as prohibited entities under the bill (*i.e.*, they either do not provide abortions or did not receive at least $800,000 in Medicaid funds during fiscal year 2023). A small number of Planned Parenthood members, which they call "non-qualifying members," are alleged to fall into that category. *Id.* ¶¶ 104–05. Count Four seeks a declaratory judgment that those "non-qualifying members" are *not* "prohibited entities" within the meaning of Section 71113. *Id.* ¶¶ 154–63. Counts Five and Six are pleaded as alternative claims on behalf of the "non-qualifying members," and contend that if Section 71113 does reach them through its "affiliates" language, that language violates those entities' First Amendment right of association and is void for vagueness. *Id.* ¶¶ 164–75.

Plaintiffs filed an "emergency" motion for a temporary restraining order and preliminary injunction on July 7. *See* Pls.' Emergency Mot. for TRO & Prelim. Inj., Doc. No. 4. The Court issued a TRO the same day. *See* Temporary Restraining Order, Doc. No. 18. On July 11, the Government moved to dissolve the TRO based on procedural defects. *See* Mot. to Dissolve TRO, Doc. No. 29. That day, the Court granted that motion, dissolved the TRO, but issued an Amended TRO. Am. Temporary Restraining Order, Doc. No. 46. The Amended TRO reasoned that Planned Parenthood had shown a likelihood of success solely on its contingent constitutional claims relating to the "non-qualifying members," and that allowing the legislation to take effect would impose irreparable harm on *patients*. *Id.* at 6–7. Despite analyzing likelihood of success as to the "non-qualifying members" only, the Amended TRO provided relief as to *all* PPFA members.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiff bears the burden of demonstrating those requirements. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

"To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam). The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury. Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S at 22.

## ARGUMENT

Planned Parenthood starts by leveling three frontal assaults on Section 71113, but this Court in its Amended TRO did not suggest any of those claims was likely to succeed on the merits. Indeed, they are legally baseless. Section 71113 is not a bill of attainder, because it merely declines to provide *federal funding* (which is not legislative punishment), and it does so based in part on *future conduct* (not by specifying a target or penalizing irreversible past conduct). There is no viable First Amendment challenge, because providing abortions is conduct, not speech, and courts may not invalidate federal legislation based on speculation about illicit subjective motives. Nor is there any serious equal protection argument, because Congress has broad line-drawing power

when it comes to allocating scarce federal funds, and it exercised that power rationally here. Because all three of these facial claims fail, Planned Parenthood's request for an injunction that would apply to all of its members is entirely unsupported.

In the Amended TRO, this Court suggested that it may be unconstitutional to cease funding "affiliates" of abortion-providing entities if those affiliates do not otherwise qualify as prohibited entities. But only a handful of Planned Parenthood members appear likely to fall into that category, and they insist they are *not* covered by the bill's language in the first place. The Government has not yet construed, applied, or enforced the provision in that factual context, so there is no ripe Article III controversy as to those "non-qualifying members," and they have no cause of action to seek a preemptive determination of how the statute might apply to their particular facts. They certainly cannot do so in an emergency preliminary-injunction posture, before discovery. In any case, their contingent constitutional claims are meritless.

Because Planned Parenthood's claims clearly fail on the merits, the Court may not issue a preliminary injunction. But the other injunction requirements point in the same direction. Loss of funding is not irreparable harm. And the Amended TRO was wrong to identify irreparable harm to *patients*, since they are not parties to the litigation and there is no evidentiary basis to believe they will be unable to find care from other providers. All that aside, a preliminary injunction will not remedy any harms. Section 71113 will continue to bind the States, who generally reimburse providers in the first instance and are not parties to this litigation. And an injunction will not provide the certainty that Planned Parenthood wants, because the Government will be able to deny (or claw back) payments if and when it ultimately succeeds. The balance of harms thus cuts against an injunction, as does the public interest, which decisively favors respecting the judgment of the Legislative and Executive Branches about the allocation of federal funding.

I.      **The Facial Constitutional Challenges Are Baseless (Counts One to Three).**

Congress has "broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AID*"). In doing so, Congress has "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." *Id.* And any "review of distinctions that Congress draws in order to make allocations from a finite pool of resources must be deferential, for the discretion about how best to spend money to improve the general welfare is lodged in Congress rather than the courts." *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 373 (1988). This "remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights"; if the recipient dislikes that condition, its "recourse is to decline the funds." *AID*, 570 U.S. at 214. Section 71113 falls in the heartland of Congress's discretionary authority.

Planned Parenthood's claims attempt to usurp this authority. Even before *Dobbs*, the Supreme Court had made clear the Government can "subsidize family planning services which will lead to conception and childbirth," while declining to "promote or encourage abortion." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). And *Dobbs* eliminated any special constitutional protection for abortion. 597 U.S. at 231. Simply put, Planned Parenthood has no right to taxpayer money, and this Court should not invent such a right. The Court should uphold Congress's lawful exercise of its authority to decide to whom it will entrust taxpayers' hard-earned dollars.

A.      **Section 71113 Is Not a Bill of Attainder.**

Planned Parenthood's lead claim—that Section 71113 is a bill of attainder—is devoid of merit. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 846–47 (1984) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)). To qualify as a bill

of attainder, a statute must (1) specify the affected person or group; (2) impose punishment by legislative decree; and (3) dispense with a judicial trial. *See id.* at 846–47. Section 71113 neither specifies Planned Parenthood nor imposes punishment, so it is not a bill of attainder.

**1.** Bills of attainder evince specification by singling out individuals for punishment. Such singling out can occur either by name or through describing individuals "in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 86 (1961). By contrast, statutes of general applicability that focus on prospective conduct are not bills of attainder. *See Selective Serv. Sys.*, 468 U.S. at 851 (finding specification lacking where a statute denying federal financial aid to male students who failed to register for the draft did not attach to "past and ineradicable actions" because students could register late); *Communist Party of U.S.*, 367 U.S. at 86 (finding specification lacking where the statute "attache[d] not to specified organizations but to described activities in which an organization may or may not engage").

Here, Section 71113 does not single out Planned Parenthood either by name or based on past conduct. Instead, it defines prohibited entities as those that (among other things) engage in specified *future* activities, namely, providing for abortions other than those permitted under the Hyde Amendment, "as of *the first day of the first quarter beginning after the date of enactment* of this Act," *i.e.*, October 1, 2025. Pub. L. No. 119-21 § 71113(b)(1)(A) (emphasis added). The statute thus applies prospectively and attaches to an activity—providing for elective abortions—in which entities may choose not to engage. For that reason alone, it is not a bill of attainder under established precedent. Like in *Communist Party*, the provision "set[s] forth a broad definition, which would permit [the entity] to escape the prescribed deprivations in the event its character changed." *United States v. Brown*, 381 U.S. 437, 452 & n.26 (1965) (explaining that the Act in

*Communist Party* required "the registration only of organizations which, after the date of the Act, [we]re found to be under the" control of foreign powers); *see also Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 13 (1st Cir. 2011) (Stahl, J., concurring) ("[The statute] does not meet the specification requirement to constitute a bill of attainder because it does not identify individuals for legislatively imposed punishment based on irreversible past acts. Rather, the statute is entirely prospective in nature.").

Section 71113 also does not single out Planned Parenthood for another reason: Its definition may apply to other entities, including Health Imperatives and Maine Family Planning. Declaration of Drew Snyder ("Snyder Decl.") ¶ 6. Indeed, Plaintiffs repeatedly acknowledge that other entities will be denied funding under the provision. *See* Mem. in Supp. of Pls.' Emergency Mot. for a TRO & Prelim. Inj., Doc. No. 5 at 13, 20 n.15. That proves that Section 71113 is a law of general applicability, not a targeted punishment for a singled-out entity.

In arguing otherwise, Plaintiffs misread the provision and misunderstand the relevant caselaw. Contrary to Plaintiffs' claim that "nothing in the Defund Provision suggests that Planned Parenthood Members have a continuing ability to avoid its effects," Doc. No. 5 at 22 n.16, the plain language of the provision makes clear that entities that conform their conduct to the Act's requirements between its enactment and the first day of the first quarter thereafter will continue to qualify for Medicaid funding. Any PPFA member can therefore remove itself from the provision's scope by ceasing to qualify as a prohibited entity, including by ceasing to provide for abortions and disaffiliating with entities that do.

Plaintiffs' reliance on *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866), and *Selective Service System* is misplaced. In *Cummings*, individuals were barred from certain professions unless they stated under oath that they had not given aid or comfort to the Confederacy. That requirement

11

met the specification requirement because it identified the targeted group based on irreversible past conduct—prior aid to the Confederacy. *See Cummings*, 71 U.S. (4 Wall.) at 318 ("The oath thus required . . . is retrospective; it embraces all the past from this day[.]"). As for *Selective Service System*, it cited *Brown* for the proposition that punishment "may involve deprivations inflicted to deter future misconduct." 468 U.S. at 852 (citing *Brown*, 381 U.S. at 458). But the provision in *Brown* met the specification requirement because it disqualified anyone who had been a member of the Communist Party within the past five years from holding union office. *See Brown*, 381 U.S. at 461. Section 71113, by contrast, defines prohibited entities in terms of *future* conduct, without regard to whether entities performed elective abortions in the past. Because that does not single out organizations based on irreversible past conduct, and instead allows opportunity to entities to conform their conduct going forward, it fails the specification requirement.

**2.** Section 71113 also does not inflict punishment. To determine whether a statute is impermissibly punitive, courts look to the following three factors: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to punish." *Selective Serv. Sys.*, 468 U.S. at 852. These factors are referred to as the historical, functional, and motivational tests, *see Nixon*, 433 U.S. at 473–83, and all three demonstrate that declining to allocate federal funds is not punishment.

*First*, from a historical perspective, bills of attainder imposed punishments like death, banishment, deprivation of the right to vote, or punitive confiscation of property. *See Brown*, 381 U.S. at 441–42. The Supreme Court has expanded the list of forbidden punishments to include legislative bars to participation in certain professions or employments. *See, e.g.*, *id.* at 438; *United*

12

*States v. Lovett*, 328 U.S. 303 (1946) (statute cut off salaries to three named federal employees); *Cummings*, 71 U.S. (4 Wall.) 277 (statute disqualified priest from practicing as a clergyman); *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866) (statute barred lawyers from practicing law).

Section 71113 "imposes none of the burdens historically associated with punishment." *Selective Serv. Sys.*, 468 U.S. at 853. Rather, "withholding of appropriations . . . does not constitute a traditional form of punishment that is considered to be punitive per se[.]" *ACORN v. United States*, 618 F.3d 125, 137 (2d Cir. 2010). In *ACORN*, Congress passed several appropriations laws barring federal funds from going to ACORN, a non-profit corporation, and its affiliates. *See id.* at 131. The Second Circuit rejected a bill-of-attainder challenge, reasoning that "withhold[ing] funds from ACORN and its affiliates constitutes neither imprisonment, banishment, nor death." *Id.* at 137; *see also Huawei Techs. USA, Inc. v. United States*, 440 F. Supp. 3d 607, 630 ("A punishment is something more than a burden." (cleaned up)). The same result should obtain here. *Cf. Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (holding that a statute did not have a punitive design where "the sanction [wa]s the mere denial of a noncontractual governmental benefit").

Plaintiffs cite *Lovett* and contend that they are effectively barred from a certain profession because they are barred from serving Medicaid patients. Doc. No. 5 at 21–22. But providing medical care to Medicaid patients is not itself a profession. Plaintiffs may continue to provide all of the services they currently provide, so long as they use a different funding stream. Or they may take steps to avoid qualifying as a prohibited entity and continue receiving Medicaid funds. *Lovett* is thus inapposite—there, Congress barred certain individuals from receiving their federal salaries, thus precluding plaintiffs from engaging in their chosen profession and preventing them from taking any action to relieve themselves from the bar. *See Lovett*, 328 U.S. at 310.

13

*Second*, Section 71113 furthers nonpunitive legislative goals. The Spending Clause affords Congress "broad discretion to tax and spend for the 'general Welfare,' including by funding particular state or private programs or activities." *AID*, 570 U.S. at 213. Congress is not compelled to subsidize activities with which it disagrees. And it may properly choose not to subsidize non-profits that receive large payments through the Medicaid program if they perform elective abortions. *See Rust*, 500 U.S. at 193; *see also Maher v. Roe*, 432 U.S. 464, 474 (1977) (holding that states may "make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds").

Plaintiffs insist that because Medicaid funds already do not cover abortions except in narrow circumstances, the provision operates only to prohibit Medicaid reimbursement for *other* services. Doc. No. 5 at 21–22. So what? Congress may make a policy choice not to contract with abortion providers even for covered medical care. Further, because money is fungible, Congress could reasonably conclude that withholding Medicaid funding from entities that perform abortions will discourage at least some of those abortions. Indeed, Plaintiffs' own declarant asserts that denial of Medicaid funding may reduce their provision of abortions. Declaration of Kimberly Custer ("Custer Decl."), Doc. No. 5-1, ¶¶ 74–81.

*Finally*, the legislative record does not clearly establish a congressional intent to punish. *See Flemming*, 363 U.S. at 617 ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground [of legislative history.]"). Plaintiffs claim that "the legislative record is replete with evidence of intent to punish Planned Parenthood." Doc. No. 5 at 24. But most of the statements they cobble together relate to previous, failed bills and thus have no bearing on whether the statutory record here evinces a congressional intent to punish. *See* Doc. No. 5 at 9–11; Doc. No. 5 at 15 n.13 (citing statements made in connection with earlier bills); *see*

14

*also Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (criticizing lower court for relying "on statements from witnesses in congressional hearings years earlier on a different bill that was never enacted into law"). Nor can Planned Parenthood rely on statements outside the legislative record. *See Nixon*, 433 U.S. at 478 (inquiring whether "*legislative record* evinces a congressional intent to punish" (emphasis added)). Indeed, almost all of the relevant statements Plaintiffs cite from the legislative record come from *opponents* of the bill. *See* Doc. No. 5 at 15 n.14. But statements of a bill's opponents obviously cannot shed light on what motivated the bill's supporters to enact it.[1]

Even if all of these statements could be considered, they still would not rise to the level of the "clearest proof" needed to invalidate the statute. *Flemming*, 363 U.S. at 617. Indeed, the Supreme Court has already rejected the claim that "isolated statements" of a smattering of legislators can count as "the unmistakable evidence of punitive intent which . . . is required before a Congressional enactment of this kind may be struck down." *Selective Serv. Sys.*, 468 U.S. at 856 n.15; *see also United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.").

For all of these reasons, Planned Parenthood's baseless bill of attainder claim must fail.

### B.    Section 71113 Does Not Amount to First Amendment Retaliation.

Planned Parenthood's second theory is that Section 71113 violates the First Amendment because it was supposedly motivated by unconstitutional animus toward Planned Parenthood's advocacy. That claim fails too. To be clear, nothing on the face of Section 71113 regulates,

---

[1] Plaintiffs also cite a statement by Representative Smith of New Jersey on March 27, 2025. *See* Doc. No. 5 at 12. That statement is in the Extension of Remarks section of the Congressional Record and, thus, not directly related to H.R. 1. And in any event, one stray remark by a single member of Congress is not sufficient to sustain a facial constitutional challenge to legislation.

burdens, or penalizes Planned Parenthood's speech, and Plaintiffs do not claim otherwise. Rather, this claim hinges entirely on the purportedly illicit legislative motives behind the statute. But that runs headlong into the general "principle of constitutional law" that courts cannot "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *O'Brien*, 391 U.S. at 383; *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47–48 (1986). Nor, in any event, has Planned Parenthood provided an evidentiary basis for this accusation.

**1.** Courts have often applied the *O'Brien* principle to reject First Amendment retaliation claims indistinguishable from the one Planned Parenthood presses here. In one case, a public-sector union argued that an Alabama statute limiting payroll deductions for union dues violated its First Amendment rights because it was allegedly enacted in retribution for past opposition to the Governor's education policy proposals. *In re Hubbard*, 803 F.3d 1298, 1301 (11th Cir. 2015). The Eleventh Circuit rejected the claim, explaining that, "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *Id.* at 1311; *see also Walt Disney Parks & Resorts U.S., Inc. v. DeSantis*, 716 F. Supp. 3d 1216, 1223–24 (N.D. Fla. 2024) (rejecting claim that State legislature's amendment was in retaliation for corporation's political speech), *appeal dismissed*, No. 24-10342, 2024 WL 3593934 (11th Cir. June 18, 2024). The Seventh Circuit similarly rejected a First Amendment retaliation claim against a facially neutral statute based on the assertion that it was designed to punish political opponents. *Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 556 (7th Cir. 1988).

Planned Parenthood's retaliation claim here is identical to the ones these courts rejected. Just as in those cases, Planned Parenthood's sole First Amendment argument is that Congress "had a retaliatory motive" to enact an otherwise valid legislative provision. *See Walt Disney Parks*, 716

F. Supp. 3d at 1224. They do not claim that Section 71113 restricts or compels their speech. That dooms their retaliation claim. While some courts have considered legislative motive when a governmental action "was directed against the plaintiffs and no one else," *Hobart*, 864 F.2d at 554, that just means that Planned Parenthood's retaliation argument adds nothing beyond the inadequate attainder and Equal Protection claims. And Planned Parenthood acknowledges that the provision applies to more than just Planned Parenthood. *See* Doc. No. 5 at 13, 20 n.15.

Planned Parenthood cites no case holding that an otherwise facially constitutional *statute* may be the predicate for a First Amendment retaliation claim based solely on the alleged motive of certain legislators that voted for it. Instead, Planned Parenthood cites cases dealing with specific discretionary *executive actions*. *See Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024) (state official's threats of retaliatory enforcement); *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) (retaliatory arrest); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (non-renewal of state contract); *McCue v. Bradstreet*, 807 F.3d 334, 339 (1st Cir. 2015) (allegedly retaliatory actions by agency). But the law has long recognized a fundamental difference between legislative enactments and executive actions, including because of the difficulties inherent in tracing the motive for bills passed by legislative majorities. *See Fletcher v. Peck*, 10 U.S. 87 (1810) (refusing to invalidate legislation based on allegations about illicit motives). That is why the *O'Brien* principle governs here, not the cases that Planned Parenthood cites.

**2.** Even if the *O'Brien* principle did not govern, Planned Parenthood's claim would fail. Any First Amendment retaliation claim must show that the plaintiff "engaged in constitutionally protected conduct"; was "subjected to an adverse action"; and that "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th

512, 514 (1st Cir. 2023). Planned Parenthood may well engage in protected advocacy, but it makes no serious showing that Section 71113 was designed to punish it for that advocacy.

Importantly, the statute does not depend on whether any entity *advocates* for abortion. Planned Parenthood and its members may continue to engage in First Amendment activity; they can only be disqualified from Medicaid if they continue to provide certain abortions on or after October 1, 2025. If Planned Parenthood and its affiliates cease *providing* those abortions, they could receive Medicaid funds even as they continue to *advocate* for abortion. And restricting funding for abortion providers does not violate the First Amendment. *See Rust*, 500 U.S. at 196; *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 915 F.2d 59, 63–64 (2d Cir. 1990) (upholding Mexico City Policy against First Amendment challenge); *Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 190 (2d Cir. 2002) (Sotomayor, J.) (same).

Nor can Planned Parenthood demonstrate that Section 71113 was intended to retaliate for *past* advocacy. It offers next to nothing to support its argument that the provision would not have been adopted absent Planned Parenthood's First Amendment protected activities. *See Hartman v. Moore*, 547 U.S. 250, 260 (2006) (recognizing failure of First Amendment retaliation claim "if that action would have been taken anyway" absent impermissible motive); *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977) (recognizing that teacher would not be entitled to reinstatement "if the same decision would have been reached" absent his protected speech).

Planned Parenthood argues that opposition to its "message and mission" animates the Defund Provision. Doc. No. 5 at 29. But message and mission are two very different things. It is appropriate for Congress to burden the "mission" of providing elective abortion. *Cf. Hobart*, 864 F.2d at 555 (observing that "many laws" burden groups of political opponents). And, indeed, all of the legislator statements Planned Parenthood cites criticize it not because it *advocates* for

abortions, but because it *provides* abortions. Doc. No. 5 at 9–12. For example, Planned Parenthood cites statements from Members of Congress in 2023 arguing that the "nation's largest abortion provider" should not "receive millions of hard-earned taxpayer dollars every year to provide abortions on demand." Doc. No. 5 at 10–11. Those statements confirm those legislators' goals of preventing federal funds from being paid to entities that provide abortion services, which have nothing to do with protected speech. In fact, Planned Parenthood itself says Congress was trying to defund Planned Parenthood "to penalize it for *performing* abortions" because "[w]e shouldn't be paying for institutions whose primary purpose is to *do abortions*." *Id.* (emphasis added). That shows that the statute addresses conduct, not speech.[2] The *only* statements Planned Parenthood provides that relate to First Amendment activity come from outside interest groups, not anyone who voted on the legislation. *Id.* at 11, n.7. It is absurd to suggest that those statements can be attributed to the Government. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021) ("[T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.").

In sum, Section 71113 neither regulates Planned Parenthood's speech, nor retaliates for First Amendment activity. Planned Parenthood remains free to speak about any topic it wants. And because Planned Parenthood has provided no basis for the counterintuitive notion that Congress

---

[2] Planned Parenthood also cites a proposed law and statements dating back to 2017, but these statements are doubly irrelevant because motives cannot be imputed from one legislative action or body to another. *See Abbott v. Perez*, 585 U.S. 579, 604–05 (2018) (past discriminatory map did not impugn map two years later); *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 298 (4th Cir. 2020) ("A legislature's past acts do not condemn the acts of a later legislature" even if membership overlaps).

would not have enacted the Defund Provision but-for First Amendment activity, this claim would be legally groundless even if the Court could look behind the statute's facial legitimacy.

### C.    Section 71113 Does Not Violate Equal Protection.

Planned Parenthood's Equal Protection claim is equally unfounded. If a classification "'neither proceeds along suspect lines nor infringes fundamental constitutional rights,' it must 'be upheld against equal protection challenge if there is any reasonable state of facts that could provide a rational basis for the classification.'" *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 197–98 (Sotomayor, J.) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The classification here is set by the statute: a non-profit abortion provider that received Medicaid payments in excess of $800,000 in 2023. Such classification is subject to rational-basis review. There is no suspect class at issue and, as explained above, Section 71113 does not turn on any exercise of constitutional rights. *See id.* at 188.

Planned Parenthood argues that the class is gerrymandered to single out PPFA's members. Doc. No. 5 at 25–26. That "class of one" theory has no hope of success. A "class of one" claim "is cognizable when—and only when—a 'plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 (1st Cir. 2007) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). "To carry the burden of proving substantial similarity, 'plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Id.* at 251.

Planned Parenthood identifies no "extremely" similar comparators that are being treated differently; on the contrary, it paints itself as a uniquely high-profile organization. And the statute says nothing to single out Planned Parenthood; rather, it sets out objective criteria for determining what entities may not receive Medicaid reimbursements, and Planned Parenthood acknowledges

that it sweeps in other entities too. *See* Doc. No. 5 at 13, 20 n.15; Snyder Decl. ¶ 6. So Planned Parenthood is not a class of one; nor has it been specially targeted.

In all events, a class-of-one claim remains subject to rational-basis review. *See Cordi– Allen*, 494 F.3d at 250 (plaintiff must show "no rational basis for the difference in treatment"). And, however analyzed, Section 71113 passes rational-basis review. Indeed, the rational basis for its classification is obvious: The United States wants to reduce abortions. There are any number of reasons for that objective: moral, economic, health- and safety-related, and more. And abortion no longer enjoys constitutional protection. *See Dobbs*, 597 U.S. at 231. So Congress is free to decline to provide taxpayer funds to entities that provide abortions. In fact, then-Judge Sotomayor rejected a similar Equal Protection challenge to the Mexico City Policy, which requires foreign non-governmental organizations that receive funds from the United States to "agree not to perform or actively promote abortion as a method of family planning." *Ctr. for Reprod. L. & Pol'y*, 304 F.3d at 188 (Sotomayor, J.). As she explained, the "Supreme Court has made clear that the government is free to favor the anti-abortion position over the pro-choice position, and can do so with public funds." *Id.* (citing *Rust*, 500 U.S. at 192–94). The same is true here.

Planned Parenthood nonetheless claims the precise lines drawn by the statute are irrational. Doc. No. 5 at 25–27. Its arguments are nowhere close to persuasive. A law passes rational-basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. . . . Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" *Beach Commc'ns*, 508 U.S. at 313–14. "This standard of review is a paradigm of judicial restraint." *Id.* All the more so where Congress is exercising its core and discretionary power of the purse, which requires that any "review of distinctions that Congress draws in order to make allocations from a finite pool of resources must be deferential." *Lyng*, 485 U.S. at 373. If Planned

Parenthood's challenge had merit, then every entity that lost out on an appropriation or an earmark when arguably similar groups received funds would have an Equal Protection claim. That is not the law. *See Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 742 (D.C. Cir. 2011) (upholding subsidization of one competitor but not another under rational-basis review). And the lines drawn here by Section 71113 were rational and well within Congress' broad discretion.

*First*, Planned Parenthood questions why the provision applies only to those who received $800,000 from Medicaid in 2023. *Id.* But even under intermediate scrutiny, Congress "need not address all aspects of a problem in one fell swoop." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. ---, 2025 WL 1773625, at *18 (U.S. June 27, 2025). Larger providers carry out more abortions and receive more government subsidies, so they are a natural first target. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604 (2008) (rejecting a class of one claim because many laws cannot be enforced against every violator, and there must be room for discretion).

*Second*, Planned Parenthood questions why the law applies only to non-profits. Doc. No. 5 at 25. Congress could have rationally concluded that if an abortion group was already receiving such an implicit government subsidy (in the form of tax-exempt status), it should not also receive federal funds. *Bob Jones Univ. v. United States*, 461 U.S. 574, 587 (1983) (explaining that 501(c)(3) status "provide[s] tax benefits to charitable organizations").

*Third*, Planned Parenthood takes issue with the law's application to providers "primarily engaged in family planning services, reproductive health, and related medical care." But that distinction is rational too. Those facilities are likely to perform a higher proportion of abortions. And Congress could reasonably conclude they are more likely to engage with pregnant women seeking family-planning advice who are susceptible to efforts to push them towards abortion. A permissible rationale for the provision is to reduce abortions and government subsidization in a

targeted manner, and these criteria rationally further that goal. *See Beach Commc'ns, Inc.*, 508 U.S. at 315 ("[W]e never require a legislature to articulate its reasons for enacting a statute").

Grasping at straws, Planned Parenthood insists the law is "inexplicable by anything but animus" towards it. Doc. No. 5 at 27 (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)). That is not credible. The law is easily explicable by a desire to reduce abortion and government subsidization of abortions in a targeted manner. That is why, by its plain text, it only applies to an entity that "provides for abortions." If Planned Parenthood and its affiliates ceased providing abortions, they could receive Medicaid funds again. That is hardly "animus." *See Smith v. City of Chicago*, 457 F.3d 643, 652–53 (7th Cir. 2006) (rejecting animus-based equal protection argument where there was no evidence of a "subjective illegitimate reason"). In fact, the only evidence Planned Parenthood cites to support any alleged animus demonstrates that Congress has tried to defund it *because* it is the nation's largest abortion provider and should not be subsidized by taxpayer money. *See supra*. In all events, courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 485 (1st Cir. 1991). Planned Parenthood does not even contend the law is facially invalid; it merely speculates that animus is the only explanation. That is not enough.

In the end, it is perfectly rational for Congress to determine that taxpayers should no longer fund major abortion providers, of which Planned Parenthood is merely one prominent example. That simple fact dooms Planned Parenthood's Equal Protection claim.

## II.    The "Non-Qualifying Members" Have No Viable Claims (Counts Four to Six).

Separate from the facial constitutional challenges to Section 71113 discussed above— claims on which the Court did *not* rely in finding Planned Parenthood was likely to succeed at the TRO stage—Planned Parenthood brings three additional claims, pled in the alternative. In this second set of claims, Plaintiffs ask this Court to issue declaratory relief in an emergency posture

interpreting Section 71113 not to cover certain Planned Parenthood members because those members do not themselves perform abortions or, like PPAU, do not independently meet the $800,000 threshold in the statute—or because if they were included, it would be unconstitutional. Although the Court appeared to rely on these claims to enter its Amended TRO, the Court should not entertain that unripe, improper, and meritless request as a basis for a preliminary injunction.

### A.    Plaintiffs' Request for Declaratory Relief Is Procedurally Improper.

Planned Parenthood's request for a preliminary declaratory judgment that certain members are not covered by the statute should be denied for multiple threshold reasons.

*First*, Plaintiffs have not established a case or controversy to support this claim. Planned Parenthood contends that the "non-qualifying members" fall outside Section 71113's reach because they are not "affiliates" within the meaning of the statute. But CMS, for its part, has had no opportunity to analyze the legal and factual questions that it must consider to construe and apply the statute. Without some concrete indication that the Government will conclude that the "non-qualifying members" are covered by Section 71113, Planned Parenthood cannot ask the Court to prematurely adjudicate the proper legal interpretation and factual application of the statute.

Instead, it must wait for a case or controversy to arise—even in seeking a declaratory judgment. The Supreme Court has made clear that "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California v. Texas*, 593 U.S. 659, 672 (2021). Under Article III, a plaintiff must face an injury that is "actual or imminent, not conjectural or hypothetical." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). "In certain circumstances, 'the threatened enforcement of a law' may suffice as an 'imminent' Article III injury in fact," *id.*, and a plaintiff need not wait for "an actual arrest, prosecution, or other enforcement action," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

But to seek a pre-enforcement declaratory judgment, the "plaintiff must demonstrate a specific threat of prosecution." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 51 (1st Cir. 2021). As a preliminary matter, Plaintiffs do not even *allege* any form of expected "prosecution" or civil enforcement—they merely assert that they may be denied federal funding. Nor could they claim that the "non-qualifying members" face an imminent threat of enforcement, as Section 71113 does not "proscribe[]" any "course of conduct" by Plaintiffs. *Cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). It simply declines to allocate taxpayer dollars to entities that meet certain criteria. That difference alone casts this case far afield from those in which the First Circuit has entertained pre-enforcement requests for declaratory relief. *See id.*; *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 3–5 (1st Cir. 2000).

Further, cases finding a ripe controversy based on "pre-enforcement standing" require some evidence that the would-be enforcer reads the relevant statute to apply to the plaintiff or his desired conduct. *N.H. Lottery Comm'n*, 986 F.3d at 51. For example, in *New Hampshire Lottery Commission*, the Department of Justice's Office of Legal Counsel had adopted an opinion taking the position that the statute at issue applied to the plaintiffs' conduct. *Id.* at 51–54. And in *New Hampshire Hemp Council*, "the DEA had expressed its view that the conduct [the plaintiff] sought to engage in violated federal law." *Id.* at 51 (citing *Hemp Council*, 203 F.3d at 5). Yet HHS and CMS have had no opportunity to opine on the scope of Section 71113's application to affiliates. Nor has any state made such a determination, such as by denying a claim from a "non-qualifying member." The "non-qualifying members" can only speculate that HHS and CMS (or certain states) will interpret the statute to apply to them and deny payment or reimbursement. That is insufficient for pre-enforcement standing and should alone doom Planned Parenthood's second set of claims.

25

*Second*, Plaintiffs identify no cause of action. Unlike Planned Parenthood's first set of claims, discussed in Part I above, their request for a declaratory judgment is statutory, not constitutional, and thus cannot proceed directly under the Constitution. Nor can the claim go forward as a bare request for declaratory judgment, as "[t]he [Declaratory Judgment Act] does not by itself create a federal cause of action." *Tyngsboro Sports II Solar, LLC v. Nat'l Grid USA Serv. Co.*, 88 F.4th 58, 64 (1st Cir. 2023). It merely "enlarged the range of remedies available in the federal courts." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Declaratory relief is therefore available only if "the underlying dispute could . . . *otherwise* be heard in federal court" under 28 U.S.C. § 1331. Hart & Wechsler, The Federal Courts and the Federal System 841 (7th ed. 2015); *see California*, 593 U.S. at 672–73 (explaining that a declaratory judgment is not available absent another "remedy that will redress the . . . plaintiffs' injuries"). That is not the case here, where no "hypothetical coercive action" could go forward under § 1331. *Tyngsboro Sports*, 88 F.4th at 65. CMS may not "enforce" Section 71113 against Planned Parenthood in any coercive sense; rather, it (or a state) could deny payment to a particular member, and that member could pursue a claim through the ordinary administrative process.

*Finally*, a declaratory judgment is inappropriate at the preliminary-injunction stage for two reasons: It is not preliminary and is not an injunction. Rule 65 authorizes only preliminary injunctions and temporary restraining orders. *See generally* Fed. R. Civ. P. 65. A declaratory judgment is neither: it "shall have the force and effect of a *final* judgment or decree," and it operates to "declare the rights and other legal relations" of the parties at issue, 28 U.S.C. § 2201(a) (emphasis added), not to "restrain[] or require[]" any particular acts, as an injunction does, Fed. R. Civ. P. 65(d)(1)(C). For that reason, the Supreme Court has recognized that "prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction."

*Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *see also Crocs, Inc. v. Jinjiang Hobibear Shoes & Clothing Co*., No. 25-CV-180 (JMF), 2025 WL 1519114, at *1 (S.D.N.Y. May 28, 2025) ("Further, to the extent HobiBear seeks a preliminary declaratory judgment, its request flies in the face of the weight of authority in this Circuit, which provides that such relief is not available under Rule 65."); *Vazquez Perez v. Decker*, No. 18-CV-10683 (AJN), 2019 WL 4784950, at *10 (S.D.N.Y. Sept. 30, 2019) ("As a sister District in this Circuit noted, 'there is no clear precedent authorizing . . . preliminary declaratory relief,'" and the Court finds that no such relief exists."). Plaintiffs' request for declaratory relief should therefore be a nonstarter in their motion for preliminary injunction.

### B.    Section 71113 Could Apply to the Non-Qualifying Members.

If this Court could nonetheless entertain the "non-qualifying members'" request for declaratory relief, it should deny that request on the merits. HHS and CMS could—depending on facts which have yet to be developed—permissibly construe the statute to cover "non-qualifying members" if, on October 1, they are "affiliates" of members that provide for abortions. Plaintiffs' contrary arguments are not only premature but also rest on a selective account of the facts, which the Government has not yet had any opportunity to probe.

Merriam-Webster defines "affiliate" as a "person or organization" that is "closely associated with another typically in a dependent or subordinate position." *Affiliate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/affiliate (last visited July 14, 2025). Black's Law Dictionary, on which Planned Parenthood relies, emphasizes the importance of one organization's control over another, or two entities' existence under common control. *Affiliate*, *Black's Law Dictionary* (12th ed. 2024). Control, in turn, includes "the direct or indirect power to govern the management and policies of a person or entity, whether . . . by contract, or otherwise." *Control*, *Black's Law Dictionary* (12th ed. 2024); *see also, e.g.*, 48 C.F.R. § 2.101

(defining, for purposes of the Federal Acquisition Regulation, "affiliate[]" in relevant part as "associated business concerns or individuals if, directly or indirectly either one controls or can control the other; or third party controls or can control both"); 2 C.F.R. § 180.905 (for purposes of federal financial assistance, "[p]ersons are *affiliates* of each other if, directly or indirectly, either one controls or has the power to control the other or a third person controls or has the power to control both").

Even Plaintiffs' own submissions demonstrate that PPFA may currently exercise sufficient control over the policies of its members to warrant treating all of them as "affiliates" under the statute (though it is their relationships as of October 1 of this year that will matter). PPFA mandates that its members abide by "membership standards," "accreditation standards," and "shared medical standards and guidelines." Custer Decl., Doc. No. 5-1, ¶¶ 11, 13. Those mandatory standards demonstrate that PPFA "govern[s]" the "policies" of its members "by contract, or otherwise." *Control*, *Black's Law Dictionary*, (12th ed. 2024). Moreover, according to a publicly available (though dated) copy of Planned Parenthood of New Mexico's ("PPNM") Bylaws, those Bylaws expressly mandate that it "shall maintain affiliation with" PPFA and "operate its programs in conformity with" the "Standards of Affiliation" found in the PPFA Bylaws. PPNM Bylaws Art. II, § 2 (updated Nov. 15, 2010), https://perma.cc/L3DR-LHR5. Indeed, PPNM's Board of Directors is restricted by the terms of its Bylaws to standards set by PPFA—it lacks authority to take any action inconsistent with PPFA's "Standards of Affiliation." *Id.*, Art. IV, § 1. PPFA appears to monitor its members by requiring mandatory reporting, too—PPNM must submit its annual plans to PPFA, and those plans must be "consistent with the Strategic Plan approved by PPFA for the ensuing year." *Id.* Art. IV, § 10. The same is true of PPNM's annual budget, *id.* Art. IV, § 11, and PPNM's Board of Directors, volunteers, and staff are all required to comply with

PPFA's conflicts of interest policy, *id.* Art. XVI. All of those requirements demonstrate PPFA's control over its members, and therefore that members could be treated as affiliates under common control.

That understanding is also consistent with how PPFA and its members describe the relationship, aside from in this litigation. PPFA's Annual Report describes health services performed by its "affiliates"—not its members—and reports financial data for those affiliates collectively. PPFA, Annual Report 2023–2024 at 7, 10, 24–27 (2024), https://perma.cc/XN6R-4UPF. The contractual terms of use for PPDirect, Planned Parenthood's telehealth app, similarly provide that "PPDirect is a contracting partner of certain regional Planned Parenthood member affiliates governed by the Bylaws of the Planned Parenthood Federation of America, Inc." Planned Parenthood Direct, Terms of Use (rev. Jan. 1, 2024), https://perma.cc/HEG5-HX67.

Indeed, a declaration submitted by PPFA in separate litigation—and signed by the same declarant, Kimberly Custer—cements that PPFA itself considers all of its members "affiliates" and reveals further mechanisms of control. Ms. Custer describes PPFA's members as "affiliates" approximately 100 times. Decl. of Kimberly Custer in Supp. of Pls.' Mot. for Prelim. Inj., *Planned Parenthood Federation of Am., Inc. v. Azar*, No. 1:19-cv-5435 (S.D.N.Y. June 17, 2019), Doc. No. 27-2. That declaration also reveals that PPFA's terms for affiliates control the services those entities offer—and mandate that they provide contraception, contraceptive counseling, and abortion. *Id.* ¶ 17.

For all of these reasons, HHS and CMS could permissibly conclude (again, depending on the facts as of October 1) that PPFA members are all "affiliates" within the meaning of the statute, and this Court should not issue a declaration that they categorically are not—certainly without discovery to test the nature of the relationship among the members and between PFFA and its

members. Indeed, Planned Parenthood's apparent strategic choice to submit a selective factual account of PPFA's relationship with its self-labeled "affiliates" demonstrates that fact discovery would be necessary for the Court to conduct any fulsome analysis of the question. Its improper attempt to obtain an authoritative ruling on the scope of the provision based on that incomplete factual account cannot form the basis for a preliminary injunction.

> ### C.    The Non-Qualifying Members' Contingent Constitutional Claims Fail In Any Event.

In the alternative, Planned Parenthood argues that Section 71113 may not constitutionally apply to the "non-qualifying members." But again, this is premature—there is no ripe controversy without some indication that the Government or the States will construe the statute to apply to those members. In any event, neither of Planned Parenthood's constitutional arguments about Section 71113's application to the "non-qualifying" subset of its members has merit.

**1.** First, Planned Parenthood asserts that the provision is unconstitutionally vague under the Due Process Clause because the so called "non-qualifying members" cannot determine whether the provision applies to them, so they are not on notice "of how it may be enforced against them." Doc. No. 5 at 33.

But Planned Parenthood does not have a protected interest in continued participation in the Medicaid program. Because "a void-for-vagueness challenge is ultimately a due-process claim, a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty interest." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023). The "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015). Here, Planned Parenthood does not allege that the "non-qualifying members" have a

protected property or liberty interest in continued reimbursements from the Medicaid program. *See* Doc. No. 5 at 33–35. Nor could they.

"The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted). Due Process protections have never been extended to providers' participation in voluntary programs such as Medicaid. *See Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 129 (1st Cir. 2009) ("Of course, where a property owner voluntarily participates in a regulated program, there can be no unconstitutional taking."); *Baker Cnty. Med. Servs., Inc. v. U.S. Att'y Gen.*, 763 F.3d 1274, 1275 (11th Cir. 2014) (rejecting Fifth Amendment challenge to Medicare compensation scheme because the provider voluntarily opted into the Medicare program); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (holding that the voluntary nature of a provider's decision to participate in Medicaid "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation").

Even if Planned Parenthood had a constitutionally protected interest in participation in the Medicaid program, Plaintiffs' vagueness challenge would still fail because the void-for-vagueness doctrine does not apply to government spending decisions. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This doctrine demands scrutiny of statutes and regulations that identify new conduct for punishment—typically in the context of law-

enforcement authorities. *See Nat'l Urb. League v. Trump*, 2025 WL 1275613, at *19 (D.D.C. May 2, 2025); *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (law is "void for vagueness" when "it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement"). It has little, if any, application "when the Government is acting as patron rather than as sovereign," where the effects "of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

Despite Planned Parenthood's insistence that Section 71113 lacks "minimal guidelines" governing its enforcement, *see* Doc. No. 5 at 35—a dubious prospect in the context of a commonly used legal phrase like "affiliate"—there is no "enforcement," either criminal or civil, when the government makes a funding decision. Indeed, in the funding context, Congress often chooses statutory language that vests the Government with discretion, as "it is not always feasible for Congress to legislate with clarity." *Finley*, 524 U.S. at 589. Many statutes therefore provide the Government discretion to award funding based on entirely "subjective criteria such as 'excellence.'" *Id.* But even discretion-laden standards do not render a funding statute unconstitutionally vague. *Id.* Nor does the "affiliate" language here.

**2.** Section 71113 does not violate the First Amendment as applied to any so-called "non-qualifying member," either directly or by imposing unconstitutional conditions.

To start, the provision does not directly restrict First Amendment rights. Planned Parenthood argues Section 71113 violates the speech rights of "non-qualifying members" because it "seeks to punish and suppress" their "advocacy for abortion rights and access." Doc. No. 5 at 37. That argument fails for the same reasons that the provision passes First Amendment scrutiny generally. *See supra* Part II.B–C. Nothing about the statute regulates any entity's speech. It instead

withholds funding based on whether entities provide abortion services—services which those entities do not have a constitutional right to provide. *See Dobbs*, 597 U.S. at 231.

The provision also does not violate the affiliates' First Amendment associational rights. Planned Parenthood's theory of associational harm seems to be that defining qualified entities to include their "affiliates" punishes the affiliates for associating with PPFA for expression-related purposes. But the word "affiliate" here has nothing to do with expressive association. Instead, Congress uses the word to account for corporate form and function. As discussed, the common legal meaning of "affiliate" includes a concept of control. *See supra* Part II.B. That concept is pervasive in the law: the Internal Revenue Code, the Employee Retirement Income Security Act (ERISA), and many other statutes regulate at the level of common control. *See, e.g.*, 26 U.S.C. § 414(b); 29 U.S.C. § 1301(a)(14). Congress even imposes penalties based on "affiliate" status. *See, e.g.*, 12 U.S.C. § 338. Treating all of those statutory schemes as burdens on First Amendment rights would be revolutionary.

Even taking Planned Parenthood's associational challenge at face value, it fails. Section 71113 "does not 'order'" affiliates "not to associate together for . . . any . . . purpose, and it does not 'prevent' them from associating together or burden their ability to do so in any significant manner." *Lyng*, 485 U.S. at 366. Thus, it does not "directly and substantially interfere" with Planned Parenthood and its affiliates' "ability to associate." *Id.* PPFA and its members are free to associate for any lawful purpose. If they wish to collaborate for the purpose of advocacy, praise or endorse each other publicly, participate in events, or issue joint press releases, no interpretation of Section 71113 prevents them from doing so. If they legally structure themselves as affiliates, however, they can be treated as a single unit for purposes of this provision and other statutes.

To the extent that Plaintiffs' argument hinges on an even broader reading of "affiliate"—such as a colloquial rather than a legal meaning—that interpretation would underscore why it is premature to adjudicate this hypothetical dispute. Neither CMS nor any state has articulated such an interpretation of the statute, and there is no reason to think they plan to adopt that reading. Courts should not adjudicate constitutional disputes that may never matter depending on how a statute is construed and applied by administrative agencies and states. *See supra* Part II.A; *cf. R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 498 (1941).

Because the law does not restrict speech or burden association, Planned Parenthood's derivative conditions-related arguments also fail. The unconstitutional-conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Such a claim, therefore, depends on the existence of a constitutional protection that the government allegedly seeks to infringe through coercion. *See id.* at 612 (explaining that the "predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure the person into doing"). But here, Section 71113 does not condition Medicaid reimbursements on any Planned Parenthood member giving up its constitutional rights.

Planned Parenthood also argues that any restrictions on the funds must be on the specific project they are funding, not the recipient generally. Doc. No. 5 at 36–37. The line is not as bright as Planned Parenthood claims. Once again, the Second Circuit rejected arguments from domestic abortion providers that their First Amendment rights were burdened by restrictions on *any* abortion advocacy by foreign groups that received *any* federal funds, even if the funds were attenuated from actual abortions. *See Planned Parenthood Fed'n of Am., Inc.*, 915 F.2d at 63–64; *Ctr. for Reprod.*

34

*L. & Pol'y*, 304 F.3d at 190 (Sotomayor, J.). The fact that this burdened Planned Parenthood's ability to associate with groups receiving funding was merely an "incidental effect from the refusal to subsidize," not a constitutional violation. *Planned Parenthood Fed'n of Am., Inc.*, 915 F.2d at 63–64. Indeed, even restrictions on the ability of a domestic organization to subgrant funds to a foreign group for abortion advocacy do not violate their freedom to associate. *See DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 292 (D.C. Cir. 1989). So when various entities are sharing funds across themselves—including for the purpose of providing abortions—it is not apparent that restrictions on use can constitute unconstitutional conditions.

In any event, the lack of any restriction on constitutional rights here makes Planned Parenthood's reliance on *Rust* and *AID* entirely inapt. Those cases discussed government programs that imposed conditions *on the recipients' speech* outside the scope of that program. *See Rust*, 500 U.S. at 197; *AID*, 570 U.S. at 210–11. *Rust*, for example, upheld a restriction on speech tied to federal funds and distinguished *FCC v. League of Women Voters of California*, 468 U.S. 364, 400 (1984), which had invalidated a funding condition that prohibited grantees "absolutely from all editorializing." *Rust*, 500 U.S. at 197. That funding condition was unconstitutional because it prohibited the grantee "from engaging in *protected* conduct outside the scope of the federally funded program." *Id.* (emphasis added). The program at issue in *AID* required recipients of federal funds to "have a policy explicitly opposing prostitution and sex trafficking," which "compell[ed] a grant recipient to adopt a particular belief as a condition of funding." 570 U.S. at 208, 218. Those cases thus depended on the fact that a government-imposed condition on funding regulated constitutionally protected conduct. Section 71113, in contrast, does not condition government funding on speech at all. Planned Parenthood members can continue to say whatever they want while still receiving federal Medicaid funds.

This lack of nexus to any regulation of speech also distinguishes the two Ninth Circuit decisions on which Plaintiffs rely. *See* Doc. No. 5 at 35 (citing *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938 (9th Cir. 1983), and *Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 789 F.2d 1348 (9th Cir. 1986)). Those cases addressed a State statute that denied funding to any entity that offered not only abortion services, but also those that offered "counseling for abortion procedures or abortion referrals." 718 F.2d at 941. The Ninth Circuit reasoned that the statute implicated "the right of Planned Parenthood to engage in abortion or abortion-related speech activities." *Id.* at 944. The statute here does not say anything about speech; none of its criteria have to do with speech; and it does not regulate Planned Parenthood's abortion-related speech activities.

### III.    Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs' motion should also be denied because they have failed to demonstrate irreparable harm. *See Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see also Winter*, 555 U.S. at 22 (a party "seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction"). In other words, "speculative injury" is not enough. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–8 (1st Cir. 1991) (cleaned up). Plaintiffs do not meet that test.

### A.    Plaintiffs Demonstrate No Irreparable Harm to Planned Parenthood.

There is no irreparable harm to Planned Parenthood because its only cognizable injuries are economic and classically remediable. The corollary to the rule requiring concrete, imminent harm is that legal remedies must be inadequate. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). That means that generally, "economic loss does not, in and of itself, constitute irreparable

harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass. 2020), *aff'd*, 976 F.3d 86 (1st Cir. 2020); *Seafreeze Shoreside, Inc v. U.S. Dep't of Interior*, Case No. 1:22-cv-11091-IT, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023).

At bottom, Plaintiffs seek reimbursement from the Government for Medicaid expenditures. But they do not need a preliminary injunction to ensure that they receive that relief. If, at the conclusion of this litigation, Planned Parenthood prevails on its claims (which it should not), it would be able to seek reimbursement from the relevant State for the provision of covered services. States have up to *two years* to submit claims for services rendered to state Medicaid agencies or designated contractors for claims adjudication and payment. *See* 42 U.S.C. § 1320b–2(a). And, what is more, there is an exception to the two-year deadline when payments are made pursuant to a court order. 45 C.F.R. § 95.19. Thus, if the Court were to conclude at final judgment that Planned Parenthood's claims have merit, Planned Parenthood could seek, at the conclusion of this litigation, payment (through the states) for any services provided during the pendency of the case. Planned Parenthood's injuries are not "irreparable" on these facts.

Nor may Planned Parenthood rely on the exception to the general no-economic-irreparable-harm rule for loss "so great as to threaten the existence of the movant's business." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Plaintiffs represent that, "[i]f Planned Parenthood Members are barred from receiving federal Medicaid reimbursement for the services, Members across the country will be forced to reduce the hours and vital programs they offer, terminate staff members, and *eventually* close health centers." Doc. No. 5 at 39 (emphasis added). But Planned Parenthood provides no evidence that the reductions it identifies will occur imminently—and, even if such purported effects were around the corner, Planned Parenthood

provides no evidence that Section 71113 threatens their very existence during the single year it is in effect. *Compare Vaqueria Tres Monjitas*, 587 F.3d at 485 (finding irreparable injury where the movants were "on the verge of losing their businesses" and "on the brink of insolvency"). Suggestions of imminent closures are highly speculative and unsupported. To the contrary, as Plaintiffs acknowledge, PPAU remained operational in the face of a significantly *larger* reduction in funding from Title X. *See* Doc. No. 5 at 43 (describing operational changes from the loss of $2.8 million in funding, nearly four times the $706,251 PPAU received in Medicaid reimbursements in 2023). And for any injunction to issue on this theory, each member would need to demonstrate nonspeculative and imminent irreparable harm to warrant injunctive relief as to that member. *See Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *15 (U.S. June 27, 2025).

Planned Parenthood's attempt to establish irreparable harm based on an alleged "contraction" in their "mission of providing vital health care," Doc. No. 5 at 41 (citing *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)), fares no better. Plaintiffs have alleged nothing close to the type of obstacles presented in *League of Women Voters*. There, in granting an injunction, the D.C. Circuit considered the rapidly approaching "hard deadline for meaningful injunctive relief" in the form of deadlines to register voters for the upcoming election. *League of Women Voters*, 838 F.3d at 7. Thus, the Circuit held, the harm to the plaintiffs was "irreparable because after the registration deadlines for the November election pass[ed], 'there [could] be no do over and no redress.'" *Id.* at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). In other words, *League of Women Voters* addressed an unusual situation where, absent immediate relief, the plaintiffs could *never* advance their time-sensitive primary mission of 'registering voters' before the 2016 election." *Planned Parenthood of*

*Greater N.Y. v. U.S. Dep't of Health & Human Servs.*, Civ. No. 25-1334, 2025 WL 178100, at *8

(D.D.C. June 26, 2025) (citing *League of Women Voters*, 837 F.3d at 9), *appeal filed*, No. 25-5238

(D.C. Cir. June 30, 2025). No such exigencies are present here. Prohibited entities may continue

to pursue their mission however they deem appropriate, and indefinitely, just without federal

subsidies in the form of Medicaid funds.

**B.    Planned Parenthood Cannot Demonstrate Irreparable Harm Based on Alleged Harm to Third Parties.**

Planned Parenthood attempts to bolster its claims of irreparable harm by relying on

purported injuries to Medicaid recipients. *See* Doc. No. 5 at 39–42. But it may not rely on alleged

harms to third parties to demonstrate irreparable harm. The "issuance of a preliminary injunction

requires a showing of irreparable harm *to the movant* rather than to one or more third parties."

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) (emphasis

added); *see also Winter*, 555 U.S. at 24 ("A plaintiff seeking a preliminary injunction must

establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief."

(emphasis added)).

Although Planned Parenthood argues otherwise based on *Rio Grande Community Health

Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005), *see* Doc. No. 5 at 43–44, the First Circuit there

was careful to distinguish between the required demonstration of irreparable harm—which the

plaintiff met with evidence it "had fallen eight or nine months behind on its mortgage and that

foreclosure proceedings were about to begin"—with the discussion of the public interest, where

the court considered potential harm to patients absent injunctive relief. *See Rio Grande Cmty.

Health Ctr.*, 397 F.3d at 76–77. Similarly, in *Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d

33 (1st Cir. 2006), the court looked to the alleged harm to the named plaintiff—explaining that the

plaintiff had "filed documents . . . indicating that it was on the brink of financial ruin"—as opposed

to alleged harm to third parties not before the court. *Beleval*, 465 F.3d at 36 n.2. Moreover, although Plaintiffs point to cases where courts have concluded that an alleged disruption or denial of services to individuals constitutes irreparable harm, Doc. No. 5 at 41, the individuals themselves were parties to those lawsuits. *See Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) (concluding that the alleged disruption of care would harm the patient plaintiffs); *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (same); *Banks v. Booth*, 468 F. Supp. 3d 101, 123 (D.D.C. 2020) (same). Plaintiffs are not joined in their lawsuit by any patients, and thus find no support for their request for an injunction on a theory of harm based on the alleged denial of services.

### C.    Planned Parenthood's Asserted Harms Are Not Imminent and Would Not Be Redressed by Its Requested Injunction.

Even assuming Plaintiffs' claimed harm could suffice, it would not justify an injunction because that alleged harm is not imminent and would not be redressed by the requested injunction. To understand why, some background on the payment process is necessary.

As described above, CMS does not (under the circumstances relevant here) pay Medicaid providers directly. Costello Decl. ¶ 7. Rather, CMS pays upfront initial awards and later reconciles the FFP provided to the states using information from the states' quarterly Form CMS-64. *Id.* ¶ 5. In the meantime, the states (or, in the case of managed care, third-party health plan providers) pay providers for services rendered after claims are submitted by the providers. *Id.* ¶¶ 3–4, 15, 17–19. This process takes time: CMS understands that a Medicaid provider in any given state can generally expect to receive payment from the state within 30 days of submitting a claim. Only then would the state incur an expenditure to include in the state's quarterly Form CMS-64. *Id.* ¶¶ 7, 9. And, in the ordinary course, CMS takes up to six months to adjust the initial grants provided to states with the quarterly state submissions. *Id.* ¶ 13. The timeline is further extended here because,

under Section 71113, states will not know whether a provider is a prohibited entity until October 1; thus, they will not be able to definitively deny claims until that date.[3] The bottom line is that Planned Parenthood faces no *imminent* harm.

Further, because Planned Parenthood receives payment from the states, not the Federal Government, enjoining Defendants would not redress its injuries. The states responsible for processing Planned Parenthood's reimbursements are independently bound to follow federal law, including Section 71113. U.S. Const., Art. VI, cl. 2; *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). A preliminary injunction against Defendants would not relieve the states, which are not parties to this litigation, of that obligation. *See CASA*, 2025 WL 1773631, at *15.

Finally, even setting that redressability issue aside, a preliminary injunction cannot give Planned Parenthood the certainty it appears to seek. The reason Planned Parenthood says it needs relief immediately is that it does not want to provide services for which it may ultimately end up not being paid. In other words, what Planned Parenthood wants is a guarantee that, whether it ultimately wins or loses on the merits, it can continue to bill Medicaid for services provided in the interim. But this Court cannot provide that relief. A preliminary injunction by definition only governs conduct that occurs while it is effective. *Dep't of Homeland Security v. D.V.D.*, No. 24A1153, 2025 WL 1832186, *1 (U.S. July 3, 2025). It cannot bind parties as to their conduct after the injunction is stayed or reversed. As a result, if and when the Government prevails on the merits at the conclusion of this litigation, it (and perhaps also the states) may still be able to deny payment

---

[3] For example, assume a claim furnished on July 8 by a Planned Parenthood provider to a Medicaid beneficiary. The Planned Parenthood provider could be expected to submit a claim for the services by July 22 to the State Medicaid agency. The state Medicaid agency could be expected to pay the claim by August 22. That claim would be reflected in the state's 2025 Q3 quarterly Form CMS-64. CMS's involvement—which would take the form of an adjustment to the state's FPP—would not occur until around April 2026.

for services provided in the interim, and claw back funds that were improperly paid out while the reversed injunction was in place. *See* 42 U.S.C. § 1396b(d); 42 C.F.R. §§ 430.42, 433.304, 433.316. That, too, means that an injunction would not avert the harms Plaintiffs identify.

Because Plaintiffs have not demonstrated irreparable harm in the absence of their requested injunctive relief, their request for a preliminary injunction should be denied.

## IV.    The Balance of Equities and the Public Interest Favor the Government.

Plaintiffs' proposed injunction threatens significant and irreparable harm to the Government and public, *see Nken*, 556 U.S. at 435, which greatly outweighs any claimed injury to Plaintiffs. There is a traditionally strong "presumption of constitutionality which attaches to every Act of Congress." *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers). As the First Circuit has recognized, the "government's inability to 'effectuate statutes enacted by representatives of the people'" is irreparable injury to the Government and the people who elected those representatives. *Somerville Public Schools v. McMahon*, 139 F.4th 63, 74 (1st Cir. 2025) (quoting *Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

That is particularly true here, where Congress has made a judgment about which entities it wishes to benefit from public funds. In addition, Plaintiffs' claim of harm to patients rests on pure speculation and does not support entry of a preliminary injunction. Medicaid enrollees may, of course, receive care from any number of other providers—as the Court acknowledged in its amended TRO. Doc. No. 46. at 8. And Plaintiffs may continue to provide services without seeking Medicaid reimbursement. At bottom, Plaintiffs simply desire to receive government subsidies on the terms that they prefer. But "the government may 'make a value judgment favoring childbirth over abortion, and implement that judgment by the allocation of public funds,'" by "declining to 'promote or encourage abortion.'" *Rust*, 500 U.S. at 192–93. Accordingly, Plaintiffs cannot

overcome the strong presumption of the statute's constitutionality, and the balance of equities and public interest make preliminary injunctive relief inappropriate.

## V.    A Bond Should Accompany Any Injunctive Relief.

If the Court were to grant Plaintiffs' motion, the Government respectfully requests that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *See also U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014) (explaining that the bond's purpose is to protect defendants who "may have already suffered harm while the TRO was in effect even if the TRO is subsequently dissolved"). "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). If the Court were to enter an injunction, the Government asks that the bond amount reflect the amount of funding affected by Plaintiffs' requested relief—that is, the costs and damages that would be sustained by the Government. To effectuate the purposes behind Rule 65(c), the Court should determine how much security is necessary based on Planned Parenthood's estimates of the amount of Medicaid reimbursements its members receive each month.

In its Amended TRO, this Court concluded only a nominal bond was appropriate because that order "does not compel Defendants to spend money they would not otherwise spend." Amended TRO, Doc. No. 46 at 8. Even assuming the Court's premise that beneficiaries would obtain the same services from other providers is correct, those other providers are entitled to receive federal Medicaid funds. Payments made under the injunction Plaintiffs seek would be in violation of federal law, and the Government would incur substantial costs in trying to claw back payments to states that reflect those reimbursements.

43

And it is not clear that the Court's premise is correct. Planned Parenthood may elect to continue offering the same services using different funding sources, and patients that prefer to do so could continue receiving services without relying on Medicaid. *See* Dana DiFilippo, *With Federal Funding At Risk, Abortion-Rights Supporters Turn to State, Private Donors*, N.J. Monitor (July 3, 2025), https://newjerseymonitor.com/2025/07/03/with-federal-funding-at-risk-abortion-rights-supporters-turn-to-state-private-donors/. In either case, an injunction would require the Government to make specific payments it is not legally obligated to make, and which may not be fully recoverable. *Cf. Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025) (staying district court injunction requiring payment of federal funds in part because the district court "declined to impose bond").

## VI.    Any Injunctive Relief Should Be Stayed Pending Appeal.

To the extent the Court issues any injunctive relief, the Government respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). For the reasons explained above, the Government has made a strong showing that it is likely to succeed on the merits and will be irreparably injured absent a stay. *See id.* The public interest strongly favors giving effect to a provision enacted by the American people's democratically elected representatives. *See id.* Those factors outweigh any injury Plaintiffs might suffer.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: July 14, 2025                    Respectfully submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        YAAKOV M. ROTH
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        ERIC J. HAMILTON
                                        Deputy Assistant Attorney General
                                        Civil Division

                                        EMILY M. HALL
                                        ELIZABETH HEDGES
                                        TIBERIUS DAVIS
                                        Counsel to the Assistant Attorney General
                                        Civil Division

                                        MICHELLE R. BENNETT
                                        Assistant Director
                                        Federal Programs Branch

                                        BRADLEY P. HUMPHREYS
                                        JACOB S. SILER
                                        Trial Attorneys
                                        Federal Programs Branch

                                        /s/ Elisabeth J. Neylan
                                        ELISABETH J. NEYLAN
                                        Trial Attorney (N.Y. Bar Reg. No. 6125736)
                                        Federal Programs Branch
                                        1100 L Street NW
                                        Washington, DC 20005
                                        Phone: (202) 616-3519
                                        Elisabeth.J.Neylan@usdoj.gov

                                        *Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2025, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

_/s/ Elisabeth J. Neylan_
Elisabeth J. Neylan
Trial Attorney
United States Department of Justice