UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, and PLANNED PARENTHOOD ASSOCIATION OF UTAH, | * * * * * * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, and CENTERS FOR MEDICARE & MEDICAID SERVICES, | * * * * * * * * * * * | Civil Action No. 1:25-cv-11913-IT |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER
July 28, 2025

TALWANI, D.J.

In this action, Plaintiffs Planned Parenthood Federation of America, Inc. ("Planned

Parenthood Federation"), Planned Parenthood League of Massachusetts ("Planned Parenthood

Massachusetts"), and Planned Parenthood Association of Utah ("Planned Parenthood Utah")

allege that Section 71113 of An Act to provide for reconciliation pursuant to title II of H. Con.

Res. 14 ("the 2025 Reconciliation Act"), Pub. L. No. 119-21, 139 Stat. 72, 300–01 (July 4,

2025), violates the United States Constitution by subjecting Planned Parenthood Federation and

its Members to a bill of attainder, by retaliating against them in violation of the First

Amendment, and by denying them equal protection of the law. Plaintiffs assert further that the

provision, which directs that certain entities ("Prohibited Entities") may not receive federal Medicaid reimbursements for a one-year period, should not be read to apply to Planned Parenthood Members who do not independently satisfy Section 71113's requirements ("Non-Qualifying Members" [1]), and that if it is read to apply to these Members, it is unconstitutionally vague and violates Planned Parenthood Federation and these Members' First Amendment and Due Process rights.

Now before the court is Plaintiffs' Emergency Motion for a Preliminary Injunction [Doc. No. 4] seeking to preliminarily enjoin Defendants from enforcing Section 71113 against Planned Parenthood Members.[2] Defendants oppose the motion, asserting that "democratically elected components of the Federal Government collaborated to enact that provision consistent with their electoral mandates from the American people as to how they want their hard-earned taxpayer dollars spent." Defs.' Mem. 1 [Doc. No. 53]. In Defendants' view, "the law turns on action, not advocacy." Id. (emphasis in original).

Defendants' overview frames this inquiry: Is Section 71113 directed at entities solely because they provide elective abortions or also because of their advocacy? As explained below, Section 71113 burdens the exercise of Planned Parenthood Federation and its Members' First

---

[1] The parties use this term in their briefing to describe Planned Parenthood Members that do not independently meet Section 71113's definition of "prohibited entity." See Pls.' Mem. 14 [Doc. No. 5]; Defs.' Mem. 6 [Doc. No. 53].

[2] The court's original Memorandum & Order [Doc. No. 62] addressed this motion in part and reserved in part. Id. at 3, 35. Defendants have filed a Notice of Appeal [Doc. No. 63] of that Order. "An appeal from the grant or denial of a preliminary injunction does not divest [this] court of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending." Contour Design, Inc. v. Chance Mold Steel Co., 649 F.3d 31, 34 (1st Cir. 2011) (quoting 11A Wright & Miller, Federal Practice and Procedure § 2962, at 438–39 (2d ed.1995)). Accordingly, this further Memorandum and Order now addresses the portions of the motion that the court took under advisement. To avoid repeated references to the first decision, the court has also included here the initial findings.

Amendment right of association and is thus subject to strict scrutiny review. Under that standard, Plaintiffs have demonstrated a substantial likelihood of success on Plaintiffs' First Amendment claim on behalf of those Members who do not provide elective abortions and on all Plaintiffs' equal protection claim based on the burdening of their right of association, where the law's classifications are not sufficiently tailored to stop elective abortions rather than advocacy.

The court also finds that Plaintiffs have demonstrated a substantial likelihood of success on Plaintiffs' Bill of Attainder claim.

In ordering relief, the court is not enjoining the federal government from regulating abortion and is not directing the federal government to fund elective abortions[3] or any healthcare service not otherwise eligible for Medicaid coverage. The court's order does not require the federal government to spend money not already appropriated for Medicaid or any other funds. Instead, this order grants preliminary relief that prevents Defendants from targeting a specific group of entities—Planned Parenthood Federation Members—for exclusion from reimbursements under the Medicaid program where Plaintiffs have established a substantial likelihood that they will succeed in establishing that such targeted exclusion violates the United

---

[3] The court adopts for purposes of this Memorandum and Order the term "elective abortions" that Defendants use to refer to abortions for which providers may not receive Medicaid reimbursement under the Hyde Amendment. See Defs.' Mem. 1 [Doc. No. 53]; see also Harris v. McRae, 448 U.S. 297, 302 (1980) ("Since September 1976, Congress has prohibited—either by an amendment to the annual appropriations bill . . . or by a joint resolution—the use of any federal funds to reimburse the cost of abortions under the Medicaid program except under certain specified circumstances.") (footnote omitted); see, e.g., Further Consolidated Appropriations Act, Pub. L. No. 118-47, §§ 506, 507(a), 138 Stat. 662, 703 (2024) (providing"[n]one of the funds appropriated in this Act . . . shall be expended for any abortion" except "(1) if the pregnancy is the result of an act of rape or incest" or "(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life endangering physical condition caused by or arising from the pregnancy itself, that would . . . place the woman in danger of death unless an abortion is performed").

States Constitution, and where Plaintiffs satisfy the remaining requirements to obtain a preliminary injunction.

Accordingly, Plaintiffs' Emergency Motion for Preliminary Injunction [Doc. No. 4] is GRANTED, as set forth below.

## I.    Standard of Review

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to such relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." Starbucks Corp. v. McKinney, 602 U.S. 339, 346 (2024) (quoting Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movants] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17–18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). The balancing of hardships and the analysis of the public interest merge when, as here, the government is the opposing party. Does 1–6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (citing Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish

a 'strong likelihood' that they will ultimately prevail." <u>Sindicato Puertorriqueño de Trabajadores v. Fortuño</u>, 699 F.3d 1, 10 (1st Cir. 2012) (quoting <u>Respect Maine PAC v. McKee</u>, 622 F.3d 13, 15 (1st Cir. 2010)).

## II.    Background

### A.    *Initial Findings*

The factual record before the court at the preliminary injunction stage as to the counts initially addressed by the court is as follows:

#### 1.    Medicaid

Medicaid is a joint state-federal funding program for medical assistance established by Title XIX of the Social Security Amendments of 1965. <u>See</u> Social Security Amendments of 1965, Pub. L. No. 89-97, § 121, 79 Stat. 286, 343–44 (1965); <u>see also</u> Costello Decl. ¶ 2 [Doc. No. 53-1] ("Medicaid is a joint state/federal partnership"). "Congress created Medicaid in 1965 to subsidize state efforts to provide healthcare to families and individuals 'whose income and resources are insufficient to meet the costs of necessary medical services.'" <u>Medina v. Planned Parenthood South Atlantic</u>, 606 U.S. __, 145 S. Ct. 2219, 2226 (2025) (quoting <u>Armstrong v. Exceptional Child Center, Inc.</u>, 575 U.S. 320, 323 (2015) (quoting 42 U.S.C. § 1396-1)). States are not required to participate in Medicaid, but all states and the District of Columbia currently participate. Brindis Decl. ¶ 15 [Doc. No. 5-5].

Medicaid is the largest source of health coverage in the United States. <u>Id.</u> ¶ 14. Medicaid is administered at the State level, but the majority of Medicaid funding is provided by the federal government in every state. Custer Decl. ¶ 41 [Doc. No. 5-1]; Brindis Decl. ¶ 15 [Doc. No. 5-5]; <u>see also</u> <u>Medina</u>, 145 S. Ct. at 2226 ("Historically, the federal government has provided on average about 57% of the funds required to implement Medicaid, and States have supplied the balance.") (citing Congressional Research Service, Medicaid: An Overview 21 (2025)).

Under Title XIX, Congress has authorized annual appropriations for each fiscal year in "a sum sufficient" to carry out the purposes of the program, which "shall be used" for making payments to participating States. 42 U.S.C. § 1396-1. Medicaid is categorized as "mandatory spending" or "direct spending." Medicaid Financing and Expenditures, https://www.congress.gov/crs-product/R42640 (last accessed July 21, 2025). For the fiscal year ending September 30, 2025, Congress has appropriated $406,956,850,000 for grants to State Medicaid programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 § 1101(a)(8), (c), 139 Stat. 9, 10–11 (Mar. 15, 2025) (appropriating amount provided in Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 662 (2024)). Congress has appropriated an additional $261,063,820,000 for Medicaid for the first quarter of fiscal year 2026. Id. § 1109(b).

Each state that chooses to participate in Medicaid must submit a plan to the Secretary of Health and Human Services ("HHS") for approval. See 42 U.S.C. § 1396a(a), (b). The Secretary exercises authority to administer the Medicaid program through the Centers for Medicare and Medicaid Services ("CMS"). If a State's plan is approved, the State is entitled to Medicaid funds from the federal government for a percentage of the money it spends in providing covered medical care to eligible individuals. 42 U.S.C. § 1396b(a)(1); see also Arkansas Dep't of Health & Hum. Servs. v. Ahlborn, 547 U.S. 268, 275 (2006) (describing the Medicaid program). Federal law requires participating States to cover certain groups of individuals. See Medicaid, List of Medicaid Eligibility Groups, Mandatory Categorically Needy, https://www.medicaid.gov/medicaid/eligibility/downloads/list-of-eligibility-groups.pdf (last visited July 21, 2025). If a patient is entitled to receive benefits under the program's criteria, that

6

patient may enroll and receive health care services from Medicaid providers. Brindis Decl. ¶ 18 [Doc. No. 5-5].

Medicaid generally works through reimbursement; the program reimburses healthcare providers for covered services that they have delivered to patients. Costello Decl. ¶ 19 [Doc. No. 53-1]. CMS does not directly pay Medicaid providers. Id. ¶ 7. Instead, Medicaid provider payment occurs at the state level. Id. CMS issues advanced funding for State Medicaid programs through initial grant awards to States at the beginning of each quarter based on CMS-reviewed state expenditure estimates. Id. ¶ 3. Once CMS approves the advanced funding request, the State can draw down the federal advance for the allotted amount as costs are incurred. Id. ¶ 4 (citing 42 C.F.R. § 430.30(d)(3)). Every quarter, initial awards are reconciled to actual state expenditures following a finalization process that includes quarterly CMS reviews of state-submitted, actual expenditures and state draw-downs. Id. ¶ 5.

Congress has long prohibited the use of any federal funds to reimburse the cost of abortions under the Medicaid program except in limited circumstances. See Harris v. McRae, 448 U.S. 297, 302–03 (1980). At the same time, family planning services and supplies are a mandatory Medicaid benefit in accordance with Section 1905(a)(4)(C) of the Social Security Act. Costello Decl. ¶ 8 [Doc. No. 53-1].

      2.   Plaintiffs' Organization, Mission, and Services

         a.   Planned Parenthood Federation

Plaintiff Planned Parenthood Federation is a not-for-profit corporation organized under the laws of New York. Custer Decl. ¶ 7 [Doc. No. 5-1]. It is a national membership organization with 47 Members (the "Planned Parenthood Members"), including Planned Parenthood Massachusetts and Planned Parenthood Utah. Id. Planned Parenthood Federation is not itself a

healthcare provider and does not participate in Medicaid, but it supports its 47 Members, who do provide healthcare and receive Medicaid funding. Id. ¶¶ 7–8.

Planned Parenthood Federation administers accreditation standards for Planned Parenthood Members, promulgates shared medical standards and guidelines, and leads certain shared policy and program initiatives. Id. ¶ 13. Planned Parenthood Federation provides support, leadership, and guidance to Planned Parenthood Members. Id.

      b.  Planned Parenthood Members

Each Planned Parenthood Member is an independent non-profit organization that is incorporated and governed separately from other Members. Custer Decl. ¶ 9 [Doc. No. 5-1]; Lee Decl. ¶ 10 [Doc. No. 5-2] (Planned Parenthood Massachusetts); Ghorbani Decl. ¶¶ 1, 8–9 [Doc. No. 5-3] (Planned Parenthood Utah). Each Member has its own CEO, governance structure, staff, books, and operations. Custer Decl. ¶ 9 [Doc. No. 5-1]; Lee Decl. ¶ 10 [Doc. No. 5-2]; Ghorbani Decl. ¶ 9 [Doc. No. 5-3].

Planned Parenthood Members must agree to meet membership standards, which are outlined in Planned Parenthood Federation's bylaws and set by the Planned Parenthood Members. Custer Decl. ¶ 11 [Doc. No. 5-1]. Planned Parenthood Members elect Planned Parenthood Federation's board of directors, approve changes to Planned Parenthood Federation's bylaws and membership standards, approve Planned Parenthood Federation's long-range goals, and determine the amount each Planned Parenthood Member pays in annual dues to Planned Parenthood Federation. Id. ¶ 10.

Planned Parenthood Members provide medical services through nearly 600 health centers in 47 states and the District of Columbia and have a telehealth presence in all 50 states. Id. ¶¶ 7,

21. Each Planned Parenthood Member provides healthcare and education services in a distinct geographic area. Id. ¶ 9.

Collectively, Planned Parenthood Members provide sexual and reproductive healthcare to more people in the United States than any other provider. Id. ¶ 21. An estimated one out of every three women and one in ten men nationally has received care from a Planned Parenthood Member at least once in their lifetime, and this number is even higher among individuals with Medicaid, 43% of whom have received services from a Member health center. Id. In federal fiscal year 2023, Members served more than 2 million patients and provided approximately 9.4 million services. Id. ¶ 23.

Planned Parenthood Members offer various services depending on the needs of their communities. Id. ¶ 22. However, typical services include providing contraception (including long-acting reversible contraceptives), contraceptive counseling, physical exams, cancer screening, hormone therapy, testing and treatment for sexually transmitted infections ("STIs"), pregnancy testing and counseling, vasectomies, and colposcopies. Id. Members also provide abortion where it is legal. Id. Abortions comprise approximately 4% of Planned Parenthood Members' services nationwide. Id. ¶ 23.

Planned Parenthood Massachusetts provides services including contraception, cervical screenings, breast cancer exams, and STI tests. Lee Decl. ¶¶ 30–31 [Doc. No. 5-2]. Planned Parenthood Massachusetts provides abortion services to patients who choose to terminate a pregnancy, but no federal funds under the Medicaid program are used to reimburse Planned Parenthood Massachusetts for the cost of providing those services (except under the limited circumstances permitted by federal law). Id. ¶ 26. Planned Parenthood Utah provides for contraception, cervical screenings, breast cancer exams, testicular cancer screening, STI tests,

pregnancy testing, and abortions. Ghorbani Decl. ¶ 11 [Doc. No. 5-3]. No federal funds are used to reimburse abortion services (except under the limited circumstances permitted by federal law). Custer Decl. ¶ 45 [Doc. No. 5-1]. The remaining Planned Parenthood Members similarly receive no reimbursement for abortions from Medicaid funds or other federal funds except in permitted circumstances. Id. ¶ 45; Lee Decl. ¶ 26 [Doc. No. 5-2].

Planned Parenthood Members participate in Medicaid programs for services other than elective abortions in every state where they are able. Custer Decl. ¶ 43 [Doc. No. 5-1]. Planned Parenthood Massachusetts received $4,744,699.47 in Medicaid reimbursements during fiscal year 2023. Lee Decl. ¶ 29 [Doc. No. 5-2]. Medicaid reimbursements accounted for more than one third of Planned Parenthood Members' aggregate revenue in fiscal year 2023. Custer Decl. ¶ 44 [Doc. No. 5-1]. Some individual Members received over three quarters of their health services revenue from Medicaid reimbursement that year. Id. Approximately 51% of Planned Parenthood Members' patients rely on Medicaid for their healthcare, and half of visits to Planned Parenthood Member health centers are covered by Medicaid. Id. ¶ 43.

Planned Parenthood Massachusetts provided services to approximately 10,822 patients enrolled in Medicaid in 2024. Lee Decl. ¶¶ 30–31 [Doc. No. 5-2]. Planned Parenthood Utah provided service to approximately 2,096 patients enrolled in Medicaid in 2024. Ghorbani Decl. ¶ 24.

Some Planned Parenthood Members, including Planned Parenthood Utah and Planned Parenthood of Delaware, received less than $800,000 in Medicaid reimbursements during federal fiscal year 2023. Custer Decl. ¶¶ 63–64 [Doc. No. 5-1]; Ghorbani Decl. ¶ 20 [Doc. No. 5-3]; see also id. ¶ 24 (Planned Parenthood Utah received $706,251.02 in Medicaid reimbursements during fiscal year 2023).

Three Planned Parenthood Members—Gulf Coast, Planned Parenthood Greater Texas, and Planned Parenthood of Tennessee and North Mississippi—do not provide abortions because abortion is not legal in any state where their health centers are located. Custer Decl. ¶ 63 [Doc. No. 5-1].

c.   Plaintiffs' Mission and Advocacy

Planned Parenthood Federation's mission is to ensure that people receive high-quality, inclusive, and comprehensive sexual and reproductive healthcare regardless of income, insurance, gender identity, sexual orientation, or race; to provide related educational services; to promote research on sexual and reproductive health; and to advocate for public policies that guarantee access to such services. Custer Decl. ¶¶ 7, 12 [Doc. No. 5-1]. Planned Parenthood Members share Planned Parenthood Federation's mission. Id. ¶ 12. Planned Parenthood Federation membership is important to Planned Parenthood Members' ability to fulfill their missions. Id. ¶ 15. Planned Parenthood Federation licenses the use of the Planned Parenthood name to each Planned Parenthood Member, and the Planned Parenthood name sends a message to the community that the Planned Parenthood Member stands for certain values and provides healthcare and educational services in furtherance of the shared Planned Parenthood mission. Id. ¶¶ 14–15. Working in furtherance of that mission, Planned Parenthood Members advocate for equitable access to the sexual and reproductive healthcare, including abortion, that Members and other non-profit sexual and reproductive healthcare providers offer. Id. ¶ 19.

Planned Parenthood Federation and Planned Parenthood Members advocate at the federal, state, and local levels to protect and expand access to reproductive healthcare services and information. Id. ¶ 75. Planned Parenthood Federation has advocated before Congress to codify the rights to abortion and contraception, block abortion bans, and repeal federal law that

prohibits federal funding of abortion. Id. Planned Parenthood Federation has also advocated for access to emergency contraception and medication abortion. Id. Planned Parenthood Members, and sometimes Planned Parenthood Federation, have litigated to secure abortion access and rights for their patients in federal and state courts. Id.

Planned Parenthood Action Fund, a related 501(c)(4) organization, advocates for policies that protect care for Planned Parenthood Members' patients and publishes a "congressional scorecard" to communicate with the public regarding their lawmakers' records and to activate constituents. Id. Additionally, Planned Parenthood Action Fund has supported campaigns for ballot initiatives. Id. Separately, Planned Parenthood Action Fund works with other national and local advocacy and political organizations to elect federal, state, and local officials who will support reproductive freedom. Id. Each Planned Parenthood Member may also have a related 501(c)(4) tax-exempt entity that works in furtherance of the Planned Parenthood mission through education, advocacy, and limited electoral activities. Id. ¶ 19.

3. Section 71113

Section 71113(a) of the 2025 Reconciliation Act provides that "no Federal funds that are considered direct spending[4] and provided to carry out a State plan under title XIX of the Social Security Act or a waiver of such a plan shall be used to make payments to a prohibited entity for items and services furnished during the 1-year period beginning on the date of the enactment of this Act . . . ." Pub. L. No. 119-21, § 71113(a), 139 Stat. 72, 300-01 (July 4, 2025). Section 71113(b)(1) defines the term "prohibited entity" as:

---

[4] "Direct Spending" is defined with reference to 2 U.S.C. § 900(c)(8), which states that "[t]he term 'direct spending' means (A) budget authority provided by law other than appropriation Acts; (B) entitlement authority; and (C) the Supplemental Nutrition Assistance Program." Id. § 71113(b)(2)

an entity, <u>including its affiliates</u>, subsidiaries, successors, and clinics--

(A) that, as of the first day of the first quarter beginning after the date of enactment of this Act-

> (i) is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;

> (ii) is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations (as in effect on the date of enactment of this Act), that is primarily engaged in family planning services, reproductive health, and related medical care; and

> (iii) provides for abortions, other than an abortion-

>> (I) if the pregnancy is the result of an act of rape or incest; or

>> (II) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed; and

(B) for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered organization, to the entity <u>or to any affiliates</u>, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

<u>Id.</u> § 71113(b)(1) (emphasis added).

Section 71113(c) also provides for $1,000,000 in appropriations to the Administrator of CMS for implementation. <u>Id.</u> § 71113(c).

### 4.  Prohibited and Non-Qualifying Entities Under Section 71113

Planned Parenthood Members are non-profit entities and essential community providers who primarily engage in family planning services, reproductive health, and related medical care. <u>See</u> Lee Decl. ¶ 8 [Doc. No. 5-2]; Ghorbani Decl. ¶ 8 [Doc. No. 5-3]; Tosh Decl. ¶ 16 [Doc. No. 5-4]. Many Planned Parenthood Members, including Plaintiff Planned Parenthood Massachusetts, also provide abortion services and received more than $800,000 in Medicaid

13

reimbursements for non-abortion services in fiscal year 2023, and are thus "prohibited entities" under Section 71113. See Custer Decl. ¶ 47 [Doc. No. 5-1]; Lee Decl. ¶ 29 [Doc. No. 5-2]. The Center for Medicaid and CHIP Services ("CMCS") has "identified at least two non-Planned Parenthood entities" that have provided for elective abortions and otherwise meet the definition of "prohibited entity." Snyder Decl. ¶ 6 [Doc. No. 53-2].

Other types of providers, including community health centers ("CHCs") and federally qualified health centers ("FQHCs"), also use Medicaid programs to provide healthcare services to patients. Brindis Decl. ¶ 20 [Doc. No. 5-5]. However, unlike Planned Parenthood Members, CHCs and FQHCs usually do not specialize in family planning, instead providing services such as primary care, dental care, and/or mental health care. Id. Accordingly, even if they do perform elective abortions, Section 71113 does not prohibit them from receiving Medicaid reimbursements for other services.

Ten Planned Parenthood Members (the "Non-Qualifying Members") either do not offer abortion services or did not receive $800,000 in Medicaid reimbursement. Defendants contend that "CMS . . . has had no opportunity to analyze the legal and factual questions that it must consider to construe and apply the statute[,]" and has given no "concrete indication that the Government will conclude that the 'non-qualifying members' are covered by Section 71113[.]" Defs.' Mem. 24 [Doc. No. 53]. Defendants contend alternatively that "HHS and CMS could—depending on facts which have yet to be developed—permissibly construe the statute to cover 'non-qualifying members' if, on October 1, they are 'affiliates' of members that provide for abortions." Id. at 27.

5.   Section 71113's Harm to Members and Patients

If Planned Parenthood Members are barred from receiving federal Medicaid reimbursement for their non-abortion services, Planned Parenthood Members across the country anticipate reducing the hours and programs they offer, terminating staff members, and eventually closing health centers. See Custer Decl. ¶¶ 4, 54–57 [Doc. No. 5-1]; Lee Decl. ¶¶ 40–42 [Doc. No. 5-2]; Ghorbani Decl. ¶¶ 6, 24 [Doc. No. 5-3]; Tosh Decl. ¶¶ 45–48 [Doc. No. 5-4]. Health centers that close may never reopen. Tosh Decl. ¶ 46 [Doc. No. 5-4].

A contraction in services causes a corresponding disruption to patient healthcare. See Custer Decl. ¶ 54 [Doc. No. 5-1]. Section 71113 creates an immediate disruption for over one million family planning patients who previously received care at Member health centers. Brindis Decl. ¶ 35 [Doc. No. 5-5]. The law "is already . . . forcing some Members to turn away patients enrolled in Medicaid; to attempt to refer them to other providers; or to offer Medicaid patients (who, by criteria of the program, have low incomes) the option to pay out-of-pocket for services where state law allows." Custer Decl. ¶ 49 [Doc. No. 5-1].

Planned Parenthood Massachusetts had nearly 150 scheduled appointments for Medicaid patients at their health centers on July 7 and July 8, and began informing those patients when Section 71113 was enacted that they could not use their Medicaid coverage for services at Planned Parenthood Massachusetts healthcare centers. Lee Decl. ¶ 4 [Doc. No. 5-2]. Many of those patients cannot afford to pay for care and cannot get timely care at another provider that accepts Medicaid. Id.

The law also disrupts healthcare for patients who do not rely on Medicaid. Custer Decl. ¶ 54 [Doc. No. 5-1]. Patients who can still access care at Member health centers could experience delays in receiving care. Id. ¶¶ 51, 54. Patients who seek healthcare elsewhere could

also face delays at those facilities, id. ¶ 56, and alternative providers may not be able to ramp up services quickly enough to fill the gap, Brindis Decl. ¶¶ 36–39 [Doc. No. 5-5]. Further, many Member health centers are located in medically underserved areas, primary care health professional shortage areas, and rural areas. Custer Decl. ¶ 55 [Doc. No. 5-1]. In many cases, patients who receive care at Planned Parenthood Member health centers will have no feasible alternative reproductive healthcare provider in their communities because of provider scarcity, language issues, unavailable services, or caps on Medicaid patients. Id. ¶¶ 24–29, 53–56; Lee Decl. ¶¶ 36–38 [Doc. No. 5-2]; Tosh Decl. ¶¶ 51–52, 54 [Doc. No. 5-4].

Patients are likely to suffer adverse health consequences where care is disrupted or unavailable. In particular, restricting Members' ability to provide healthcare services threatens an increase in unintended pregnancies and attendant complications because of reduced access to effective contraceptives, and an increase in undiagnosed and untreated STIs. Brindis Decl. ¶¶ 11, 58, 62–66 [Doc. No. 5-5]. Moreover, decreased access to contraceptives and the corresponding increase in the number of unintended pregnancies caused by excluding Planned Parenthood Members from Medicaid will likely result in an increased number of abortions. Id. ¶ 71. Restricting access to Member healthcare clinics will negatively affect more than just reproductive health; Members often serve as a source of primary care for patients. Id. ¶ 82. Planned Parenthood Federation reported in its most recent annual report that its Members provided 426,268 cancer screenings and other diagnostic procedures. Id. ¶ 84. Reduced access to screening services creates a likelihood that health issues will go undetected with attendant serious consequences. Id. ¶ 74.

B. *Further Findings—Legislative Backdrop*

As set forth above, Planned Parenthood Federation does not provide abortion services but does engage in and facilitate advocacy with and by its Members. Over the last several legislative sessions, members of Congress have introduced legislation seeking to defund "Planned Parenthood," culminating in the legislation at issue here. Throughout, the proposed and final legislation targeted Planned Parenthood Federation and its Members' receipt of federal funding as if Plaintiffs constituted a single entity. The proposed legislation did not target abortion services themselves.

Section 71113 is substantially similar to a provision proposed in a 2017 reconciliation bill. See H.R. 1628, 115th Cong. § 103 (2017). That bill similarly sought to bar "prohibited entit[ies]" from receiving Medicaid reimbursements for a one-year period. See id. § 103(a). The bill defined a "prohibited entity" based in part on that entity receiving more than $350 million in Medicaid reimbursements during fiscal year 2014. Id. § 103(b)(1)(B). Collectively, Planned Parenthood Members received over $350 million in Medicaid reimbursements that year, and the law would not have excluded any abortion providers other than Planned Parenthood Members from Medicaid funding. Custer Decl. ¶ 48 [Doc. No. 5-1].

When the House of Representatives considered the 2017 reconciliation bill, one former Representative explained that, in addition to tax cuts, spending cuts, and deficit reductions, it "represents . . . defunding Planned Parenthood," and asked rhetorically, "How long have we been fighting to defund Planned Parenthood?" 163 Cong. Rec. H2393, H2409 (Mar. 24, 2017) (Statement of Rep. Matt Gaetz (Fla.)). Another former Representative explained that "[t]his bill eliminates funding for Planned Parenthood," and that he was "excited to be part of it." Id. at H2414 (Statement of Rep. Roger Marshall (Kan.)). A third former Representative added, "I am

17

proud to defund Planned Parenthood once and for all." <u>Id.</u> at H2433 (Statement of Rep. Kevin

Brady (Tex.)). The bill passed the House. <u>See</u> <u>Roll Call 256 | Bill Number: H. R. 1628</u>, Clerk of

the U.S. House of Reps. (May 4, 2017), <u>https://clerk.house.gov/Votes/2017256</u> (last accessed

July 25, 2025). H.R. 1628 was then amended in the Senate to reduce the threshold for the

funding criterion to $1,000,000. <u>See</u> S. Amend. 267 to H.R. 1628 § 106(b)(1)(B) (2017).

Ultimately, this bill did not pass the Senate.

  Attempts to exclude Planned Parenthood Federation and its Members from receiving

federal funding continued in subsequent sessions. On January 9, 2023, Representative Lauren

Boebert of Colorado introduced the Defund Planned Parenthood Act of 2023, H.R. 128, 118th

Cong. (2023). This bill sought a one-year "moratorium on federal funding to Planned Parenthood

Federation of America," barring Planned Parenthood Federation "or any affiliate or clinic of

Planned Parenthood Federation" from receiving any federal funding "unless such entities certify

that Planned Parenthood Federation of America affiliates and clinics will not perform, and will

not provide any funds to any other entity that performs, an [elective] abortion[.]" <u>Id.</u> § 3(a). The

bill provided further that "[a]ll funds that are no longer available to Planned Parenthood

Federation of America, Inc. and its affiliates and clinics pursuant to this Act will continue to be

made available to other eligible entities to provide women's health services." <u>Id.</u> § 2(3). The bill

also provided for an additional $235,000,000 to be appropriated for the community health center

program (under 42 U.S.C. § 254b) during the moratorium <u>Id.</u> § 4(a). As with all Federal funds,

those funds could not be used for elective abortion. <u>See</u> <u>id.</u> § 4(b). At the same time, the bill did

not bar funded community health center programs from providing abortion.

An identical bill was introduced a few days later by Representative Michelle Fischbach of Minnesota. See Defund Planned Parenthood Act of 2023, H.R. 371, 118th Cong. (2023).[5] Representative Fischbach reintroduced the bill in the current legislative session on January 9, 2025. See Defund Planned Parenthood Act of 2025, H.R. 271, 119th Cong. (2025).[6]

Separately, on November 2, 2023, Representative Robert B. Aderholt of Alabama introduced the Protect Funding for Women's Health Care Act, H.R. 6176, 118th Cong. (2023), a bill "[t]o prohibit Federal funding of Planned Parenthood Federation of America."[7] This bill

---

[5] This bill was introduced with Representatives Christopher H. Smith (N.J.), Kat Cammack (Fla.), Andy Harris (Md.), Mike Johnson (La.), Glenn Grothman (Wis.), Andrew Clyde (Ga.), Earl L. Carter (Ga.), John W. Rose (Tenn.), Michael Waltz (Fla.), Michael Cloud (Tex.), Troy Balderson (Ohio), Diana Harshbarger (Tenn.), Robert B. Aderholt (Ala.), Tim Walberg (Mich.), Randy Feenstra (Iowa), Steve Womack (Ark.), Tracey Mann (Kan.), Jeff Duncan (S.C.), Jerry L. Carl (Ala.), Paul A. Gosar (Ariz.), Trent Kelly (Miss.), John R. Moolenaar (Mich.), Bob Good (Va.), Dan Newhouse (Wash.), Pete Sessions (Tex.), Mike Kelly (Pa.), Matthew M. Rosendale Sr. (Mont.), Blaine Luetkemeyer (Mo.), Barry Loudermilk (Ga.), Dan Bishop (N.C.), Darin LaHood (Ill.), Guy Reschenthaler (Pa.), Robert E. Latta (Ohio), Alexander X. Mooney (W. Va.), Rick W. Allen (Ga.), Andy Barr (Pa.), Gary J. Palmer (Ala.), Brian Babin (Tex.), Brad R. Wenstrup (Ohio), Glenn Thompson (Pa.), Michael Guest (Miss.), Bard Finstad (Minn.), Jake Ellzey (Tex.), Anna Paulina Luna (Fla.), Roger Williams (Tex.), Lloyd Smucker (Pa.), John Joyce (Pa.), James R. Baird (Ind.), Erin Houchin (Ind.), Burgess Owens (Utah), Ronny Jackson (Tex.), David Kustoff (Tenn.), and Beth Van Duyne (Tex.) as co-sponsors. See id. at 1.

[6] In this session, the bill was introduced with Representatives Houchin, Claudia Tenney (N.Y.), Feenstra, Dan Crenshaw (Tex.), Randy K. Weber Sr. (Tex.), Mike Ezell (Miss.), Moolenaar, Jackson, Harshbarger, Mary E. Miller (Ill.), Ellzey, Aderholt, Williams, Doug LaMalfa (Cal.), Nathaniel Moran (Tex.), Kelly (Pa.), Daniel Webster (Fla.), Van Duyne, Kustoff, Finstad, Kelly (Miss.), Mike Bost (Ill.), Richard Hudson (N.C.), Grothman, Richard McCormick (Ga.), Scott Fitzgerald (Wis.), Thompson, Womack, Mike Collins (Ga.), Smith, Mark E. Green (Tenn.), Mann, Stephanie I. Bice (Okla.), David Taylor (Ohio), Mark Alford (Mo.), Guest, Robert Onder (Mo.), Joyce, Babin, and Latta as cosponsors. See id. at 1.

[7] This bill was introduced with Representatives Gus M. Bilirakis (Fla.), McCormick, Cloud, Moolenaar, David Rouzer (N.C.), Waltz, Ashley Hinson (Iowa), Jim Banks (Ind.), Mooney, Miller, Russell Fry (S.C.), Guest, Williams, Keith Self (Tex.), Harris, Smucker, Mann, Ellzey, Lance Gooden (Tex.), Joyce, Reschenthaler, Jake LaTurner (Kan.), Rose, LaMalfa, Andrew Ogles (Tenn.), Gosar, Duncan, Charles J. "Chuck" Fleischmann (Tenn.), Houchin, Bruce Westerman (Ark.), Barry Moore (Ala.), Carl, Weber, Jackson, Aaron Bean (Fla.), and Palmer as cosponsors. See id. at 1.

provided for a "prohibition" rather than a moratorium on federal funding, stating that "no Federal funds may be made available to Planned Parenthood Federation of America, or to any of its affiliates, subsidiaries, successors, or clinics" without an end date or exception if clinics stopped providing abortions. Id. § 3(a). The bill made no references to abortion except that the bill "shall not be construed to . . . affect any limitation contained in an appropriations Act relating to abortion[.]" Id. § 3(b)(1). Representative Aderholt reintroduced this bill in the current legislative session on January 22, 2025. See Protect Funding for Women's Health Care Act, H.R. 599, 119th Cong. (2025).[8] Senator Joni Ernst of Iowa introduced an identical bill in the Senate on the same day. See Protect Funding for Women's Health Care Act, S. 177, 119th Cong. (2025).[9]

Finally, on January 23, 2025, Senator Rand Paul introduced the Defund Planned Parenthood Act, S. 203, 119th Cong. (2025),[10] a bill "[t]o prohibit Federal funding of Planned Parenthood Federation of America." The bill stated simply that "[n]otwithstanding any other provision of law, no Federal funds may be made available to Planned Parenthood Federation of America, or to any of its affiliates." Id. § 2. As with each of the other bills, the bill did not seek to bar other healthcare providers that provide abortion from receiving federal funds for other services. And as with the bills introduced by Representative Aderholt and Senator Ernst, this bill

---

[8] This time, the bill was introduced with by Representatives Moolenaar, Crenshaw, Miller, Cloud, Ellzey, Webster, Rouzer, Dale W. Strong (Ala.), Rile Moore (W. Va.), Moore (Ala.), Tim Moore (N.C.), Green, and Hinson as co-sponsors. See id. at 1.

[9] This bill was introduced with Senators Chuck Grassley (Iowa), James Lankford (Okla.), Bill Cassidy (La.), Steve Daines (Mont.), Roger F. Wicker (Miss.), Deb Fischer (Neb.), Tim Sheehy (Mont.), John Thune (S.D.), James E. Risch (Idaho), Kevin Cramer (N.D.), Bill Hagerty (Tenn.), Thomas Tillis (N.C.), Jim Banks (Ind.), Josh Hawley (Mo.), and Marsha Blackburn (Tenn.) as cosponsors. See id. at 1.

[10] This Bill was introduced with Senators Roger Marshall (Kan.), Tommy Tuberville (Ala.), Markwayne Mullin (Okla.), Ted Budd (N.C.), Eric Schmitt (Mo.), Tillis, Ted Cruz (Tex.), and Banks as co-sponsors. See id. at 1.

contained no exception to the prohibition in the event that all Planned Parenthood Members stopped providing abortion services.

None of these bills were enacted. Instead, Congress turned to the 2025 Reconciliation bill. Representative Christopher Smith of New Jersey, a co-sponsor of the Defund Planned Parenthood Act of 2023 and the Defund Planned Parenthood Act of 2025, explained on the House floor on March 27, 2025: "reconciliation legislation offer[ed] an important opportunity to stop funding abortion purveyors like Planned Parenthood. This is an opportunity we cannot afford to miss." 171 Cong. Rec. E255 (2025) (statement of Rep. Smith). On April 29, 2025, Speaker Mike Johnson, a co-sponsor of the Defund Planned Parenthood Act of 2023, H.R. 371, 118th Cong. (2023), announced that "in the weeks ahead, the House is going to be working on the [Reconciliation Act] . . . and we're absolutely making it clear to everybody that this bill is going to redirect funds away from Big Abortion." SBA Pro-Life America, Speaker Mike Johnson at the SBA Pro-Life America Gala 2025, YouTube (May 1, 2025), https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794 (last accessed July 25, 2025).

H.R. 1, a bill to provide for reconciliation, was reported out of the House of Representatives Committee on the Budget on May 20, 2025. See H.R. Rep. No. 119-106 (2025). Section 44126 of that bill contained the provision that, following amendments in the Senate, would become Section 71113. See H.R. Rep. 119-106, pt. 2, at 2203 (2025). Section 44126 defined a "prohibited entity" as one "including its affiliates, subsidiaries, successors, and clinics," that, *inter alia*, "provides for abortions" as of the enactment date and received more than $1,000,000 in Medicaid expenditures during a previous fiscal year. Id. at 2203–04. H.R. 1 barred prohibited entities from receiving Medicaid funds for ten years. Id. at 2203.

The majority Report of the House Committee on the Budget accompanying H.R. 1 included the following regarding Section 44126:

> Section 44126. Federal payments to prohibited entities[:] This section prohibits Medicaid funds to be paid to providers that are nonprofit organizations, that are essential community providers that are primarily engaged in family planning services or reproductive services, provide for abortions other than for Hyde Amendment exceptions, and which received $1,000,000 or more (to either the provider or the provider's affiliates) in payments from Medicaid payments in 2024.

H.R. Rep. No. 119-106, pt. 1, at 618 (2025). The minority Report identified Planned Parenthood as the subject of the legislation:

> Subtitle D also would prohibit federal Medicaid funding for Planned Parenthood and its affiliates across the country. Section 44126 creates a specific and narrow definition intended to target certain providers in the Medicaid program that separately, and without federal Medicaid funding, provide abortion services. . . . Even in the nearly two-dozen states that have outlawed or severely restricted abortion care, Medicaid beneficiaries would be unable to seek [other] care at Planned Parenthood as a result of this provision. Millions of Medicaid beneficiaries would be left without the ability to seek care from their provider of choice solely because of the Republicans' hostility towards Planned Parenthood and the ability for women to seek comprehensive reproductive health care.

Id. at 635.

On July 1, the bill was amended in the Senate in three respects: the historic Medicaid reimbursement threshold for a "prohibited entity" was lowered from $1,000,000 to $800,000, the period of exclusion from receiving Medicaid reimbursements was reduced from ten years to one year, and the deadline for ceasing abortion services was moved from the bill's effective date to October 1, 2025. See S. Amend. 2360 to H.R. 1 (July 1, 2025); Pub. L. No. 119-21, § 71113(b), 139 Stat. 72, 300-01 (July 4, 2025). The Senate passed H.R. 1, as amended, on July 1,[11] and the

---

[11] The amended bill was passed on a 51-50 vote, with Vice President JD Vance and all but two Republican Senators in favor, and Senators Susan Collins of Maine and Rand Paul of Kentucky and all other Senators opposed. See Roll Call Vote 119th Congress - 1st Session, U.S. Senate. Roll Call Votes,

House voted to concur in the Senate amendment on July 3, 2025.[12] The President signed the bill

into law on Saturday, July 4, 2025, and this action was commenced on July 7, 2025. See Compl.

[Doc. No. 1].

### III.    Likelihood of Success on the Merits

A.    *Initial Findings: First Amendment Rights of Members That Do Not Provide Abortions*

Plaintiffs argue that if Section 71113 covers Planned Parenthood Members that do not

provide abortions, the law imposes an unconstitutional condition on those Members and Planned

Parenthood Federation's First Amendment right of association. Pls.' Mem. 35 [Doc. No. 5].[13]

Defendants argue that Section 71113 merely "withholds funding based on whether entities

provide abortion services," that Plaintiffs' arguments concerning "affiliates" are not ripe, and

that "the word 'affiliate' here has nothing to do with expressive association." Defs.' Mem. 30, 33

[Doc. No. 53].

Planned Parenthood Federation and each Planned Parenthood Member are entitled to

First Amendment protections. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 355

(2010) (invalidating law on First Amendment grounds where "[t]he purpose and effect of [the]

---

https://www.senate.gov/legislative/LIS/roll_call_votes/vote1191/vote_119_1_00372.htm. (last accessed, July 25, 2025).

[12] The motion to concur was passed on a 218-214 vote, with all but two Republican Representatives in favor, and Representative Brian Fitzpatrick of Pennsylvania and Thomas Massie of Kentucky and all other Representatives opposed. See Roll Call 190 | Bill Number: H. R. 1, Clerk of the U.S. House of Reps. (July 3, 2025), https://clerk.house.gov/Votes/2025190. (last accessed, July 25, 2025).

[13] Plaintiffs also claim that if Section 71113 covers Planned Parenthood Members who perform abortions but received less than $800,000 from Medicaid in fiscal year 2023, the law imposes an unconstitutional condition on these Members and Planned Parenthood Federation's right of association. Id. The court addresses this argument in connection with Plaintiffs' equal protection claim.

law is to prevent corporations, including . . . nonprofit corporations, from presenting both facts and opinions to the public"). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 213 (2013) (quoting Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 641 (1994)). The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others" in pursuit of desired political, educational, or social ends. Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984).

At the same time, the Constitution provides Congress exclusive power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. const. art. I, § 8, cl. 1. This provision gives Congress broad discretion to spend for the "general [w]elfare." All. for Open Soc'y, 570 U.S. at 213. Congress may exercise this power by funding particular programs or activities, and it has "authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." Id. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." Rust v. Sullivan, 500 U.S. 173, 193 (1991). Generally, a party is limited to declining federal funds where it objects to a condition Congress places on receipt of those funds, even where that condition affects the recipient's First Amendment rights. All. for Open Soc'y, 570 U.S. at 214.

However, "the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 606 (2013). The government

24

> may not deny a benefit . . . on a basis that infringes [a recipient's] constitutionally protected interests—especially, [the recipient's] interest in freedom of speech. For if the government could deny a benefit to a [recipient] because of . . . constitutionally protected speech or associations, [the recipient's] exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which (it) could not command directly."

Perry v. Sindermann, 408 U.S. 593, 597 (1972) (last alteration in original) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958)). The unconstitutional conditions doctrine bars the government from denying a benefit "on a basis that infringes [the recipient's] constitutionally protected . . . freedom of speech even if [the recipient] has no entitlement to that benefit." Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 59 (2006) (quoting United States v. American Library Ass'n., Inc., 539 U.S. 194, 210 (2003)). Permissible conditions on funding "specify the activities Congress wants to subsidize[,]" while unconstitutional conditions "seek to leverage funding to regulate speech outside the contours of the [funded] program itself." All. for Open Soc'y, 570 U.S. at 214–15.

Contrary to Defendants' assertion, Section 71113 does not merely "withhold[] funding based on whether entities provide abortion services," but also based on whether "an entity, including its affiliates," provides abortion services.[14] Pub. L. No. 119-21, § 71113(b)(1), 139

---

[14] Defendants' assertion that Plaintiffs' arguments concerning the law's application to "affiliates" are not ripe fails where, without injunctive relief, Planned Parenthood Members who do not provide abortion services will need to decide whether to disaffiliate from other Planned Parenthood Members before October 1, 2025, or risk ineligibility for Medicaid reimbursements because of their continuing membership in Planned Parenthood Federation. Therefore, even accepting Defendants' contention that there is uncertainty regarding how Defendants will apply Section 71113 to "affiliates," this uncertainty has an immediate chilling effect on Members' right of association. Given this chilling effect, and in light of Defendants' ultimate contention that "HHS and CMS could permissibly conclude (. . . depending on the facts as of October 1) that [Planned Parenthood Federation] members are all 'affiliates' within the meaning of the statute," id. at 29, Plaintiffs' unconstitutional conditions claim is ripe. See Franklin California Tax-Free Tr. v. Puerto Rico, 805 F.3d 322, 333 n.16 (1st Cir. 2015) (concluding case ripe where "plaintiffs

Stat. 72, 300 (July 4, 2025) (emphasis added). And Defendants assert that "two entities' existence under common control" would satisfy the dictionary definition of an "affiliate," and that, in Defendants' view, Planned Parenthood Federations' "membership standards," "accreditation standards," and "shared medical standards and guidelines," would be sufficient to show common control such that Planned Parenthood Members who do not provide abortion could be "affiliates" of the Planned Parenthood Members who do. See Defs.' Mem. 28 [Doc. No. 53].

To the extent that Section 71113 may be applied to Planned Parenthood Members who do not provide abortion, Plaintiffs are likely to succeed in establishing that the law impermissibly conditions the receipt of Medicaid reimbursements on these Members foregoing their right to associate with Planned Parenthood Federation and other Members. Members who do not provide abortions cannot escape the law's burden except by disassociating from Members that do. And because Section 71113 may be applied to Members who are affiliates of each other via the structure, governance, and membership requirements of Planned Parenthood Federation, disassociating with other Members requires disassociating from Planned Parenthood Federation itself.

While Defendants contend that Section 71113 does not regulate speech, the record demonstrates that Members' affiliation via their membership in Planned Parenthood Federation is expressive. Planned Parenthood Federation advocates before Congress, provides education and information about sexual and reproductive health, and through Planned Parenthood Action Fund, communicates with the public regarding lawmakers' voting records, supports campaigns for

---

allege that the very enactment of the [statute], rather than the manner of enforcement" impaired plaintiffs' rights") (emphasis in original).

ballot initiatives, and supports candidates for federal, state, and local officials who will support reproductive freedom in furtherance of its mission. Custer Decl. ¶¶ 38, 75 [Doc. No. 5-1]. Members engage in those activities with Planned Parenthood Federation and each other. Id. ¶ 75. Additionally, Planned Parenthood Federation provides leadership and financial support to Members around shared policy and program initiatives. Id. ¶¶ 13, 75. Moreover, each Member licenses the use of the Planned Parenthood name, which expresses that each Member stands for particular values. Id. ¶¶ 14–15. Membership in Planned Parenthood Federation—and corresponding affiliation with other Members—is thus part and parcel with Planned Parenthood Members' associational expression.

The association between Members and with Planned Parenthood Federation is protected expression that is "outside the contours" of the Medicaid program. All. for Open Soc'y, 570 U.S. at 214–15. The "government is not required to subsidize activities that it does not wish to promote." Matal v. Tam, 582 U.S. 218, 240 (2017) (citing 570 U.S. at 215). Congress may set conditions "that define the limits" of a spending program by "specify[ing] the activities Congress wants to subsidize," but Congress may not set "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." 570 U.S. at 214–15. Here, Medicaid funds healthcare services for qualifying low-income patients. Section 71113 places conditions on funds appropriated for Medicaid, including that a Medicaid provider may not affiliate with a "prohibited entity," which by definition provides abortions. But conditioning Medicaid funding on affiliation is not a limit on the services that Medicaid funds may reimburse.

Rust v. Sullivan provides an illustrative distinction. There, Congress barred project funds from funding particular conduct: abortion-related speech. 500 U.S. at 196. The regulations at issue allowed funded entities to engage in abortion-related speech so long as it was not funded

with project monies. Id. In upholding Congress's limitation on funding, the Supreme Court emphasized that "'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the recipient of the subsidy rather than on the program or service," which "effectively prohibit[s] the recipient from engaging in the protected conduct outside the scope of the federally funded program." Id. at 197. That is what the government has done here. Congress has refused to fund particular recipients: affiliates of entities that provide abortion. Therefore, Members that do not provide abortion must disassociate from Planned Parenthood Federation to disaffiliate from Members that provide abortion to remain eligible for Medicaid funds. This requirement is unrelated to the scope of healthcare services that a Member provides.

The Supreme Court has underscored that the use of separate corporate entities, even where closely related, allows Congress to set conditions with its spending powers without unconstitutionally leveraging the funding to regulate speech. In Regan v. Taxation With Representation of Wash., 461 U.S. 540 (1983), the Court upheld a prohibition on "substantial lobbying activities" by 501(c)(3) organizations against an unconstitutional conditions challenge in part because the organization remained free to use a "dual structure . . . , with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying," meaning the prohibition did not necessarily inhibit the organization's ability to engage in First Amendment activities. Id. at 544–45. In F.C.C. v. League of Women Voters of Cal., 468 U.S. 364 (1984), the Court struck down a statute barring any recipient of certain federal grants from engaging in editorializing. Id. at 400. In so holding, the Court explained that "if Congress were to adopt a revised version" of the statute "that permitted . . . broadcasting stations to establish 'affiliate' organizations" that engaged in editorializing, "such a statutory mechanism would plainly be valid" because "[a] public broadcasting station[] would be free . . . to make

known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its noneditorializing broadcast activities." Id.

Here, Section 71113 prohibits the type of dual structure that would have insulated the abortion restriction from an unconstitutional conditions challenge. Instead of merely prohibiting Planned Parenthood Members that receive Medicaid funds from providing abortions, the statute prohibits them from affiliating with entities that do. Moreover, the record is devoid of evidentiary support for Defendants' suggestion that Planned Parenthood entities share funds that are ultimately used for abortions. See Defs.' Mem. 35 [Doc. No. 53]. Therefore, restricting funds based on affiliation with an abortion provider operates only to restrict the associational right of Members that do not provide abortion.

Defendants also rely on Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 485 U.S. 360 (1988), where the Supreme Court found denying food stamps to households of striking workers did not violate the associational rights of household members or striking workers. Id. at 366. The Court there explained that a legislature's decision "not to subsidize the exercise of a fundamental right does not infringe the right." Id. at 368 (citing Regan, 461 U.S. at 549 (1983)). But the Court also acknowledged that associational rights "can be abridged even by government actions that do not directly restrict" the "ability to associate freely," and that the right to associate is "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." Id. at 367 n.5 (citations omitted).

Further, in Lyng, the law denied eligibility for food stamps only while a household member was on strike. Id. at 362. And in upholding the law, the court explained:

> Exposing the members of an association to . . . economic reprisals . . . merely because of their membership in that group poses a much greater danger to the

> exercise of associational freedoms than does the withdrawal of a government
> benefit based not on membership in an organization but merely for the duration of
> one activity that may be undertaken by that organization.

Id. at 367 n.5. Here, Section 71113 withholds Medicaid reimbursements from Planned

Parenthood Members who do not provide abortion so long as any other Member continues to do

so. Where Section 71113 imposes a funding restriction based on the activity of other Members,

the law burdens membership in Planned Parenthood Federation rather than a particular activity in

which a Member engages. And the government may not burden a Member's associational right

as a means of limiting other Members' undesired conduct. See NAACP v. Claiborne Hardware

Co., 458 U.S. 886, 908 (1982) ("[T]he right to associate does not lose all constitutional

protection merely because some members of the group may have participated in conduct . . . that

itself is not protected.").

In sum, where Section 71113 disqualifies Planned Parenthood Members who do not

provide abortion because of their affiliation with other Members who will continue to provide

abortion, and where membership in Planned Parenthood Federation is expressive, Plaintiffs are

likely to succeed in establishing that Section 71113 unconstitutionally conditions Medicaid

reimbursements on these Members foregoing their First Amendment right of association.

### B. *Further Findings: Bill of Attainder*

Plaintiffs argue that Section 71113 specifies Planned Parenthood Federation and its

Members as the bill's object because "prohibited entity" is designed to ensure "nearly all of the

entities covered are Planned Parenthood Members[,]" and the legislative history and context

confirm that the law's purpose is to single out Planned Parenthood Federation and its Members

for punishment. Pls.' Mem. 20 [Doc. No. 5]. Defendants argue that Section 71113 is not a bill of

attainder because it applies to at least two entities that are not Planned Parenthood Members and

because it is based on future conduct. Defs.' Mem. 7, 11 [Doc. No. 53]. Defendants further

contend that declining to provide federal funding is not legislative punishment. Id. at 7, 12.

Article I, Section 9 of the United States Constitution provides that "[n]o Bill of Attainder

or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. "[T]he draftsmen of the

Constitution sought to prohibit the ancient practice of the Parliament in England of punishing

without trial 'specifically designated persons or ground.'" Selective Serv. Sys. v. Minnesota Pub.

Int. Rsch. Grp., 468 U.S. 841, 847 (1984) (citation omitted). The Bill of Attainder Clause thus

prohibits Congress from enacting a law that "legislatively determines guilt and inflicts

punishment" on an identifiable party without a judicial trial. Nixon v. Adm'r of Gen. Servs., 433

U.S. 433 U.S. 425, 468 (1977). The Supreme Court has explained:

> [T]he Bill of Attainder Clause was intended not as a narrow, technical (and
> therefore soon to be outmoded) prohibition, but rather as an implementation of the
> separation of powers, a general safeguard against legislative exercise of the judicial
> function, or more simply—trial by legislature.

United States v. Brown, 381 U.S. 437, 442, (1965). Accordingly, the Clause is "not to be given a

narrow historical reading," but instead must "be read in light of the evil the Framers had sought

to bar: legislative punishment, of any form or severity, of specifically designated persons or

groups." Id. at 447.

    1.   Specification

A bill of attainder must name the affected parties or apply "to easily ascertainable

members of a group[.]" United States v. Lovett, 328 U.S. 303, 315 (1946). The scope of the class

designated by a law does not determine whether it is a bill of attainder. See Nixon, 433 U.S. at

472 (explaining law that specified only individual to whom it applied "[did] not automatically

offend the Bill of Attainder Clause"); Brown, 381 U.S. at 449–50 (holding statute prohibiting

members of Communist Party from union employment constituted bill of attainder). A bill of

attainder satisfies the specification prong where it defines the affected class "entirely by irreversible acts committed by them" in the past. See Selective Serv. Sys., 468 U.S. at 848.

Where bills of attainder come in varying forms, four guideposts may be drawn from Supreme Court caselaw to direct the inquiry into whether legislation singles out a person or class within the meaning of the Bill of Attainder Clause. See SeaRiver Mar. Fin. Holdings, Inc. v. Mineta, 309 F.3d 662, 669 (9th Cir. 2002). First, courts "look to whether the statute or provision explicitly names the individual or class, or instead, describes the affected population in terms of general applicability." Id. (citing Selective Serv. Sys., 468 U.S. at 847; Nixon, 433 U.S. at 469–71). The second guidepost, which is "intricately connected with the first, is whether the identity of the individual or class was 'easily ascertainable' when the legislation was passed." Id. (quoting Brown, 381 U.S. at 448–49). Third, a court should "examine whether the legislation defines the individual or class by 'past conduct [that] operates only as a designation of particular persons.'" Id. (quoting Selective Serv. Sys., 468 U.S. at 847). Finally, a court should "review whether the past conduct defining the affected individual or group consists of 'irrevocable acts committed by them.'" Id. (quoting Selective Serv. Sys., 468 U.S. at 848).

The first guidepost does not support specification in this case because Section 71113 does not single out Planned Parenthood Federation or its Members by name. Instead, it defines the affected class using a generally-applicable set of conjunctive criteria.

However, Plaintiffs are likely to establish that Planned Parenthood Federation and its Members were the "easily ascertainable" target of the law when the legislation was passed. This is apparent from the statutory text. As set forth above, the law's conjunctive criteria create a narrow class of entities consisting almost entirely of Planned Parenthood Members. And where Defendants construe the term "affiliates" to apply based on membership in Planned Parenthood

Federation, Defs.' Mem. 28 [Doc. No. 53], Section 71113 targets Planned Parenthood Members who do not provide abortion—and continues to apply to those Members so long as any other Planned Parenthood Member provides abortion. At the same time, Defendants do not suggest that Section 71113 covers any entities that do not provide abortion except Planned Parenthood Members.

The inclusion of two additional entities in Section 71113's scope appears to be no more than collateral damage. The 2017 version of this provision included a $350 million Medicaid reimbursement threshold which, based on their aggregate revenues from Medicaid funding from 2014, captured only Planned Parenthood Members. See H.R. 1628, 115th Cong. § 103 (2017); Custer Decl. ¶ 48 [Doc. No. 5-1]. That threshold was then reduced to $1,000,000, but language aggregating Medicaid reimbursement to "affiliates" remained in place. S. Amend. 267 to H.R. 1628 (2017). Then, in 2025, the reconciliation bill first introduced in the House of Representatives included the same funding threshold. See H.R. 1. The Senate later reduced the $1,000,000 threshold to $800,000. See S. Amend. 2360 to H.R. 1, § 71115 (2025). But where reducing the funding threshold from $350 million to $800,000 resulted in coverage of only two entities not affiliated with Planned Parenthood Federation, the inclusion of those entities does not undercut Plaintiffs' showing that Section 71113's criteria were crafted to target Planned Parenthood Members.

Defendants focus on the third guidepost, contending that Section 71113 is not a bill of attainder because it "applies prospectively and attaches to an activity—providing for elective abortions—in which entities may choose not to engage." Defs.' Mem. 10 [Doc. No. 53]. But Section 71113 only attaches this restriction on providing elective abortions to the targeted entities. In other words, only entities that are nonprofit organizations, that are essential

community providers primarily engaged in family planning services or reproductive services, and which received $800,000 or more in fiscal year 2023—and such entities' affiliates—are prohibited from providing elective abortions under Section 71113. Pub. L. No. 119-21, § 71113(b), 139 Stat. 72, 300-01 (July 4, 2025). Rather than defining the affected entities based on whether they will provide abortion, the law establishes a class of entities and requires only those entities to stop providing abortion—and to disaffiliate with prohibited entities that do—to continue receiving Medicaid reimbursements.

The statute here is also distinguishable from the one at issue in Communist Party of U.S. v. Subversive Activities Control Bd., 367 U.S. 1 (1961), which Defendants cite for support. See Defs.' Mem. 10 [Doc. No. 53]. In Communist Party, the Court explained that "[s]o long as the incidence of legislation is such that the persons who engage in the regulated conduct, be they many or few, can escape regulation merely by altering the course of their own present activities, there can be no complaint of an attainder." 367 U.S. at 88. Under the law at issue, the plaintiff organization could avoid the law's burden—a registration requirement—if at any time it abandoned the activities triggering the requirement. Id. at 87. Therefore, "the application of the registration section [was] made to turn upon continuing contemporaneous fact; its obligations arise only because, and endure only so long as, an organization presently conducts operations of a described character." Id. (emphasis added). Here, as explained above, Section 71113 uses retrospective characteristics—inter alia the receipt of $800,000 in Medicaid reimbursements in 2023—to limit which entities are subject to the no-abortion requirement for receiving future Medicaid reimbursements. And then, if such an entity provides elective abortion as of October 1 (or affiliates with another prohibited entity that does), it is barred by Section 71113 from

receiving Medicaid reimbursements for any services rendered during the entire period that the law is effective. Therefore, the law does not "turn upon continuing contemporaneous fact." Id.

Ultimately, the third guidepost "seeks to determine whether the statute is retrospective, or whether it carries the potential to encompass a larger class than the individual or group allegedly targeted." SeaRiver Mar. Fin. Holdings, 309 F.3d at 670. Here, Congress has defined the outer bounds of the affected class with reference to past conduct. In other words, where Section 71113 limits its application to essential community providers that specialize in family planning and received $800,000 in Medicaid reimbursements in fiscal year 2023, the law will not encompass a larger class than Planned Parenthood Members and the two additional entities currently identified as falling within its scope.

In light of the above, the fourth guidepost bolsters Plaintiffs' contention that the law specifies Planned Parenthood Federation and its Members. "[T]he past conduct defining the affected . . . group[,]" most importantly, receiving $800,000 in Medicaid reimbursements in fiscal year 2023, "consists of 'irrevocable acts . . . .'" Id. at 669 (quoting Selective Serv. Sys., 468 U.S. at 848). Because no Planned Parenthood Member can change the amount of Medicaid reimbursements that they received in the past, no Member can "escape the effect of the legislation"—a prohibition on providing elective abortions—"by correcting the past conduct." Id. at 671. Conditioning the law's effect on surrendering separate activities does not allow a Member to "correct" its past participation in Medicaid, its registration as a non-profit, and its specialization in family planning and reproductive healthcare, which provide the basis for the statute's application. Cf. Selective Serv. Sys., 468 U.S. at 850–51 (concluding law withholding financial assistance from individuals who failed to register for the draft did not satisfy specification element where "a student who wants public assistance [could] correct" past failure

by registering late). Instead, as explained further below, Section 71113 imposes a condition that punishes the entities that Congress has singled out.

In sum, Plaintiffs have demonstrated that they are substantially likely to establish that Planned Parenthood Federation and its Members are the "easily ascertainable" target of Section 71113 where its criteria encompass every Planned Parenthood Member but only two entities not affiliated with Planned Parenthood Federation, and where Congress has set the outer bounds of the affected class based on retrospective criteria.

### 2. Punishment

"The deprivation of any rights, civil or political, previously enjoyed, may be punishment[.]" Cummings v. Missouri, 71 U.S. 277, 320 (1866). A burden imposed by law is not necessarily punishment. Selective Serv. Sys., 468 U.S. at 851. Nor is "the severity of a sanction . . . determinative of its character as punishment." Id. But "legislative intent to encourage compliance with the law does not establish that a statute is merely the legitimate regulation of conduct." Id. And "[p]unishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct." Id. at 851–52. Accordingly, a bill of attainder may also impose punishment conditionally. Cummings, 71 U.S. at 324.

In deciding whether a statute imposes punishment, the Supreme Court has recognized three necessary inquiries: "(1) whether the challenged statute falls within the historical meaning of legislative punishment," i.e. the historical test, "(2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes,'" i.e. the functional test, and "(3) whether the legislative record 'evinces a congressional intent to punish,'" i.e. the motivational test. Selective Serv. Sys., 468 U.S. at 852; see also Foretich v. U.S., 351 F.3d 1198, 1218–26 (D.C. Cir. 2003). Whether a statute inflicts

punishment is ultimately circumstantial, and none of these inquiries are dispositive. See Selective Serv. Sys., 468 U.S. at 852–54.

Section 71113 most plainly deprives a "prohibited entity" of Medicaid funding. But the legislative punishment applied to these specified entities—entities who received $800,000 in Medicaid reimbursements in 2023, are registered as non-profits, provide care to underserved communities, and specialize in family planning and reproductive healthcare, or are affiliated with such entities—is that they alone may not receive Medicaid funding for other services if they perform elective abortion (or are affiliated with an entity that performs elective abortions). The law thus forces these entities—and not any other abortion providers—to choose between continuing to provide elective abortion and continuing to participate in Medicaid programs. And as explained above, where the law applies on the basis of affiliation, it encourages Members to disassociate from Planned Parenthood Federation, which impinges Planned Parenthood Federation's and its Members' associational rights. Therefore, the punishment inquiry must consider the financial, occupational, and constitutional harms that the law imposes.

Section 71113 is consistent with historical notions of punishment. Bills of attainder commonly included as punishment "imprisonment, banishment, and the punitive confiscation of property by the sovereign." Nixon, 433 U.S. at 474 & n.36–38 (collecting examples). Additionally, "barring designated . . . groups from participation in specified employments or vocations" is a historical form of punishment characteristic of bills of attainer. Id. at 474. Plaintiffs argue that section 71113 similarly "prevents Planned Parenthood Members from continuing to serve Medicaid patients." Pls.' Mem. 21 [Doc. No. 5]. The record supports Plaintiffs' contention that Section 71113 will force Planned Parenthood Members to turn away Medicaid patients, and lost revenue from Medicaid programs will force Member health centers to

reduce hours and may cause some health centers to close. Custer Decl. ¶¶ 4, 54–57 [Doc. No. 5-1]; Lee Decl. ¶¶ 40–42 [Doc. No. 5-2]; Ghorbani Decl. ¶¶ 6, 24 [Doc. No. 5-3]; Tosh Decl. ¶¶ 45–48 [Doc. No. 5-4].

Section 71113 on its face does not operate as a categorical exclusion from the Medicaid program, nor does it require any Member to cease operations. But a conditional exclusion can still constitute punishment within the scope of the bill of attainder clause. See Cummings, 71 U.S. at 325 (requiring loyalty oath to become clergy "adjudge[d] the punishment conditionally").

Where Section 71113 conditions a specified group's continued participation in Medicaid on Planned Parenthood Members surrendering certain activities, it fits within a historical category of bills of attainder. See Brown, 381 U.S. at 442 (explaining "some [bills of attainder] left the designated parties a way of escaping the penalty"); see also The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause, 72 Yale L.J. 330, 339–40 (1962) (collecting examples); Gaines v. Buford, 31 Ky. 481, 510 (1833) ("A British act of parliament might declare that if certain individuals or a class of individuals, failed to do a given act by a named day, they should be deemed to be, and treated, as convicted felons or traitors."). Moreover, where Section 71113 requires Planned Parenthood Members to stop providing elective abortions and to stop affiliating with entities that provide abortions to remain eligible for Medicaid reimbursements, and providing elective abortions where legal is part of their mission to "ensure access to sexual and reproductive health care services, including abortion" where it is legal, Custer Decl. ¶ 78 [Doc. No. 5-1], it prevents Planned Parenthood Members from engaging in a core part of their operation.

Turning to the functional inquiry, there is a poor fit between Section 71113 and any non-punitive legislative purpose. Section 71113 excludes few abortion providers from participating in

Medicaid programs and bars Planned Parenthood Members that do not provide abortion from receiving Medicaid funds. Moreover, the law does not reduce Medicaid funding for elective abortion where federal law already bars federal funding of elective abortion. Consequently, the law does little to further its purported non-punitive ends. See Defs.' Mem. 23 [Doc. No. 53]. And Defendants do not contend that Section 71113 reduces government spending, nor could they, where the law merely directs funding away from a small class of recipients and appropriates $1,000,000 to implement this change.

On the other hand, Section 71113 imposes severe burdens on both Planned Parenthood Federation and its Members. Planned Parenthood Members stand to lose over a third of their aggregate revenue because they are barred from receiving Medicaid reimbursements. Custer Decl. ¶ 44 [Doc. No. 5-1]. Further, to the extent a Member can remain eligible for Medicaid reimbursements by disaffiliating from Planned Parenthood Federation, Section 71113 imposes an unconstitutional condition that burdens Planned Parenthood Federation's and its Members' First Amendment rights. See supra Section III.A. And as explained above, where Section 71113 conditions Medicaid funding on Planned Parenthood Members ending their abortion services, it interferes with Members' ability to further their mission.

At bottom, Section 71113 requires each Member to disaffiliate with Planned Parenthood Federation and stop providing abortion to continue participating in Medicaid programs. But because collective advocacy and protecting access to legal abortion are core pieces of Planned Parenthood Federation and its Members' mission, imposing that choice kneecaps the entire organization. In light of the severe burdens on Planned Parenthood Federation and its Members on the one hand, and Section 71113's scant impact on abortion providers other than Planned Parenthood Members, Section 71113 cannot "reasonably . . . be said to further

nonpunitive legislative purposes." <u>Nixon</u>, 433 U.S. at 475; <u>see also</u> <u>Foretich</u>, 351 F.3d at 1222

(explaining "the [statute's] specificity . . . renders the asserted nonpunitive purposes suspect").

Finally, there is ample evidence that Congress intended to punish Planned Parenthood

Federation and its Members. "Courts conduct [the] inquiry" into legislative intent "by reference

to legislative history, the context or timing of the legislation, or specific aspects of the text or

structure of the disputed legislation." <u>Foretich</u>, 351 F.3d at 1225 (citing <u>Selective Serv. Sys.</u>, 468

U.S. at 855 n.15). Starting with the text and structure, Section 71113's conjunctive criteria

substantiate Congress's intent to punish Planned Parenthood Federation and its Members where

the criteria encompass every Planned Parenthood Member and exclude all but two other

Medicaid providers.

Legislative context corroborates Plaintiffs' contention that Congress drafted these criteria

with the intent to punish Planned Parenthood Federation and its Members. Section 71113

followed several explicit attempts to "defund Planned Parenthood" through bills first introduced

in 2023, which were then reintroduced in 2025, each time with substantial support. <u>See</u> <u>supra</u>

Section II.B.  Those bills addressed funding for "Planned Parenthood" as a single entity by

barring funding Planned Parenthood Federation or its "affiliates." <u>See, e.g.</u>, Defund Planned

Parenthood Act, S. 203, 119th Cong. (2025); <u>see also</u> <u>supra</u>, Section II.B. Section 71113 was

similarly drafted to encompass "affiliates" of a "prohibited entity." And where Defendants do not

contend that any entity is covered on the basis of affiliation with an entity providing abortion

other than a Planned Parenthood Member, the language appears intended to implement previous

attempts to defund Planned Parenthood Federation and its Members.

Statements by individual legislators also support the conclusion that Congress's intent

was punitive. "[S]everal isolated statements" are not themselves "unmistakable evidence of

punitive intent." <u>Selective Serv. Sys.</u>, 468 U.S. at 855 n.15 (citation omitted). But "[e]vidence in the legislative history can bolster [that] conclusion, however, where other factors suggest punitiveness." <u>Foretich</u>, 351 F.3d at 1225. And courts may look to statements by individual legislators in bill-of-attainder cases where "where the very nature of the constitutional question requires an inquiry into legislative purpose." <u>United States v. O'Brien</u>, 391 U.S. 367, 384 & n.30 (1968). Here, the legislative record includes a "call for the defunding of Planned Parenthood—Child Abuse, Incorporated" and a corresponding admonition that "[r]econciliation legislation offers an important opportunity to stop funding abortion purveyors like Planned Parenthood." <u>See</u> 171 Cong. Rec. E255 (daily ed. Mar. 27, 2025) (statement of Rep. Christopher H. Smith). While some legislators may view Planned Parenthood Federation and its Members guilty as charged, the purpose of the Bill of Attainder clause is designed to prevent "punishing without trial 'specifically designated persons or groups.'" <u>Selective Serv. Sys.</u>, 468 U.S. at 847 (citation omitted).

In sum, Section 71113's text and structure make Planned Parenthood Federation and its Members the "easily ascertainable" target of the law. <u>See</u> <u>Lovett</u>, 328 U.S. at 315. And in light of the disconnect between the law and its purported ends on the one hand, and the severe burdens it imposes on Planned Parenthood Federation and its Members on the other, Plaintiffs are likely to establish that Congress singled them out with punitive intent. The legislative context bolsters that conclusion. Plaintiffs have thus demonstrated a substantial likelihood of success on their claim that Section 71113 is an unconstitutional bill of attainder.

C.  *Initial and Further Findings: Equal Protection*

Plaintiffs assert that Section 71113 violates the Fifth Amendment's equal protection guarantee by barring Planned Parenthood Members from receiving Medicaid reimbursements

while "leaving virtually all other abortion providers outside its scope." Pls.' Reply 1 [Doc. No. 60]. Plaintiffs argue that Section 71113 is subject to strict scrutiny because it treats Planned Parenthood Members differently than other similarly-situated entities because of their association with Planned Parenthood Federation and each other. Pls.' Mem. 24–25 [Doc. No. 5]. And Plaintiffs argue that the law fails strict scrutiny because it applies based on a combination of conjunctive criteria that almost exclusively affect Planned Parenthood Members, Pls.' Reply 1 [Doc. No. 60], and are unrelated to the goal of reducing abortions. Pls.' Mem. 25 [Doc. No. 5].

Defendants argue that rational basis review applies and that the law effectuates a congressional desire "to reduce abortion and government subsidization of abortions." Defs.' Mem. 23 [Doc. No. 53]. Plaintiffs contend that "[e]ven if rational basis review applied, . . . [Section 71113] is unlawful." Pls.' Mem. 27 [Doc. No. 5].

   1.   Framework

"[T]he Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws." Vance v. Bradley, 440 U.S. 93, 94 n.1 (1979) (collecting cases). Equal protection claims under the Fifth Amendment are subject to the same analysis as 14th Amendment equal protection claims. Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

Equal protection directs "that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); see also Walker v. Exeter Region Co-op. Sch. Dist., 284 F.3d 42, 44 n.2 (1st Cir. 2002) ("[T]he equal protection guaranteed by the Constitution forbids the legislature to select a person, natural or artificial, and impose upon him or it burdens and liabilities which are not cast upon others similarly situated.") (quoting Atchison, Topeka & Santa Fe R.R. Co. v. Matthews, 174 U.S. 96, 104 (1899)). Entities

42

are similarly situated where "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001) (citation omitted).

"The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." Plyler v. Doe, 457 U.S. 202, 216 (1982) (quoting Tigner v. Texas, 310 U.S. 141, 147 (1940)). And a legislature "ha[s] substantial latitude to establish classifications that roughly approximate the nature of the problem perceived[.]" Id. Accordingly, legislative classifications are generally permissible so long as "the classification at issue bears some fair relationship to a legitimate public purpose." Id. "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). "[C]lassifications that . . . impinge upon the exercise of a 'fundamental right'" are "presumptively invidious." Plyler, 457 U.S. at 216–17. Accordingly, laws that impinge on fundamental rights, including "free speech rights, are subject to strict scrutiny and will only be upheld if 'precisely tailored to serve a compelling governmental interest.'" Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 9 n.6 (1st Cir. 2013) (quoting Plyler, 457 U.S. at 217). In such cases, the government bears the burden to demonstrate "that its classification has been precisely tailored to serve a compelling governmental interest." Plyler, 457 U.S. at 216–17.

Under rational basis review, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer v. Evans, 517 U.S. 620, 632 (1996). Although "legislation may impose special burdens upon defined classes in order to

achieve permissible ends[,]" equal protection "does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.'" Rinaldi v. Yeager, 384 U.S. 305, 309 (1966). In other words, equal protection requires "some rationality in the nature of the class singled out." Id. at 308–09. And "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to [equal protection]." Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 37–38 (1928).

2.  Discussion

Section 71113 bars a narrow class of healthcare providers from receiving Medicaid funding. As relevant here, Section 71113 denies Medicaid reimbursements to non-profit health care providers that are "essential community provider[s] . . . primarily engaged in family planning services, reproductive health, and related medical care"[15] and provide abortion. See Pub. L. No. 119-21, § 71113(b)(1)(A), 139 Stat. 72, 300 (July 4, 2025). Additionally, a Planned Parenthood Member that provides abortion services but did not receive more than $800,000 in Medicaid funding in fiscal year 2023 may be precluded from receiving Medicaid funding as an "affiliate" of another Member that provides abortion services that meets the funding threshold.

These conjunctive criteria capture a small subset of abortion providers while leaving many others untouched. For-profit abortion providers may still receive Medicaid reimbursements

---

[15] An "essential community provider" is

 a provider that serves predominantly low-income, medically underserved individuals . . . ; or a State-owned family planning service site, or governmental family planning service site, or not-for-profit family planning service site that does not receive Federal funding under special programs, including under Title X of the PHS Act, or an Indian health care provider . . . .

45 C.F.R. § 156.235(c).

for covered non-abortion services. Entities that provide abortions but are not "essential community providers" because they do not primarily serve predominantly low-income, medically underserved individuals may still engage in family planning services without losing Medicaid funding. Entities that provide abortions, are "essential community providers," but are not primarily engaged in family planning services, such as community health centers and federally qualified health centers, see Brindis Decl. ¶ 20 [Doc. No. 5-5], may also still receive Medicaid payments for their non-abortion services. And Section 71113 does not cover any abortion provider that did not receive more than $800,000 in Medicaid funding in fiscal year 2023 that is not an "affiliate" of an entity that meets the definition of "prohibited entity." On the record before the court, Section 71113 applies to 46 abortion providers: 37 Planned Parenthood Members that meet all of the "prohibited entity" criteria, 7 Planned Parenthood Members who provide abortion but received less than $800,000 in Medicaid reimbursements in fiscal year 2023 but may be considered "affiliated" with Planned Parenthood Members, see Custer Decl. ¶ 63 [Doc. No. 5-1], and two non-Planned Parenthood entities, see Snyder Decl. ¶ 6 [Doc. No. 53-2].

And where Section 71113 classifies on the basis of affiliation, it impinges on Planned Parenthood Federation's and each Member's right of association. Because Section 71113 applies to affiliates of an entity that provide abortion, no Member can escape the law's burden simply by ending its own abortion services. Instead, a Member must also disaffiliate from any Member that continues to provide abortion, which requires disassociating from Planned Parenthood Federation. As explained above, conditioning Medicaid reimbursements on disassociating from Planned Parenthood Federation burdens the right of association. Because Section 71113 impinges on a fundamental right, it is subject to strict scrutiny. See Rocket Learning, 715 F.3d at 9 n.6.

Defendants argue first that this classification is constitutionally permissible because Congress is "free to decline to provide taxpayer funds to entities that provide abortions." Defs.' Mem. 21 [Doc. No. 53]; see also id. at 14 ("Congress may make a policy choice not to contract with abortion providers even for covered medical care"). But Section 71113 is not "precisely tailored" toward denying taxpayer funds from abortion providers where Defendants do not dispute that the conjunctive criteria leave "virtually all abortion providers who participate in Medicaid—other than Planned Parenthood Members—unaffected" by the legislation. Pls.' Mem. 25 [Doc. No. 5] (emphasis in original).

Defendants argue further that Congress was free to focus on providers that are "primarily engaged in family planning services, reproductive health, and related medical care" because "they are likely to perform a higher proportion of abortions," and was free to distinguish between for-profit providers and non-profit providers because the non-profits already receive "an implicit government subsidy (in the form of tax-exempt status)[.]" Defs.' Mem. 22 [Doc. No. 53]. But Defendants do not explain how excluding providers of family planning services, reproductive healthcare, and related medical care that are not "essential community providers" because they do not serve predominantly low-income or medically underserved individuals relates to Congress's goal of reducing abortion. Nor do Defendants explain how denying Medicaid reimbursements from entities that already have "the benefit of a tax-exempt status" furthers that end.

Defendants also assert that Congress was free to address providers that specialize in family planning and received more than $800,000 in Medicaid funding in fiscal year 2023 because "[l]arger providers carry out more abortions and receive more government subsidies, so they are a natural first target." Id. at 22. But Defendants offer no basis for treating Planned

Parenthood Members who provide abortion but received less than $800,000 in Medicaid reimbursement, such as Planned Parenthood Utah, differently than other abortion providers who received less than $800,000 and are not Planned Parenthood Members. Congress sought to treat Planned Parenthood Federation and its Members as a single legal entity. See id. at 1 ("[T]he bill stops federal subsidies for Big Abortion."). But the record before the court establishes each Planned Parenthood Member is an independent organization. See Custer Decl. ¶ 9 [Doc. No. 5-1]. Consequently, restricting Medicaid reimbursements for them on the basis of affiliation creates the First Amendment problem described above.

At bottom, Defendants seek to justify each of Section 71113's criteria in isolation, but offer no justification for the classification established by the criteria in conjunction. Defendants argue that this classification is constitutionally permissible because Congress is "free to decline to provide taxpayer funds to entities that provide abortions." Defs.' Mem. 21 [Doc. No. 53]; see also id. at 14 ("Congress may make a policy choice not to contract with abortion providers even for covered medical care."). But Section 71113 does more: It declines Medicaid reimbursements on the basis of affiliation, and thus draws a classification that burdens a fundamental First Amendment right. Where Defendants have not shown the law is precisely tailored to serve a compelling governmental interest, Plaintiffs have demonstrated a substantial likelihood of success on their equal protection claim.

Moreover, Plaintiffs are likely to show that there is no rational relationship between the class burdened by Section 71113—comprised of 47 Planned Parenthood Members and two additional entities—and the goal of reducing abortion. As explained above, Section 71113 affects only a small number of abortion providers and leaves every other conceivable category unaffected. Defendants contend that Congress was free to focus on providers that are "primarily

engaged in family planning services, reproductive health, and related medical care" because "they are likely to perform a higher proportion of abortions." Defs.' Mem. 22 [Doc. No. 53]. But it is unclear how including only entities that are non-profits and provide medical services in underserved communities is in any way related to reducing abortion. Nor is it clear how withholding Medicaid reimbursements from Planned Parenthood Members who do not provide abortion furthers that end.

Defendants also suggest that Congress was free to focus on "Big Abortion." But the Member healthcare providers that are defunded by Section 71113 are separate legal entities. And as explained above, singling them out for exclusion from Medicaid on the basis of their affiliation with each other runs afoul of the First Amendment and the Bill of Attainder Clause.

Moreover, there is a substantial likelihood that Plaintiffs will establish that Section 71113 serves no legitimate fiscal purpose. The law includes a $1,000,000 appropriation for implementation, but it does not increase or decrease funding for Medicaid programs. See Pub. L. No. 119-21, § 71113(c), 139 Stat. 72, 300-01 (July 4, 2025). Instead, it directs Medicaid reimbursements away from 49 entities, nearly all of which are Planned Parenthood Members, and some of which do not provide abortions. Although Congress has significant latitude in allocating funds "from a finite pool of resources," Congress cannot pursue fiscal objectives "by discriminating against individuals or groups." See Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 485 U.S. 360, 373 (1988). Here, Section 71113 in effect makes only one change to Medicaid programs: It excludes Planned Parenthood Members (and two other entities) from participation. But discriminatory exclusion is not a permissible means to accomplish fiscal objectives, nor is it a permissible legislative end. See id.; cf. Romer,

517 U.S. at 632 (holding law failed rational basis review where scope of law "seem[ed] inexplicable by anything but animus toward the class it affects").

D. *First Amendment Retaliation*

Plaintiffs argue that Section 71113 amounts to retaliation against Planned Parenthood Federation and its Members "for [their] political stances on reproductive health." Pls.' Mem. 28 [Doc. No. 5].

Plaintiffs are likely to succeed in showing that Planned Parenthood Members engage in constitutionally protected expression and expressive association via membership in Planned Parenthood Federation. Planned Parenthood Federation advocates before Congress, provides education and information to Members' patients and the general public about sexual and reproductive health, and through Planned Parenthood Action Fund, communicates with the public regarding lawmakers' voting records, supports campaigns for ballot initiatives, supports candidates for federal, state, and local officials who will support reproductive freedom in furtherance of its mission. Custer Decl. ¶¶ 28, 75 [Doc. No. 5-1]. Members engage in those activities with Planned Parenthood Federation and each other. Id. ¶ 75. And each Member licenses the use of the Planned Parenthood name, which expresses that each Member shares Planned Parenthood Federation's mission. See id. ¶¶ 14–15.

At this stage, however, the court need not reach whether a law enacted by a congressional majority can constitute retaliation for engaging in activity protected by the First Amendment where Plaintiffs have demonstrated that they are likely to succeed in showing that Section 71113 constitutes a Bill of Attainder and denies Planned Parenthood Federation and its Members equal protection of the law.

IV.    **Irreparable Harm**

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005). "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). Further, "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Id. "[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis in original). Moreover, "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (emphasis in original).

Plaintiffs correctly note, and Defendants do not contest, that injury to Planned Parenthood Federation's and Planned Parenthood Members' First Amendment rights constitutes irreparable harm to Plaintiffs sufficient to support the issuance of injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Mahmoud v. Taylor, 606 U.S. __, 2025 WL 1773627, at *24 (U.S. June 27, 2025) (quoting Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020) (per curiam)); see also Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 15 (1st Cir. 2012) (explaining "[t]here is no need for an extensive analysis of" irreparable harm where "plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim.").

It is no answer that Planned Parenthood Federation and its Members remain "free . . . to collaborate for the purpose of advocacy." Defs.' Mem. 33 [Doc. No. 53]. As explained above, membership in Planned Parenthood Federation constitutes expressive association. Where Section 71113 encourages Members to give up their membership to avoid affiliation with a "prohibited entity," it injures Members' First Amendment right to engage in collective advocacy. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 908 (1982) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.") (quoting NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460 (1958)).

Where Section 71113 encourages Non-qualifying Planned Parenthood Members to disassociate from Planned Parenthood Federation, it also causes Planned Parenthood Federation to suffer First Amendment injury. A membership organization suffers injury from government action that has the effect of discouraging or reducing membership in that organization. Cf. NAACP, 357 U.S. at 459–60. Such action "is likely to affect adversely the ability of [the organization] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it . . . ." Id. at 462–63. Section 71113 encourages Non-qualifying Members to give up their membership in Planned Parenthood Federation to avoid losing Medicaid funding on the basis of affiliation. Discouraging membership in Planned Parenthood Federation impairs its ability to engage in advocacy, particularly where Members not only pay dues, but participate in advocacy alongside Planned Parenthood Federation. Custer Decl. ¶¶ 10, 19 [Doc. No. 5-1]. In other words, a statute that discourages membership in Planned Parenthood Federation has the effect of weakening its message. Consequently, Section 71113 causes irreparable harm to Planned Parenthood Federation in addition to its Members. In sum,

where Section 71113 burdens Non-qualifying Members' affiliation with other Planned Parenthood Members, it diminishes Planned Parenthood Federation's and those Members' associational expression and causes First Amendment injury. Moreover, where Section 71113 forces only Planned Parenthood Members to decide whether stop performing elective abortions and and stop affiliating with entities that perform elective abortions to remain eligible for Medicaid reimbursements, the law injures constitutional rights protected by the Bill of Attainder clause, equal protection principles, and the First Amendment.

Additionally, Plaintiffs have shown that the disruption to patient care described above risks irreparable harm to Planned Parenthood Federation and its Members. Actions that make it more difficult for an organization to accomplish its primary mission constitute irreparable harm. See Victim Rts. L. Ctr. v. United States Dep't of Educ., __ F. Supp. 3d __, 2025 WL 1704311, at *18 (D. Mass. June 18, 2025). Where Section 71113 has and will continue to force Member health centers to cancel appointments for Medicaid patients and reduce hours and staffing, it interferes with Planned Parenthood Federation and its Members' mission to ensure that "people can receive high-quality, inclusive, and comprehensive sexual and reproductive healthcare" "regardless of income[.]" Custer Decl. ¶ 12 [Doc. No. 5-1]. Relatedly, Planned Parenthood Members' inability to provide timely or comprehensive patient care is likely to damage the public perception that Planned Parenthood Members "stand[] for certain values and provide[] high-quality health care . . . ." Id. ¶ 15. And "[b]ecause injuries to goodwill and reputation are not easily quantifiable, courts often find this type of harm irreparable." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000).

In sum, injunctive relief is necessary to prevent Planned Parenthood Federation and its Members from suffering irreparable injury.

V.    **Balance of Hardships and the Public Interest**

The balance of hardships and public interest factors merge when the government is the opposing party. Nken v. Holder, 556 U.S. 418, 435 (2009) (factors merge in stay context); accord Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (factors merge in preliminary injunction context). Plaintiffs argue that those factors favor preliminary injunctive relief because the public health consequences of Section 71113 will be dire. Pls.' Mem. 44 [Doc. No. 5]. Defendants contend that "Plaintiffs' proposed injunction threatens significant and irreparable harm to the Government and public" where it prevents implementation of "Congress['s] judgment about which entities it wishes to benefit from public funds." Defs.' Mem. 42 [Doc. No. 53].

There is a significant public interest in the implementation of duly enacted statutes. Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo, 18 F.4th 38, 47 (1st Cir. 2021) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (alterations in original). Here, however, any injury is minimal. Section 71113 was enacted as part of budget reconciliation legislation. See generally Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025). But Section 71113 itself has a negligible impact on the federal budget. It does not limit Medicaid funding and it includes an appropriation of $1,000,000 to support implementation. Id. § 71113(c). Nor does not increase or decrease funding for Medicaid programs. And the court's order here does not require the government to expend funds for services other than those the government has approved. Further, the court's order does not bear on legitimate policy choices that are within the province of Congress, including whether Medicaid funding may be used for abortion or even whether abortion should be discouraged. Instead, the court's order only enjoins

the statute's targeted exclusion of a disfavored group of entities from receiving Medicaid funding that has already been appropriated.

Moreover, when social policy burdens the exercise of First Amendment rights, the public interest in protecting those rights may outweigh the public interest in allowing such policy to take effect. See Roman Cath. Diocese of Brooklyn, 592 U.S. 14, 19–20 (2020) (concluding injunctive relief was warranted where coronavirus mitigation restrictions "str[uck] at the very heart of the First Amendment's guarantee of religious liberty."). And in general, there is no public interest in the perpetuation of unlawful government action. See Somerville Pub. Sch. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025). For this reason, there is a public interest in Congress's judgment "about which entities it wishes to benefit from public funds," only so long as that judgment does not violate the constitution.

Where Plaintiffs have demonstrated a substantial likelihood of success on constitutional claims premised on impingement of First Amendment associational rights, singling out Planned Parenthood Federation and its Members for legislative punishment, and denial of equal protection, injunctive relief is in the public interest. See Roman Cath. Diocese of Brooklyn, 592 U.S. at 19–20.

Additionally, as Defendants point out, the disruption in patient care and corresponding adverse health outcomes caused by Section 71113 are properly considered in evaluating the effect of preliminary injunctive relief on the public interest, see Defs.' Mem. 39 [Doc. No. 53]; Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 77 (1st Cir. 2005) (concluding district court appropriately found injunctive relief was in public interest where "any shut down of [FQHC health center] would adversely affect hundreds of Medicaid patients"), and those harms weigh in favor of injunctive relief. Plaintiffs' have demonstrated that before this case may be

litigated through judgment, services will be cut and many Member health centers will be forced to close if no injunction enters. See Custer Decl. ¶¶ 4, 54-57, 78 [Doc. No. 5-1]; Lee Decl. ¶¶ 40-42 [Doc. No. 5-2]; Ghorbani Decl. ¶¶ 6, 24 [Doc. No. 5-3]; Tosh Decl. ¶¶ 45-48 [Doc. No. 5-4]. Some of those health centers may never be able to reopen. See Tosh Decl. ¶ 46 [Doc. No. 5-4]. This is particularly antithetical to the public interest, where, by Section 71113(b)(1)(A)(ii)'s own definition, the entities impacted by the legislation "serve[] predominantly low-income, medically underserved individuals." See 45 C.F.R. § 156.235(c).

A preliminary injunction maintains Planned Parenthood Members' ability to seek Medicaid reimbursements—and maintain their status quo level of service to patients. And an injunction requiring Defendants to continue funding Medicaid reimbursements in accordance with the status quo imposes no additional Medicaid costs on Defendants, where there is no dispute that Medicaid funds will still be provided only for reimbursable healthcare services.

## VI.    Bond

In accordance with the court's Amended Temporary Restraining Order [Doc. No. 46], Plaintiffs posted a nominal bond of $100. See Notice [Doc. No. 55]. Defendants argue that the court should further impose a bond in an amount "based on Planned Parenthood's estimates of the amount of Medicaid reimbursements its members receive each month." Defs.' Mem. 43 [Doc. No. 53].

Federal Rule of Civil Procedure 65(c) provides in relevant part: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The First Circuit has noted the "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a

district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991).

Here, in determining the amount of security, the court considers the costs and damages that Defendants would sustain if they were wrongfully enjoined. Defendants do not contend that Medicaid will have to reimburse more services because of the injunction but only that the reimbursement will be to disfavored providers rather than other providers. Accordingly, any harm that Defendants would sustain is not a monetary harm.

Additionally, the court finds that the constitutional harm to Members and the health consequences Medicaid patients who forego or cannot obtain care may suffer without a preliminary injunction outweigh any financial harm that Defendants might incur if they are wrongly enjoined.

Where Plaintiffs have already posted nominal bond under the court's Amended Temporary Restraining Order [Doc. No. 46], the court finds no additional bond necessary while a preliminary injunction is in place.

## VII.    Stay Pending Appeal

Defendants request that any injunctive relief be stayed pending appeal. Defs.' Mem. 44 [Doc. No. 53]. A district court may stay injunctive relief while an appeal is pending. Fed. R. Civ. P. 62(d). "A stay is not a matter of right, even if irreparable injury might otherwise result." Nken, 556 U.S. at 433 (2009) (citation omitted).

In determining whether to stay an order pending appeal, courts consider

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Id. at 426. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 433–34. "The first two factors . . . are the most critical. It is not enough that the [applicant's] chance of success on the merits be 'better than negligible.'" Id. at 434 (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999)).

Defendants have not shown that a stay should issue. Above, the court has concluded that Plaintiffs have shown a substantial likelihood of success on their First Amendment, Bill of Attainder and Equal Protection claims. Accordingly, Defendants have not made a strong showing that they are likely to prevail on appeal.

The court has also concluded that enjoining enforcement of Section 71113 will risk minimal harm to Defendants. Further, staying the preliminary injunction burdens Plaintiffs and Planned Parenthood Members with an immediate choice between exercising their associational rights and maintaining eligibility for Medicaid reimbursements. A stay should not issue where it would leave Plaintiffs unprotected from First Amendment injury. See Murthy v. Missouri, 601 U.S. __, 144 S. Ct. 7, 9 (2023) (Alito, J., dissenting) (disagreeing with stay of preliminary injunction where stay "allows the defendants to persist in committing . . . First Amendment violations . . . ."). And in light of the First Amendment injury, the likely unconstitutional bill of attainder and violation of the equal protection clause, and harm to patient care that will occur absent an injunction, the public interest does not favor staying relief.

## VIII.   Conclusion

For the foregoing reasons, Plaintiffs' Emergency Motion for a Preliminary Injunction [Doc. No. 4] is GRANTED.

It is hereby ORDERED that:

1.      Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants are hereby enjoined from enforcing, retroactively

enforcing, or otherwise applying the provisions of Section 71113 of "An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14," against Planned Parenthood Association of Utah, Planned Parenthood League of Massachusetts, and all other members of Planned Parenthood Federation of America, Inc.;

2.      Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants shall take all steps necessary to ensure that Medicaid funding continues to be disbursed in the customary manner and timeframes to Planned Parenthood Association of Utah, Planned Parenthood League of Massachusetts, and all other Members of Planned Parenthood Federation of America, Inc.;

3.      Defendants shall provide a copy of this Order to all personnel within the Department of Health and Human Services and all state agencies involved with the disbursement of Medicaid funding; and

4.      Plaintiffs' nominal $100 bond posted with the court on July 15, 2025, will continue to be held by the court as the bond in this matter.

IT IS SO ORDERED.

July 28, 2025                                 /s/Indira Talwani_____
                                             United States District Judge